**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email:   jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS*
*AG, London Branch*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

------------------------------------------------------------x
*In re*                                                 :    Chapter 11
                                                        :
HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]   :    Case No. 19-34054-sgj11
                                                        :
                        Debtor.                         :
------------------------------------------------------------x

## UBS'S BRIEF IN SUPPORT OF MOTION FOR
## TEMPORARY ALLOWANCE OF CLAIMS FOR VOTING PURPOSES
## PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 3018

---

[1]      The last four digits of Debtor's taxpayer identification number are 6725.  The headquarters and service
address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND .....................................................................................................................3

    I.    THE CHAPTER 11 CASE ....................................................................................3

    II.    THE STATE COURT ACTION............................................................................4

    III.    THE UBS CLAIMS...............................................................................................11

JURISDICTION AND VENUE ............................................................................................13

RELIEF REQUESTED.........................................................................................................14

LEGAL STANDARD............................................................................................................14

ARGUMENT.........................................................................................................................16

    I.    UBS'S CLAIM FOR BREACH OF THE IMPLIED DUTY OF GOOD
             FAITH AND FAIR DEALING SHOULD BE TEMPORARILY
             ALLOWED...........................................................................................................17

    II.    UBS'S FRAUDULENT CONVEYANCE CLAIM SHOULD BE
             TEMPORARILY ALLOWED ............................................................................20

    III.    THE UBS CLAIMS SHOULD BE TEMPORARILY ALLOWED FOR
             VOTING PURPOSES IN THE AMOUNT OF $543 MILLION.........................24

RESERVATION OF RIGHTS ..............................................................................................25

NOTICE AND PRIOR REQUEST .......................................................................................26

CONCLUSION......................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ally Bank v. Reimer*,
   No. CV-09-2795, 2010 WL 446025 (E.D.N.Y. Jan. 29, 2010) ..............................................22

*In re Am. Solar King Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988) .....................................................................................15

*In re Amarex Inc.*,
   61 B.R. 301 (Bankr. W.D. Okla. 1985) ..............................................................15, 17, 20, 24

*In re Armstrong*,
   294 B.R. 344 (B.A.P. 10th Cir. 2003), *aff'd,* 97 F. App'x 285 (10th Cir. 2004)............. *passim*

*Bittner v. Borne Chem. Co.*,
   691 F.2d 134 (3d Cir. 1982)......................................................................................................15

*In re Brints Cotton Mktg., Inc.*,
   737 F.2d 1338 (5th Cir. 1984) ..................................................................................................15

*In re Century Glove, Inc.*,
   88 B.R. 45 (Bankr. D. Del. 1988) .....................................................................................14, 15

*CIT Grp./Comm. Servs., Inc. v. 160-09 Jamaica Ave. Ltd. P'ship*,
   808 N.Y.S.2d 187 (N.Y. App. Div. 2006) ...............................................................................23

*In re Dreier LLP*,
   462 B.R. 474 (Bankr. S.D.N.Y. 2011) .....................................................................................21

*EAC of N.Y., Inc. v. Capri 400, Inc.*,
   853 N.Y.S.2d 419 (N.Y. App. Div. 2008) ...............................................................................20

*Farm Stores, Inc. v. School Feeding Corp.*,
   102 A.D.2d 249 (2d Dep't 1984), *aff'd in part*, 64 N.Y.2d 1065 (1985) ...............................21

*In re Frascella Enterprises, Inc.*,
   360 B.R. 435 (Bankr. E.D. Pa. 2007) .................................................................14, 15, 16, 23

*In re FRG, Inc.*,
   121 B.R. 451 (Bankr. E.D. Pa. 1990) ......................................................................................14

*Gard Entm't, Inc. v. Block*,
   No. 102399/2012, 2012 WL 3764525 (N.Y. Sup. Ct. Aug. 21, 2012)....................................23

*Gardner v. New Jersey*,
   329 U.S. 565 (1947)...................................................................................................15

*HYMF, Inc. v. Highland Capital Mgmt., L.P.*,
   No. 601027/09, 2012 N.Y. Misc. LEXIS 1424 (N.Y. Sup. Ct. Mar. 23, 2012) .....................17

*In re Kovler*,
   253 B.R. 592 (S.D.N.Y. 2000).....................................................................................24

*In re Mangia Pizza Invs., LP*,
   480 B.R. 669 (Bankr. W.D. Tex. 2012) ........................................................................14

*In re Pac. Sunwear of Cal., Inc.*,
   No. 16-br-10882, 2016 WL 4250681 (Bankr. D. Del. Aug. 8, 2016) .....................................15

*Schoenberg v. Shoenberg*,
   449 N.Y.S.2d 137 (N.Y. Sup. Ct. 2010) ........................................................................24

*UBS Sec. LLC v. Highland Capital Mgmt., L.P.*,
   72 N.Y.S.3d 72 (N.Y. App. Div. 2018) ........................................................................16

*UBS Sec. LLC v. Highland Capital Mgmt., L.P.*,
   86 A.D.3d 469 (N.Y. App. Div. 2011) .......................................................................1, 7

*UBS Sec. LLC v. Highland Capital Mgmt., L.P.*,
   No. 650097/09, 2017 WL 1103879 (N.Y. Sup. Ct. Mar. 13, 2017) ...............................16, 23

*UBS Sec. LLC v. Highland Capital Mgmt., L.P.*,
   No. 650097/2009, 2017 WL 4460668 (N.Y. Sup. Ct. Sept. 20, 2017)...................................16

## STATUTES

11 U.S.C. § 502(a) ...................................................................................................14

11 U.S.C. § 1126........................................................................................................14

N.Y. Debt. & Cred. Law § 272 ....................................................................................20

N.Y. Debt. & Cred. Law § 273 ....................................................................................20

N.Y. Debt. & Cred. Law § 274 ....................................................................................20

N.Y. Debt. & Cred. Law § 275 ....................................................................................20

## OTHER AUTHORITIES

Fed. R. Bankr. P. 3001(f)...........................................................................................15

Fed. R. Bankr. P. 3018(a) ......................................................................................3, 14

N.Y. CPLR § 5004..................................................................................................................20, 24

UBS Securities LLC and UBS AG, London Branch (together "**UBS**"), by and through their undersigned counsel, submit this *Brief* (the "**Brief**") *in Support of Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* (the "**3018 Motion**") to request entry of an order temporarily allowing UBS's claims against the Debtor as set forth in *Proof of Claim No. 190* and *Proof of Claim No. 191* filed by UBS Securities LLC and UBS AG, London Branch, respectively, (the "**UBS Claims**")[2] in the amount of $543,620,736.03 for the purpose of voting to accept or reject the Second Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1287] (as may be amended or modified, the "**Plan**").[3]  In support of this request, UBS states as follows:

## PRELIMINARY STATEMENT

1.      UBS, like many of Highland Capital Management, L.P.'s (the "**Debtor**") other creditors, was defrauded by the Debtor and its principal, James Dondero ("**Dondero**").  While UBS endeavored to transact with the Debtor and two of its affiliates in an ordinary course business transaction, as UBS has with a multitude of other entities over the years, it unfortunately was not clear to UBS until much later that the Highland entities never had any intention of holding up their end of the bargain.  When it became clear to the Debtor and its affiliates that the deal they had struck with UBS would cost the entities millions of dollars as the result of a significant dip in the

---

[2]      Capitalized terms used herein, but not defined have the meanings ascribed to such terms in the UBS Claims.

[3]      Although UBS Securities LLC and UBS AG, London Branch have each filed claims against the Debtor, the claims relate to the same causes of action for breach of the implied covenant of good faith and fair dealing and fraudulent conveyance.  And, although those claims are disputed, UBS believes that its claims are properly valued at the amounts stated in the UBS Claims, but for logistical purposes and solely with respect to the Motion, UBS seeks an order temporarily allowing such claims for voting purposes in the amount of at least $543,620,736.03, as calculated herein, which does not account for, among other things, punitive damages, attorneys' fees, and additional damages based on information that UBS has sought from the Debtor but has not yet been provided as of this date.  UBS would be amenable to the Court, in the interest of administrative convenience, granting temporary allowance for voting purposes of only one of the UBS Claims in the aggregate amount of $543,620,736.03 or both of the UBS Claims, each in the amount of $271,810,368.01.  For the avoidance of doubt, however, each of UBS Securities LLC and UBS AG, London Branch reserve the right to recover the full amount of their claims against the Debtor.

value of the Knox Assets (as defined below), they hastily moved money and assets around the Highland web in a concerted and deliberate effort to prevent UBS from recovering the money owed to it under the Warehouse Agreements (as defined below)—hundreds of millions of dollars that the New York State Court has since ruled UBS was clearly entitled to receive.

2.        By filing the UBS Claims, UBS seeks to recover from the Debtor for its role in orchestrating the fraudulent transfer of millions of dollar (among multiple other tactics) in a one-sided game of keep away from UBS, in blatant disregard of the Debtor's implied duty of good faith and fair dealing.  Numerous courts, including this one, have already recognized the Highland entities were rife with fraud and deceit.  It should be no surprise to anyone that the Highland entities also defrauded UBS.  Notably, in the Debtor's recent summary judgment motion, it does not contend that it is entitled to summary judgment on the merits of UBS's fraudulent conveyance or implied duty claims; rather, it only seeks to improperly limit the scope of the damages UBS is entitled to.  For the reasons set forth in *UBS's Brief in Opposition to Motions for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 and in Support of Rule 56(d) Request* [Docket No. 1341] (the "**UBS Summary Judgment Opposition**"), filed concurrently herewith, the Debtor is not entitled to summary judgment on any portion of the UBS Claims, which were ready to proceed to trial in the State Court Action (as defined below) when the Debtor filed this Chapter 11 Case.

3.        In addition to filing its summary judgment motion, the Debtor also filed objections to the UBS Claims.  Pursuant to the *Debtor's Motion for Entry of an Order (A) Approving the Adequacy of the Disclosure Statement; (B) Scheduling a Hearing to Confirm the First Amended Plan of Reorganization; (C) Establishing Deadline for Filing Objections to Confirmation of Plan; (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; and (E) Approving*

2

*Form and Manner of Notice* [Docket No. 1108] (the "**Solicitation Procedures Motion**"), seeking approval of procedures for the solicitation of votes to accept or reject the Plan (the "**Solicitation Procedures**"), the pending objections to the UBS Claims (which will not be resolved before the deadline to vote to accept or reject the Plan) would disenfranchise UBS by preventing UBS from having the ability to vote on the Plan. UBS's vote could have a significant impact on this Chapter 11 Case, the Plan, the timing of distributions, and the expected recovery of other general unsecured creditors, even if UBS's claims are reduced in connection with the pending motions for summary judgment.

4.      Federal Rule of Bankruptcy Procedure 3018(a), which permits the temporary allowance of claims for voting purposes, was designed to give all creditors, even those holding disputed claims, an opportunity to vote on a plan. This Court has broad authority to determine whether to allow UBS's Claims for purposes of voting. As set forth below, UBS must only present sufficient evidence that it has a colorable claim capable of temporary evaluation, a bar that UBS clears by a wide mark. For all of the reasons set forth below, the UBS Claims should be temporarily allowed in the amount of $543,620,736.03 so that UBS is not further disenfranchised by the Debtor by being denied the ability to cast a vote on the Debtor's Plan.

### BACKGROUND[4]

### I.      THE CHAPTER 11 CASE

5.      The Debtor in the above captioned chapter 11 proceeding (the "**Chapter 11 Case**") filed for bankruptcy protection on October 16, 2019 (the "**Petition Date**"), in the Bankruptcy Court

---

[4]      For the sake of brevity and to avoid burdening the Court, UBS provides here an abbreviated description of the background underlying the UBS Claims. The background is described in more detail in the UBS Summary Judgment Opposition, filed concurrently herewith and incorporated herein by reference.

for the District of Delaware.  The Chapter 11 Case was then transferred to the Bankruptcy Court

for the Northern District of Texas.

6.      On March 2, 2020, the Court entered the *Order (I) Establishing Bar Dates for*

*Filing Claims and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 488],

establishing the deadline for parties to file proofs of claim related to prepetition claims against the

Debtor as April 8, 2020 at 5:00 p.m. Central Time.  On March 22, 2020, the Debtor and UBS

entered into a joint stipulation [Docket No. 547] extending the deadline for UBS to file its proof

of claim until the later of June 22, 2020 at 5:00 p.m. Central Time or five business days after the

Court entered an order on a motion by UBS to lift the automatic stay.  On May 20, 2020, UBS

filed *UBS's Motion for Relief From the Automatic Stay to Proceed With State Court Action*

[Docket No. 644] (the "**Stay Motion**") seeking to avoid potential forfeiture of UBS's rights to a

jury trial due to the filing of a proof of claim.

7.      On June 19, 2020, the Court entered an order denying the relief sought by UBS in

the Stay Motion and ordering UBS to file any proofs of claim against the Debtor by no later than

June 26, 2020 [Docket No. 765].  On June 26, 2020, UBS timely filed two substantially identical

proofs of claim—Claim No. 190 by UBS Securities, LLC, and Claim No. 191 by UBS AG, London

Branch.

## II.     THE STATE COURT ACTION

8.      The UBS Claims stem from a New York state court litigation that has been pending

for over a decade (the "**State Court Action**").  UBS's claims against the Debtor arise out of a

failed securitization transaction (the "**Knox Transaction**") involving the Debtor and two of the

Debtor's affiliates, Highland CDO Opportunity Master Fund, L.P. ("**CDO Fund**") and Highland

Special Opportunities Holding Company ("**SOHC**") (together with CDO Fund, the "**Fund**

**Counterparties**").

9.    The Knox Transaction was formalized in three contracts: the Engagement Letter between UBS and the Debtor (the "**Engagement Letter**"); the Cash Warehouse Agreement among UBS, the Debtor, and the Fund Counterparties; and the Synthetic Warehouse Agreement among UBS, the Debtor, and the Fund Counterparties (collectively, the "**Warehouse Agreements**").  *See*, Engagement Letter [UBSAG313]; Cash Warehouse Agreement ("**CWA**") [UBSAG334]; Synthetic Warehouse Agreement ("**SWA**") [UBSAG367].  The Debtor agreed to be the "Servicer" of the Knox Transaction, meaning it was responsible for identifying the assets to be warehoused (the "**Knox Assets**") and then supervising and directing the process to securitization.  The reason was simple:  If the parties were able to successfully securitize the Knox Assets, and sell the resulting newly-formed securities to third-party investors, the Debtor stood to make a fortune in asset management fees.  *See*, Engagement Ltr. § 3(b) (entitling HCM, as Servicer, to management and incentive fees) [UBSAG317-18]; Trial Tr. 93:16-94:6, 95:3-13 (Grimaldi) (explaining that because it bore the risk, "Highland had a far greater upside" than UBS) [UBSAG275].  UBS, in turn, agreed to finance the acquisition of the Knox Assets identified by the Debtor—assets with a total notional value of $818 million.  *See* SWA [UBSAG368-82].

10.    Under the Warehouse Agreements, UBS obtained certain contractual rights to limit its risk.  UBS did not bear the risk of any losses on the Knox Assets.  Instead, the Fund Counterparties bore 100% of that risk.  *See* SWA § 6(C) [UBSAG375] ("the CDO Fund and SOHC shall collectively be responsible for 100% of any such CDS Losses"); Engagement Letter § 3(c) [UBSAG318]; *see also* CWA § 5(A) [UBSAG339] (similarly assigning risk to Fund Counterparties).  The Engagement Letter—signed *only by* UBS and the Debtor—specified that "*UBS and Servicer [the Debtor] agree* that the CDO Fund and SOHC will in aggregate bear 100% of the risk."  Engagement Letter § 3(c) [UBSAG318].

5

11.     The parties agreed that if aggregate "mark-to-market" losses on the Knox Assets exceeded $100 million, the Fund Counterparties would post an additional $10 million in collateral "for each increment of U.S. $100,000,000."  SWA § 12(C) [UBSAG380];, Proof of Claim No. 190, Phase I Op. at 4 [UBSAG086].  In late 2008—as the Knox Assets suffered precipitous losses amid the global economic recession—UBS had to exercise this contractual right three times. Despite the Warehouse Agreements specifying that the Fund Counterparties had to post the additional collateral, it was the Debtor that fished $20 million in funds out of other Highland affiliates to cause the Fund Counterparties to meet UBS's first and second margin calls.  *See* LeRoux Aff. ¶¶ 23-26 [UBSAG1092-93]; Braner Dep. 939:8-940:4 (explaining "there were assets that were dividend from HFP Asset Funding 2 to HFP and then those assets were invested in SOHC to meet this collateral call" for both SOHC and CDO Fund) [UBSAG1084].

12.     The Fund Counterparties failed to meet UBS's third margin call in breach of the Warehouse Agreements.  Proof of Claim No. 190, Phase I Op. at 4 [UBSAG086].  UBS thus terminated the Warehouse Agreements in December 2008, at which time the Fund Counterparties owed the full amount of mark-to-market losses on the Knox Assets which had grown to $519,374,149.  *Id* at 17 [UBSAG099].  Indeed, the Debtor's officer who had executed the Warehouse Agreements, Todd Travers, admitted under oath that, "as of the end of the year 2008," the Debtor was aware of the fact that "Highland Financial Partners [("**HFP**")] and CDO Fund collectively owed UBS hundreds of millions of dollars in connection with the Knox Warehouse Agreements." Travers Dep. 261:8-20 [UBSAG1080].

13.     On February 24, 2009, UBS sued the Debtor and the Fund Counterparties in the Supreme Court of the State of New York (the "**State Court**").  2009 Compl. [UBSAG245].  UBS alleged that the Fund Counterparties had breached the Warehouse Agreements and UBS sought

indemnification from the Debtor based on an indemnification provision in the Engagement Letter. 2009 Compl. at 2 [UBSAG247]; Engagement Ltr. at Schedule I (indemnification provision) [UBSAG329]. After the Debtor was dismissed from the case, UBS filed a new complaint against the Debtor on June 28, 2010, asserting claims for fraudulent transfer, breach of the implied covenant of good faith and fair dealing (the "**implied duty**" or "**implied covenant**" claim), fraud, and tortious interference with contractual relations. *See* 2010 Compl. [USAG458-118] (the "**2010 Complaint**"). This case was later consolidated with UBS's 2009 suit, which had been amended to add, among other causes of action, an alter ego theory against HFP—SOHC's parent corporation and alter ego. Second Am. Compl., N.Y.D.E. 002 [UBSAG023-81]. Subsequent Appellate Division decisions limited UBS's claims to those that accrued after February 24, 2009, the date UBS had filed its initial complaint in the State Court Action. *E.g.*, *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, 86 A.D.3d 469, 474, 476 (N.Y. App. Div. 2011) ("***UBS II***").

14.     Even after UBS filed suit, and even though the Fund Counterparties and HFP had substantial assets as of February 24, 2009, the Debtor did not permit the Fund Counterparties to pay any portion of their obligation. Instead, the Debtor devised an elaborate scheme—one that would last for more than a decade thereafter—to not just impede UBS's ability to recover what it was owed under the Warehouse Agreements, but to prevent UBS from recovering any such amounts even if UBS prevailed in the State Court Action. *See* 1/16/09 Latimer Email [UBSAG271]. The Debtor had the exclusive and express ability to cause the Fund Counterparties and HFP to pay UBS what it was owed under the Warehouse Agreements. *E.g.*, Am. & Restated Mgmt. Agmt. § 2(b)(viii) [UBSAG875] (giving the Debtor control of HFP and SOHC's operations, including responsibility over "payment of the debts and obligations" of each entity); *see also* Inv. Mgmt. Agmt. (the Debtor and CDO Fund) [UBSAG895]; Braner Aff. ¶¶ 5, 8

7

[UBSAG908-09]. But the Debtor never used its control over those entities to direct them to comply with their legal obligations to UBS. To the contrary, the Debtor purposefully moved assets *from* the Fund Counterparties and HFP to other Highland entities and ensured that no additional value would accrue *to* the Fund Counterparties—all to prevent UBS from collecting the millions it was owed.

15.     For example, in March 2009, approximately $233 million in assets were transferred from HFP or HFP's subsidiaries to other Highland entities, including Highland Credit Strategies Master Fund, L.P. ("**Credit Strategies**"), Highland Crusader Offshore Partners, L.P. ("**Crusader Offshore**"), Highland Crusader Holding Corporation ("**Crusader Holding**"), Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P. or "**Multi-Strat**"), and the Debtor, as well as third-party Citibank, N.A. These transfers (the "**March 2009 Transfers**") were as follows:

| Recipient | Market Value of Assets |
|---|---|
| Credit Strategies | $20,044,219 |
| Crusader Holding | $108,961,751 |
| Crusader Offshore | $43,405,815 |
| Multi-Strat Entities | $25,782,988 |
| Debtor | $17,778,566 |
| Citibank, N.A. | $17,481,808 |
| **Total** | **$233,455,147** |

*See* 3/18/13 Expert R. of Louis Dudney at 33, Table 6 [USAG946]. Although these payments supposedly unwound "notes" issued just months earlier, the evidence shows that the true purpose of the March 2009 transfers in question—all overseen by the Debtor and Mr. Dondero—was *not* to repay any actual debt. Rather, unwinding the "notes" (by transferring assets worth over $100 million more than the value of the notes allegedly released, and to entities that were not involved

in the earlier "debt issuance," 3/18/13 Expert R. of Louis Dudney at 33, Table 6 [USAG946])
improperly repaid Highland affiliates' past equity infusions ahead of its creditors—all to the
Debtor's benefit and UBS's detriment.  These fraudulent conveyances orchestrated by the Debtor
were but one of many tactics that the Debtor employed to frustrate UBS's right to recover under
the Warehouse Agreements, in violation of the Debtor's implied duty of good faith and fair
dealing.

16.     As set forth in the UBS Summary Judgment Opposition, the procedural history of
the State Court Action is complex.  Ultimately, the Debtor and other parties filed four sets of
motions to dismiss and two sets of summary judgment motions, which led to a series of complex
rulings by the State Court.  The parties also filed multiple interlocutory appeals of the State Court's
rulings on the motions to dismiss and for summary judgment to the New York Appellate Division
(the "**Appellate Division**"), which issued five decisions.  *See* UBS Summary Judgment Opposition
at 10-15.

17. In 2015, UBS entered into two nearly identical settlement agreements with certain of the
Debtor's co-defendants (the "**Settlements**")—one between UBS and Credit Strategies, and one
among UBS, Crusader Offshore, and Crusader Holding (together, "**Crusader**") (Crusader together
with Credit Strategies, the "**Settling Defendants**").  *See* Crusader Settlement [UBSAG767];
Credit Strategies Settlement [UBSAG806].  Under the Settlements, UBS released the Settling
Defendants from "any and all claims . . . arising out of, or directly or indirectly relating to, the
[Warehouse Agreements] and/or the UBS Litigation."  Crusader Settlement [UBSAG772]; Credit
Strategies Settlement [UBSAG810].  In return, the Settling Defendants collectively agreed to pay
UBS $70.5 million.  *See* Crusader Settlement [UBSAG769]; Credit Strategies Settlement
[UBSAG814].  But UBS did not settle with the Debtor, nor was the Debtor otherwise a party to

the Settlements. *See* Crusader Settlement [UBSAG768] ████████████████████

███████████████████████████████████████████████████████████

UBSAG807 Credit Strategies Settlement [UBSAG807] (including same language). The

Settlements include a separate section specifying that UBS ████████████████████

██████████████████████████████████████████████████with the

limited exception that UBS does ██████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████ Crusader

Settlement [UBSAG772-73]; Credit Strategies Settlement [UBSAG810-11]. ███████████

███████ the Settlements further specify that this limited release of the Debtor ███████████

███████████████████████████████████████ and provide that

nothing in the Settlements limits UBS's ability to submit evidence about the fraudulent transfers

while litigating its unreleased claims. Crusader Settlement [UBSAG773]; Credit Strategies

Settlement [UBSAG811].

18.     In early 2018, the State Court Action was finally ready for trial. The Warehouse

Agreements contained a jury waiver clause for legal proceedings arising out of or relating to the

agreements. Accordingly, the State Court bifurcated the trial into two phases: Phase I, consisting

of a bench trial on UBS's claims against the Fund Counterparties for breach of the Warehouse

Agreements and on the Debtor's counterclaims for breach of the same agreements and unjust

enrichment; and Phase II, consisting of a jury trial on UBS's other claims against all remaining

defendants, including UBS's fraudulent transfer and implied covenant claims against the Debtor

(with the State Court deciding liability for the implied covenant claim given the jury waiver clause

in the Warehouse Agreements). *See* Decision & Order, N.Y.D.E. 641 [UBSAG024-25].

19.     Phase I, a 13-day bench trial, was held in July 2018.  On November 14, 2019, the State Court issued its decision on Phase I, ruling in UBS's favor on almost every issue.  The State Court found that the Fund Counterparties were liable to UBS for breaching the Warehouse Agreements; found that UBS was not liable for either of the Debtor's counterclaims; and rejected almost every one of the Debtor and Fund Counterparties' arguments about why they were entitled to offset damages (reserving the only remaining offset issue, their argument that damages should be offset by the $70.5 million that UBS received in the Settlements, for Phase II).  *See* Decision & Order, N.Y.D.E. 641 [UBSAG024-64].  On January 22, 2020, the State Court entered a judgment against the Fund Counterparties in favor of UBS for $1,039,957,799.44.  *See* 2/10/20 State Court Judgment, N.Y.D.E. 646 [UBSAG262-63].  Phase II is currently stayed pursuant to Section 362 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").

## III.    THE UBS CLAIMS

20.     UBS asserts unsecured claims against the Debtor in the amount of at least $1,039,957,799.40 for damages resulting from (1) the Debtor's breach of the implied covenant of good faith and fair dealing for its efforts to impair and impede UBS's contractual rights; and (2) the Debtor's role in directing the fraudulent conveyances, as well as for further damages (including punitive damages), prejudgment interest, and attorneys' fees.  *See* UBS Claims ¶ 26 [UBSAG019].

21.     On August 7, 2020, the (i) Debtor; (ii) Redeemer Committee of the Highland Crusader Funds (the "**Redeemer**"); and (iii) Crusader Offshore, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "**Crusader Funds**"), objected to the UBS Claims, arguing that a portion of the claims were subject to summary

disposition based on certain decisions in the State Court Action and the 2015 Settlements (the "**UBS Claim Objections**").  *See* [Docket Nos. 928, 933].[5]

22.     UBS filed an omnibus response to the UBS Claim Objections on September 25, 2020 (the "**Omnibus Response**").  *See* Docket No. 1105.[6]  On October 6, 2020, the Court held a status conference on the UBS Claim Objections and set November 6, 2020, as the deadline for UBS to file the 3018 Motion.  On October 16, 2020, the Debtor filed *Debtor's Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [Docket No. 1180], and the Redeemer and Crusader Funds filed *Redeemer Committee of the Highland Crusader Fund and the Crusader Funds' Motion for Partial Summary Judgment and Joinder in the Debtor's Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [Docket No. 1183] (together, the "**MSJs**"), seeking to disallow a significant portion of the UBS Claims.  A hearing on the MSJs and the 3018 Motion has been set for November 20, 2020.  *See* Docket No. 1163.

23.     On September 28, 2020, the Debtor filed the Solicitation Procedures Motion.  And, on October 25, 2020, the Debtor filed the Plan and the *Disclosure Statement for the Second Amended Plan of Reorganization of Highland Capital Management, L.P.*  [Docket No. 1289].

24.     Pursuant to the Solicitation Procedures, the pending UBS Claim Objections would disenfranchise UBS by preventing UBS from having the ability to vote on the Plan.  And, the dispute regarding the UBS Claims (the "**Claim Dispute**") will not be resolved before the deadline to vote to accept or reject the Plan, which the Debtor has requested be set for November 20, 2020.

---

[5]     Shortly thereafter, the Debtor filed a motion seeking approval of a settlement with respect to the claims of Redeemer and the Crusader Funds, which the Court approved on October 20, 2020.  *See* Docket No. 1271.

[6]     UBS respectfully submits that its Omnibus Response addresses similar issues as this Motion and may provide helpful context to the Court in ruling on this Motion.

25.     UBS remains open to resolving its claims in this Chapter 11 Case without further litigation, but it has no choice but to oppose the MSJs and to file the 3018 Motion in order to preserve its right to vote on the Debtor's Plan.  If UBS prevails in the Claim Dispute, as it expects it will, UBS's vote to accept or reject the Plan will likely determine whether the Plan's Class 8, which consists of general unsecured creditors that are not otherwise part of the Class 7 convenience class, votes to accept or reject the Plan.  In fact, even if UBS's claims are reduced, they could still have a significant impact on this Chapter 11 Case, the Plan, the timing of distributions, and the expected recovery of other general unsecured creditors.

26.     Accordingly, because UBS has presented "sufficient evidence that it has a colorable claim capable of temporary evaluation," *In re Armstrong*, 294 B.R. 344, 354 (B.A.P. 10th Cir. 2003), *aff'd*, 97 F. App'x 285 (10th Cir. 2004), the UBS Claims should be temporarily allowed in the amount of $543,620,736.03 for purposes of voting on the Plan.  In the alternative, should the Court determine that the MSJs have merit and should be granted in whole or in part,[7] the UBS Claims should be temporarily allowed for voting in at least the amount of $119,143,263.26, as calculated below.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this matter under 28 U.S.C. § 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

---

[7]     For all of the reasons set forth in the UBS Summary Judgment Opposition, UBS submits that the MSJs lack merit and should be denied in their entirety.

## RELIEF REQUESTED

28.     Pursuant to Federal Rule of Bankruptcy Procedure 3018(a), UBS requests that the Court temporarily allow the UBS Claims in the amount of $543,620,736.03 as a general unsecured claim against the Debtor for the purpose of voting on the Plan.

## LEGAL STANDARD

29.     Under 11 U.S.C. § 1126, only holders of allowed claims or interests are entitled to vote on a chapter 11 plan.  A claim, asserted by a timely and properly filed proof of claim, is "deemed allowed" unless an interested party objects.  11 U.S.C. § 502(a).  Thus, once an interested party objects to a claim filed against a debtor, the holder of that claim may ordinarily not vote on the debtor's chapter 11 plan.  But Federal Rule of Bankruptcy Procedure 3018(a) permits the temporary allowance (and estimation) of claims for voting purposes.  Rule 3018 "was designed to give all creditors, even those holding disputed claims, the opportunity to vote," *In re Century Glove, Inc.*, 88 B.R. 45, 46 (Bankr. D. Del. 1988), and provides in relevant part:

> Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan.

Fed. R. Bankr. P. 3018(a).

30.     Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure instruct how to determine whether to permit the temporary allowance of a filed claim.  *See In re Armstrong*, 294 B.R. at 354.  Courts thus have "broad authority to determine whether to allow or disallow a claim for purposes of voting."  *See In re Mangia Pizza Invs., LP*, 480 B.R. 669, 679 (Bankr. W.D. Tex. 2012).  The prevailing view among courts is that the burden of proof is "consistent with the burdens of proof in claim litigation."  *In re Frascella Enterprises, Inc.*, 360 B.R. 435, 458 (Bankr. E.D. Pa. 2007); *see also In re FRG, Inc.*, 121 B.R. 451, 456 (Bankr. E.D.

Pa. 1990) ("the allocation of the burdens of proofs in the [Rule] 3018(a) estimation process is the same as in deciding objections to proofs of claim").[8]  Consistent with Rule 3018's purpose of providing all creditors with an opportunity to vote, courts have also held that there is a presumption in favor of temporarily allowing disputed claims for voting purposes.  *See, e.g.*, *In re Amarex Inc.*, 61 B.R. 301, 303 (Bankr. W.D. Okla. 1985) (holding that allowing claims for voting purposes, even if those claims were later disallowed for purposes of distribution, "is more in keeping with the spirit of chapter 11 which encourages creditor vote and participation in the reorganization process."); *In re Century Glove*, 88 B.R. at 46 (holding that Rule 3018 was "designed to give all creditors, even those holding disputed claims, the opportunity to vote").

31.     Thus, because a properly filed proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim," Fed. R. Bankr. P. 3001(f),[9] the burden falls to the objecting party to present rebuttal "evidence in support of its objection which must be of probative force equal to that of the allegations of the creditor's proof of claim."  *In re Frascella Enterprises*, 360 B.R. at 458 n.49.  Temporary allowance of a claim is warranted if the evidence establishes that the claimant has "a colorable claim capable of temporary evaluation."  *In re Armstrong*, 294 B.R. at 354.  As for the method of estimating the claim, the court "should use whatever method is best suited to the circumstances"—but it is "bound by the legal rules which govern the ultimate value of the claim."  *In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984) (citation omitted).[10]

---

[8]     *But see In re Pac. Sunwear of Cal., Inc.*, No. 16-br-10882, 2016 WL 4250681, at *5 (Bankr. D. Del. Aug. 8, 2016) (observing that, "because a Rule 3018 proceeding is meant to enfranchise claimants, there is an inconsistency in using the burden of proof rules that apply to objections to claims").

[9]     *See also Gardner v. New Jersey*, 329 U.S. 565, 573 (1947) ("A proof of claim is, of course, prima facie evidence of its validity.").

[10]    *See also Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982) (holding that a creditor is entitled to vote a claim in full if the claim is valid as shown by a preponderance of the evidence); *In re Am. Solar King Corp.*, 90 B.R. 808, 829 n.39 (Bankr. W.D. Tex. 1988) ("In estimating a claim, the bankruptcy court should use whatever method

## ARGUMENT

32.     The UBS Claims are predicated on "the Debtor's breach of the implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP, additional interest, further damages (including punitive damages), and attorneys' fees that may be awarded by any court at the conclusion of [the] Phase II [trial]."  UBS Claims ¶ 26 [UBSAG019].  UBS's claims against the Debtor have survived over a decade of litigation in the State Court.  They have undergone no less than four sets of motions to dismiss, two sets of summary judgment motions, and multiple trips to the Appellate Division.  And both the State Court and the Appellate Division have determined that UBS has not just alleged prima facie claims, but that UBS's claims cannot be resolved without a trial.[11]  As described in the UBS Claims—and detailed even further in pages 5-13 of UBS's Omnibus Response, paragraphs 4-20 on pages 5-11 of the Stay Motion, and pages 8-10 of the UBS Summary Judgment Opposition—there is ample evidence that the Debtor is liable for its breach of the implied covenant of good faith and fair dealing and for its role in fraudulently transferring assets.

33.     The factual and legal record unequivocally establishes that UBS has "a colorable claim capable of temporary evaluation."  *In re Armstrong*, 294 B.R. at 354.  And the Debtor has offered nothing close to "evidence . . . of probative force equal to" the evidence that UBS has presented.  *In re Frascella Enterprises*, 360 B.R. at 458 n.49.  As explained further below,

---

is best suited to the particular circumstances.  Although the bankruptcy court is bound by the legal rules which govern the ultimate value of the claim, there are no other limitations on the court's authority to estimate claims.").

[11]    *See UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, No. 650097/09, 2017 WL 1103879, at *16 (N.Y. Sup. Ct. Mar. 13, 2017) ("defendants' motion for summary judgment dismissing UBS's fraudulent conveyance claims will accordingly be denied"); *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, No. 650097/2009, 2017 WL 4460668, at *2 (N.Y. Sup. Ct. Sept. 20, 2017) ("defendants' motion for summary judgment seeking to dismiss [UBS's] third cause of action for breach of [the] covenant of good faith and fair dealing is denied"); *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, 72 N.Y.S.3d 72, 73-64 (N.Y. App. Div. 2018) (affirming denials of summary judgment); *see also* 3/15/18 Appellate Div. MSJ Rearg. Order. at UBSAG266 ("[The Debtor's] motion for reargument is denied.").

temporary allowance of the UBS Claims in the amount of $543,620,736.03 for purposes of voting

on the Plan is thus appropriate and consistent with the presumption in favor of allowing disputed

claims for voting purposes.  *See, e.g.*, *In re Amarex*, 61 B.R. at 303.  Alternatively, if this Court

grants the MSJs, then it should temporarily allow the UBS Claims in the amount of at least

$119,143,263.26 for the purposes of voting on the Plan.

I.    **UBS'S CLAIM FOR BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND
FAIR DEALING SHOULD BE TEMPORARILY ALLOWED**

34.    UBS's implied covenant claim is governed by New York law, under which all

contracts impose a duty of good faith and fair dealing in the course of performance.  *See HYMF,

Inc. v. Highland Capital Mgmt., L.P.*, No. 601027/09, 2012 N.Y. Misc. LEXIS 1424, at \*24 (N.Y.

Sup. Ct. Mar. 23, 2012) (denying the Debtor's summary judgment motion on the plaintiffs' breach

of implied covenant claim based on evidence that it "acted to obstruct plaintiffs' contractual rights"

by directing Highland entities it controlled to withhold redemptions after termination of the

contracts).  The implied covenant is "a pledge that neither party will do anything which destroys

or injures the right of the other party to receive the benefits of the contract."  *Id.*  It broadly

encompasses "any promises that a reasonable person in the position of the promisee would be

justified in understanding were included."  *Id.*

35.    Even though the Fund Counterparties bore the contractual obligation to pay 100%

of any losses on the Knox Assets, UBS "would be justified in understanding" that the Debtor—

itself having expressly agreed to the Fund Counterparties' obligation—would not do anything to

destroy, injure, or otherwise frustrate UBS's right to recover such losses from the Fund

Counterparties.  But, as the evidence establishes, the Debtor deliberately acted—or failed to act—

to obstruct UBS's contractual rights.  For example:

- Prior to February 24, 2009, the Debtor had specific knowledge of the Fund Counterparties'
breach of the Warehouse Agreements and their liability to UBS.  *E.g.*, 12/22/08 Braner

Email [UBSAG1068] (the Debtor's employees discussing "745mm total shortfall" in response to the "Knox Payment Demand"). In fact, by the end of 2008, the Debtor knew that the Fund Counterparties owed UBS "hundreds of millions of dollars in connection with the Knox Warehouse Agreements." Travers Dep. 261:8-20 [UBSAG0180].

- As of February 24, 2009, the Fund Counterparties and HFP had meaningful amounts of assets—and a substantial debt owed to UBS.[12] The Debtor, however, did not direct the Fund Counterparties bear these losses, and instead carried out its threat that "[UBS] can see us in court for their additional collateral." 1/16/09 Latimer Email [UBSAG271].

- As of and after February 24, 2009, the Debtor controlled the Fund Counterparties and HFP through both its direct and indirect ownership interests in these entities, through Mr. Dondero's common control over the Highland web, and through Investment Management Agreements giving the Debtor "full power and authority" over the daily operations and assets of the Fund Counterparties and HFP. *E.g.*, Inv. Mgmt. Agmt. § 2(a), (b) (HCM & CDO Fund) [UBSAG897-98]; Am. & Restated Mgmt. Agmt. (HCM & HFP and SOHC) [UBSAG871]; Highland Ownership Chart [UBSAG1042]; Dudney Report at 41, Chart 12 [UBSAG954] (HFP Subsidiaries Illustration).

- This control gave the Debtor a nearly unfettered ability to move assets around the Highland web, as it often did for its own benefit and the benefit of its principal and affiliates. As just one example, on December 10, 2008—just five days after SOHC became indebted to UBS for hundreds of millions of dollars, the Debtor caused the transfer of $3.7 million from SOHC to HFP, then to CDO HoldCo, and then to Dondero, and the Debtor approved all this in a single email. 12/10/08 Stoops Email [UBSAG1044].

- The Debtor did not exert its "full power and authority" and failed to have the Fund Counterparties "bear 100% of the losses" associated with the Knox Assets as they were contractually bound to do. Instead, the Debtor "devised a strategy to delay the resolution of that obligation [to pay UBS] for as long as possible." Travers Dep. 261:8-20 [UBSAG1080].

- The Debtor further exercised its control over the Fund Counterparties and HFP to dissipate and transfer their assets to other Highland affiliates, principals, and creditors, thereby impairing the Fund Counterparties' ability to bear losses on the Knox Assets and to comply with what they, and the Debtor, knew were contractual obligations owed to UBS. As one significant example, the Debtor orchestrated the March 2009 Transfers—which shuffled

---

[12]       For instance, it is clear that HFP had at least $233 million (the amount the Debtor transferred away from HFP in March 2009). *See also* 3/16/09 HFP Board Minutes at H_008495 [UBSAG1046] (estimating that "the assets of HFP post" March 2009 Transfers would have a market value of approximately $45 million). Despite UBS's repeated requests, the Debtor has failed to provide information to UBS sufficient to show (1) the assets held by the Fund Counterparties and HFP as of February 24, 2009 and (2) subsequent asset-related activity of the Fund Counterparties and HFP, including whether and how such assets were valued, transferred, or dissipated thereafter. Such information is directly relevant to the UBS Claims and quantifying the full amount of damages underlying UBS's implied covenant claims against the Debtor. The Debtor has produced limited documents that suggest that the damages proximately caused by the Debtor's interference with UBS's contractual rights may be well over $278 million plus prejudgment interest. *See infra* at 19-20.

$233,455,147 in assets from HFP or its subsidiaries to other entities—as part of its strategy to frustrate UBS's rights.[13]  *See, e.g.*, Dudney Report [USAG971-93].

- The Debtor intentionally diverted other assets that would have, in the ordinary course, gone to the Fund Counterparties and HFP to its other affiliates and away from UBS.  *See, e.g.*, Braner Dep. 939:8-940:4 [USAG1084]; LeRoux Aff. ¶¶ 13-18, 44-45 [USAG1090-91, 98].

36.    There is thus abundant evidence that the Debtor is liable on UBS's implied covenant claim.  And—although UBS's implied covenant claim is based on far more conduct than the March 2009 Transfers—the March 2009 Transfers (before accounting for additional damages based on the value of assets held by SOHC, CDO, and HFP as of February 24, 2009) provide an easily calculable metric for estimating the minimum amount of the UBS Claims based on UBS's implied covenant theory.

37.    But using the March 2009 Transfers as a damages metric does not take into account the full range of damages proximately flowing from the Debtor's interference.  As explained in the UBS Summary Judgment Opposition, the Debtor has not provided UBS with discovery sufficient to quantify its damages from the Debtor's breach of the implied covenant.  To do so, UBS would need information sufficient to show (1) the assets held by the Fund Counterparties and HFP as of February 24, 2009 and (2) subsequent asset-related activity of the Fund Counterparties and HFP, including whether and how such assets were valued, transferred, or dissipated thereafter. Based on the limited information provided, it appears that the Fund Counterparties and HFP may have had assets of at least $45 million (in addition to the $233 million transferred in March 2009)— which, when combined with prejudgment interest, could support another $120 million in damages on UBS's implied covenant claim.  *See* 3/16/09 HFP Board Minutes at H_008495 [UBSAG1055] (estimating that "the assets of HFP post" March 2009 Transfers would have a market value of

---

[13]    As the litany of conduct described here makes clear, UBS's implied covenant claim is broader than UBS's fraudulent transfer claim—but the March 2009 transfers fall within the post-February 24, 2009 conduct on which the implied covenant claim is based.

approximately $45 million).  The Debtor produced a limited set of unaudited documents from non-consecutive time periods which suggests the assets available to the Fund Counterparties and HFP as of February 24, 2009 may have been significantly higher.

38.   Thus, because UBS has more than demonstrated that it has "a colorable claim capable of temporary evaluation," *In re Armstrong*, 294 B.R. at 354, this Court should temporarily allow the UBS Claims for voting purposes in the amount of ***at least*** $543,620,736.03, which is calculated by taking the value of the March 2009 Transfers—$233,455,147.00, *see* Dudney Report [UBSAG942]—then adding the value of the assets of HFP after the March 2009 Transfers—approximately $45,000,000, *see* 3/16/09 HFP Board Minutes at H_008495 [UBSAG1055]—and adding 9% prejudgment interest from March 20, 2009, through the petition date pursuant to New York law—$265,165,589.03, *see* N.Y. CPLR § 5004—for a total of $543,620,736.03. Temporarily allowing the UBS Claims for voting purposes in this amount is also consistent with the presumption of allowing claims for voting purposes to avoid disenfranchising creditors. *See, e.g.*, *In re Amarex*, 61 B.R. at 303.

## II.   UBS'S FRAUDULENT CONVEYANCE CLAIM SHOULD BE TEMPORARILY ALLOWED

39.   UBS can prevail on its fraudulent transfer claims against the Debtor by establishing either actual or constructive fraud.  *See* N.Y. Debt. & Cred. Law ("**N.Y. DCL**") §§ 273-75 (constructive fraudulent transfer), 276 (actual fraudulent transfer).  There is ample evidence of both.

40.   The evidence establishes that the March 2009 Transfers orchestrated by the Debtor in March 2009 were constructively fraudulent.  A transfer is constructively fraudulent as to creditors if it is made by an insolvent entity and lacks "fair consideration."  N.Y. DCL §§ 272, 273, 274, 275.  For consideration to be fair, (1) the transferor must receive either property or

discharge of an antecedent debt; (2) the transfer must be made in good faith; and (3) the exchange must be for a fair equivalent. *EAC of N.Y., Inc. v. Capri 400, Inc.*, 853 N.Y.S.2d 419, 421 (N.Y. App. Div. 2008); *see also* N.Y. DCL § 272.   The absence of any one of these three elements demonstrates a lack of fair consideration. *See In re Dreier LLP*, 462 B.R. 474, 489-90 (Bankr. S.D.N.Y. 2011).

41.    The evidence shows that HFP was insolvent at the time of the March 2009 Transfers. *See, e.g.*, 1/27/09 HFP Ltr. to Investors at 1 [UBSAG840] ("We expect our December 31, 2008 balance sheet will reflect liabilities greatly exceeding our assets."); Levitske Dep. 233:6-234:2 [UBSAG834] (Highland expert explaining HFP was insolvent by December 31, 2008); Travers Dep. 124:19-125:2 [UBSAG1078] (admitting "the red flags were waving" for HFP in October 2008 as HFP neared insolvency); Waterhouse Dep. 349:17-20 [UBSAG838].

42.    The evidence also shows that these transfers lacked fair consideration and were not made in good faith—and that they were orchestrated by the Debtor to frustrate UBS's right to recovery under the Warehouse Agreements. *See, e.g.*, Dudney Report [UBSAG971-93] (UBS's financial expert's analysis of circumstances surrounding transfers, including lack of fair consideration for transfers).[14]   The Debtor has acknowledged that a transfer to an insider presumptively lacks good faith.  Debtor Claim Obj. [Docket No. 928] ¶¶ 53-54.  And even if the earlier 2008 "notes issuance" created secured debt (it did not), that does not provide the Debtor with an escape hatch from liability for its misconduct—as the State Court already told the Debtor when it explained that "[e]ven in the face of a claim by a transferee that it was a secured creditor, a court considering a constructive fraud claim must evaluate whether the transfer was made for

---

[14]    Further evidence that the March 2009 Transfers were fraudulent is discussed at pages 32 to 38 of the UBS Omnibus Response.

fair consideration—that is, for a fair equivalent <u>and</u> in good faith." 3/24/17 Summ. J. Op. at 32 [UBSAG309] (citing *Farm Stores, Inc. v. School Feeding Corp.*, 102 A.D.2d 249, 254 (2d Dep't 1984), (finding transfers to be fraudulent despite the transferees contention "they were secured"), *aff'd in part*, 64 N.Y.2d 1065 (1985)).  Thus, even if the 2008 "notes" were secured (and—again— they were not), the March 2009 Transfers were still constructively fraudulent if not made for a fair equivalent and in good faith.

43.    Here, there was no fair equivalent exchanged because the value of the assets transferred from HFP exceeded the benefit HFP received.  *See Ally Bank v. Reimer*, No. CV-09-2795, 2010 WL 446025, at *6 (E.D.N.Y. Jan. 29, 2010) (transferring property in satisfaction of an antecedent debt does not constitute fair consideration where the debt is "disproportionately small as compared with the value of the property").  Indeed, although the Debtor has claimed that the March 2009 Transfers supposedly unwound "notes" issued just months earlier, the value of assets transferred from HFP in March 2009 exceeded the value of the "notes" allegedly released by over $100 million, as calculated by HFP's own valuation agent.  *See* 3/26/09 Sterling Valuation Grp. Asset Analysis [UBSAG1101] ("coming up with a mark of 31.78% for the HFP notes").

44.    Moreover, Dondero's undisputed common control of the transferor and Highland entity transferees underscores the utter absence of good faith.  Dondero exerted control over both sides of the March 2009 Transfers and the "notes termination":  he decided what entities would participate and negotiated with himself on behalf of all Highland parties.  Travers Dep. 229:5-14 [UBSAG1097] ("Q. Who was negotiating on behalf of parties to the note agreement at that time? A. Dondero.  Q. And who was negotiating on behalf of HFP?  A. Dondero.  Q. Did you have concerns about Mr. Dondero's ability to fairly negotiate on behalf of all parties with respect to the retirement of the notes? . . . A. Of course.").

45.     The evidence also shows that the March 2009 Transfers were actually fraudulent. Under New York law, fraudulent intent can be inferred from so-called "badges of fraud," which include facts like a "close relationship among the parties to the transaction, the inadequacy of consideration, [the defendant's] knowledge of [the plaintiff's] claims and [the defendant's] inability to pay them, and the timing of the transfer." *CIT Grp./Comm. Servs., Inc. v. 160-09 Jamaica Ave. Ltd. P'ship*, 808 N.Y.S.2d 187, 190 (N.Y. App. Div. 2006); *see also Gard Entm't, Inc. v. Block*, No. 102399/2012, 2012 WL 3764525, at *5 (N.Y. Sup. Ct. Aug. 21, 2012) (three badges "constitutes substantial indicia of actual intent . . . sufficient to meet the clear and convincing standard").

46.     Here, the transfers (1) were among entities with a close relationship; (2) lacked fair consideration; (3) were made one month after UBS sued the Debtor and the Fund Counterparties; and (4) were made while HFP was insolvent. *See, e.g.*, Dudney Report [UBSAG918-923]. Indeed, the State Court has already held that the Debtor "fail[ed] to demonstrate as a matter of law that UBS cannot establish that [HFP] acted with actual intent to defraud in effectuating the March 2009 [transfers]." *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, No. 650097/09, 2017 WL 1103879, at *16 (N.Y. Sup. Ct. Mar. 13, 2017).

47.     UBS thus has "a colorable claim capable of temporary evaluation" with respect to its claims against the Debtor for fraudulent conveyances. *In re Armstrong*, 294 B.R. at 354. And the Debtor has offered nothing close to "evidence . . . of probative force equal to" the evidence that UBS has presented. *In re Frascella Enterprises*, 360 B.R. at 458 n.49. Thus, even to the extent that UBS is unable to recover any portion of the March 2009 Transfers pursuant to its implied covenant claim, the UBS Claims should still be allowed in the amount of at least $119,143,263.26 (before accounting for the possibility of punitive damages and attorneys' fees, if

23

UBS can prove that the transfers were actually and not just constructively fraudulent).[15]   This

amount is calculated by taking the value of the March 2009 Transfers to the Debtor itself

($17,778,566), the Multi-Strat entities ($25,782,988), and Citibank ($17,481,808)—$61,043,362,

*see supra* at 8—and adding 9% prejudgment interest pursuant to New York law—

$58,099,901.26—for a base claim amount of ***at least*** $119,143,263.26.   *See* N.Y. CPLR § 5004.

Importantly, a finding of actual intent further supports awards of attorneys' fees and punitive

damages, in addition to monetary damages.   *See* N.Y. DCL 276 (actual intent); *Schoenberg v.*

*Shoenberg*, 449 N.Y.S.2d 137 (N.Y. Sup. Ct. 2010) (awarding attorneys' fees); *In re Kovler*, 253

B.R. 592, 604-05 (S.D.N.Y. 2000) (punitive damages based on an actual fraudulent transfer claim

available where plaintiff can prove that defendant's conduct was "gross and wanton" and involved

high "moral culpability").   Temporary allowance for purposes of voting on the Plan is, again,

appropriate and consistent with the presumption in favor of allowing disputed claims for voting

purposes.   *See, e.g.*, *In re Amarex*, 61 B.R. at 303.

## III.   THE UBS CLAIMS SHOULD BE TEMPORARILY ALLOWED FOR VOTING PURPOSES IN THE AMOUNT OF $543 MILLION

48.     No party has submitted a colorable argument that UBS is entitled to no recovery

against the estate at all.   And, given the complex nature of the UBS Claims—it took over a decade

to litigate Phase I—UBS anticipates that the Claim Dispute will stretch past confirmation,

especially when accounting for potential appeals.   Accordingly, given the policy underlying the

Bankruptcy Code and Rule 3018 that creditors should be permitted to vote their claims on a chapter

---

[15]      In the Settlements with Credit Strategies and Crusader, UBS agreed to a narrow release of the Debtor from

███████████████████████████████████████████████████████ Settlements § 5.3 [UBSAG810-11, 772-73].
The Settlements therefore release a certain portion of UBS's fraudulent conveyance claims against the Debtor based
on the amounts transferred in March 2009 to Credit Strategies and Crusader, but do not release UBS's implied duty
claims against the Debtor based on those amounts.   For the avoidance of doubt, UBS does not contend that it is entitled
to recover for the March 2009 Transfers under both theories (*i.e.*, "double recover"), only that it is entitled to recover
those amounts once, under either (and in some instances, both) theories.

11 plan despite strategic claim objections, UBS respectfully submits that the Court should temporarily allow the UBS Claims in the total amount of $543,620,736.03 (under the alternative theories of breach of the implied covenant and fraudulent conveyances, based on information known to date), *see supra* at 17-24, for the purpose of voting.

49.     Having settled with most of the other major claimants, the Debtor has a clear interest in disenfranchising UBS in this case.  But the Debtor should not be permitted to prevent what may be the largest unsecured creditor by a significant margin in this Chapter 11 Case from participating in the confirmation and voting process solely based on arguments and defenses to the UBS Claims that have not yet been adjudicated by this Court and that UBS believes are wholly without merit.  Until the claims set forth in the UBS Claims can be fully resolved, UBS should not be denied the opportunity to meaningfully participate in the Chapter 11 Case by not being allowed to vote the full amount of its significant claim (as currently knowable today)—$543,620,736.03. The Court's ruling on the 3018 Motion would have no bearing on the Court's later resolution of the UBS Claims on a substantive basis for allowance and Plan distribution purposes.[16]

## RESERVATION OF RIGHTS

50.     UBS expressly reserves the right to amend, modify, and/or supplement its proofs of claim in the Chapter 11 Case.  UBS expressly reserves all rights, claims, arguments, defenses, and remedies with respect to any issue in this Chapter 11 Case.

---

[16]        If this Court grants all or any portion of the MSJs, it should nevertheless temporarily allow, for the purpose of voting on the Plan, the UBS Claims in the amount of $543,620,736.03 less the amount the Court determines UBS is not entitled to as a matter of law, which should be (based on the UBS MSJs) no less than $119,143,263.26.  This number is calculated by subtracting the amounts transferred to the Settling Defendants ($172,411,785) from the market value of the assets transferred in March 2009 ($233,455,147) and adding 9% prejudgment interest under New York law ($58,099,901.26).

**NOTICE AND PRIOR REQUEST**

51.    UBS will provide notice of the 3018 Motion to: (a) the Debtor's counsel; (b) the Office of the United States Trustee for the Northern District of Texas; (c) Counsel for the Official Committee of Unsecured Creditors appointed in this Chapter 11 Case; and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002.  UBS submits that, in light of the nature of the relief requested, no other or further notice need be given.

**CONCLUSION**

WHEREFORE UBS respectfully requests that the Court (i) enter an order granting temporary allowance of the UBS Claims in the amount of $ $543,620,736.03 for the purposes of voting on the Plan and (ii) grant such other and further relief as the Court may deem appropriate.

DATED this 6th day of November 2020.

**LATHAM & WATKINS LLP**

By */s/ Andrew Clubok*

Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email: jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX. Bar No. 18855645)
Candice M. Carson (TX. Bar No. 24074006)
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
Facsimile: (469) 680-5501
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS
AG, London Branch*

**<u>CERTIFICATE OF SERVICE</u>**

I, Martin Sosland, certify that *UBS's Brief in Support of Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* was filed electronically through the Court's ECF system, which provides notice to all parties of interest.

Dated:  November 6, 2020.

*/s/ Martin A. Sosland*
Martin A. Sosland