IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
| | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) Friday, November 20, 2020 |
| | ) 9:30 a.m. Docket |
| Debtor. | ) |
| | ) - DEBTOR'S MOTION FOR PARTIAL |
| | ) SUMMARY JUDGMENT [1214] |
| | ) - REDEEMER COMMITTEE'S MOTION |
| | ) FOR PARTIAL SUMMARY JUDGMENT |
| | ) [1215, 1216] |
| | ) - UBS'S MOTION FOR TEMPORARY |
| | ) ALLOWANCE OF CLAIM FOR VOTING |
| | ) PURPOSES [1338] |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:            Jeffrey N. Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                             13th Floor
                           Los Angeles, CA  90067-4003
                           (310) 277-6910

For the Debtor:            Robert J. Feinstein
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7700

For UBS Securities, LLC:   Andrew Clubok
                           Sarah A. Tomkowiak
                           LATHAM & WATKINS, LLP
                           555 Eleventh Street, NW,
                             Suite 1000
                           Washington, DC  20004
                           (202) 637-2200

```
 1   APPEARANCES, cont'd.:

 2   For UBS Securities, LLC:      Kimberly A. Posin
                                   LATHAM & WATKINS, LLP
 3                                 355 South Grand Avenue, Suite 100
                                   Los Angeles, CA  90071-1560
 4                                 (213) 485-1234

 5   For Redeemer Committee of     Terri L. Mascherin
     the Highland Crusader         Brandon J. Polcik
 6   Fund:                         JENNER & BLOCK, LLP
                                   353 N. Clark Street
 7                                 Chicago, IL  60654-3456
                                   (312) 923-2799
 8
     For Redeemer Committee of     Mark B. Hankin
 9   the Highland Crusader         JENNER & BLOCK, LLP
     Fund:                         919 Third Avenue
10                                 New York, NY  10022-3098
                                   (212) 891-1600
11
     For Redeemer Committee of     Mark A. Platt
12   the Highland Crusader         FROST BROWN TODD, LLC
     Fund:                         100 Crescent Court, Suite 350
13                                 Dallas, TX  75201
                                   (214) 580-5852
14
     Recorded by:                  Michael F. Edmond, Sr.
15                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
16                                 Dallas, TX  75242
                                   (214) 753-2062
17
     Transcribed by:               Kathy Rehling
18                                 311 Paradise Cove
                                   Shady Shores, TX  76208
19                                 (972) 786-3063

20

21

22

23

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

1              DALLAS, TEXAS - NOVEMBER 20, 2020 - 9:38 A.M.

2              THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, the Honorable Stacey Jernigan presiding.

5              THE COURT:  Good morning.  Please be seated.  This is

6    Judge Jernigan.  We're ready to start our Highland settings

7    this morning.  We have motions for partial summary judgment by

8    each the Debtor and the Redeemer Committee with regard to the

9    UBS proofs of claim.  We also have a motion to temporarily

10   allow UBS's claim for voting purposes.

11      I know we have a lot of folks on the phone, but let me

12   just get the parties who have filed papers appearances at this

13   time.

14      First, for the Debtor team, who do we have appearing?  I

15   think I see Mr. Feinstein there.  Are you taking the lead on

16   this this morning?

17              MR. FEINSTEIN:  Good morning, Your Honor.

18              MR. POMERANTZ:  Yeah.  It's Jeff Pomerantz and Rob

19   Feinstein.  I would like to address the Court on a couple

20   matters, one related to UBS and one not, before we begin,

21   after Your Honor takes appearances, if it pleases the Court.

22              THE COURT:  Okay.  That's fine.  So we have Mr.

23   Pomerantz and Mr. Feinstein for the Debtors.

24      All right.  Well, let me turn to the Redeemer Committee.

25   Who do we have appearing for that team today?

1              MS. MASCHERIN:  Good morning, Your Honor.  Terri

2     Mascherin, along with my colleagues Mark Hankin and Brandon

3     Polcik, as well as our local counsel, Mark Platt, appearing

4     for both the Redeemer Committee as well as the Crusader Funds

5     today, as our motions are joint motions.

6              THE COURT:  Okay.  Thank you.  All right.  For UBS

7     now, who do we have appearing for that team?

8              MR. CLUBOK:  Good morning, Your Honor.  It's Andrew

9     Clubok, Latham & Watkins.  And I'm here also with my

10    colleagues Kimberly Posin and Sarah Tomkowiak.

11             THE COURT:  Okay.  Good morning to all of you.  All

12    right.  So I'm just going to get those appearances, even

13    though I know we have lots of interested observers today.

14        Mr. Pomerantz, I'll turn back to you.  You had something

15    --

16             MR. POMERANTZ:  Thank you, Your Honor.

17             THE COURT:  Uh-huh.

18             MR. POMERANTZ:  Yes.  Your Honor, last night there

19    was filed on the docket by Mr. Dondero a motion and emergency

20    motion to consider what is styled as a motion to require

21    disclosure of out-of-the-ordinary-course transactions.  I'm

22    not here to argue it, of course, today, but I wanted to let

23    the Court know that the Debtor will be filing opposition to

24    the motion for shortening time, which we intend to get that

25    opposition on file on Monday.  So we just wanted to make sure

1  Your Honor was aware of that before Your Honor considered the

2  shortening time request, because it asks for a hearing next

3  Wednesday.

4          THE COURT:  All right.  Well, thank you for alerting

5  me.  I think my law clerk and I both were up pretty late

6  reading, and I was just focused on this morning's hearing, so

7  I was not even aware of that pleading.  So I haven't seen it.

8  I won't be looking at it until, you know, late today when this

9  is over.  So, it -- well, we'll just see what the emergency

10 is, but I had not even planned to have court on Wednesday.  If

11 there was a genuine emergency, I would certainly consider

12 doing that, but I don't even know what the alleged emergency

13 is.

14      So, thank you for alerting me to that and to the Debtor's

15 opposition.

16          MR. POMERANTZ:  You're very welcome.

17          THE COURT:  Okay.

18          MR. POMERANTZ:  Your Honor, before we proceed with

19 the motion regarding UBS, I did want to make a few

20 introductory comments.

21      As Your Honor recalls, in June Your Honor denied UBS's

22 motion for relief from the automatic stay, effectively saying

23 that the UBS claims would be resolved in this court.  And at

24 the time, Your Honor, Mr. Feinstein on behalf of the Debtor

25 told the Court that the Debtor believed that there were

1    certain threshold legal issues that could be decided promptly

2    by this Court, and the outcome of those legal issues would

3    substantially affect the nature and extent of UBS's claims and

4    either facilitate a settlement or at least narrow the issues

5    to be litigated.

6         Thereafter, in July, Your Honor, Your Honor suggested that

7    the Debtors engage in mediation with UBS and Acis in an

8    attempt to resolve the Debtor's disputes with those parties

9    without litigation.  And in fact, the Debtor participated in a

10   several-day mediation with Judge Gropper and Sylvia Mayer at

11   the end of August and beginning of September.

12        As Your Honor is aware, the Debtor was able to resolve its

13   disputes with Acis and Josh Terry, and the Court last month

14   approved a 9019 motion approving that settlement.

15        Unfortunately, the Debtor and UBS were not able to reach

16   settlement through the process.  And while the mediation

17   process did provide the parties with a forum with which they

18   could communicate their respective views about the strengths

19   and weaknesses of the positions, in that respect, it was

20   productive.  However, at the -- by the end of the mediation,

21   it became clear to the Debtor that the Debtor and UBS had sort

22   of fundamental disagreements on the law regarding the validity

23   of UBS's claims, and enforced the Debtor's belief that, as we

24   previously suggested to the Court, the Court's assistance in

25   adjudicating some threshold issues were necessary.

1        We appeared before Your Honor on October 6th for a status

2    conference with respect to the objection to UBS's claim, and

3    over UBS's objection the Court allowed the Debtor to file a

4    motion for summary judgment, the hearing of which is set for

5    today.

6        During the last several weeks, discussions have taken

7    place at high levels between the Debtor's board and senior

8    businesspeople at UBS, without counsel, as the parties

9    intended to continue to explore settlement.  But

10   unfortunately, the businesspeople were not able to reach a

11   resolution.

12       UBS has requested that the Debtor return to mediation to

13   reach a settlement.  However, until the Court provides

14   guidance to the parties regarding the legal issues before the

15   Court today, the Debtor doesn't believe that further mediation

16   would be productive.  Rather, the Debtor believes the Court

17   should rule on the motions today, and those rulings may

18   facilitate further discussions between the parties, and in

19   connection therewith further mediation may be appropriate.

20       That concludes my introductory comments, Your Honor, and I

21   would turn it over to Mr. Feinstein at this point.

22               THE COURT:  All right.

23               MR. CLUBOK:  Your Honor?

24               THE COURT:  Thank you.

25               MR. CLUBOK:  Your Honor?

1          THE COURT:  Go ahead.  Did you want to reply to that?

2          MR. CLUBOK: Yes, Your Honor.  This is Andrew Clubok.

3   You know, I was not going to say anything about settlement

4   today, but I think the reason why Mr. Pomerantz made that

5   opening statement is in response to a series of letters that

6   we have sent and requests that we have made over the last few

7   weeks.  And now I'm just compelled to respond.

8      We did not want to be here today.  We did not want to

9   spend any money or have the Debtor spend any more money on

10  today's proceedings.  We are super-mindful of your

11  encouragement, admonishment, begging, praying that the parties

12  would just work things out.  To that end, weeks ago we said,

13  Can we have another meeting with the directors, with our

14  businesspeople, in front of the mediators, to really take a

15  stab at trying to resolve issues?  We know there's going to be

16  a disputed issue that, Your Honor, Mr. Pomerantz wants you to

17  rule on today, and we understand one side will win and one

18  side will lose.  But we said, Look, before we get to that,

19  let's have -- let's at least get in a room and try one more

20  time in front of the mediators.

21     The directors adamantly refused.  They would not talk to

22  the mediators.  I mean, in fact, one of them disparaged the

23  mediators.  The other didn't engage at all.  One of them did

24  engage with us in good faith.  And as Mr. Pomerantz said, one

25  director spoke directly to businesspeople.  They did try to

1    make some progress.  They actually made incredible progress.

2    All throughout the last three weeks, we've said, Please,

3    please -- and I can send you the correspondence -- let's just

4    get back in front of the mediators, help us close this

5    remaining relatively small gap, where neither side is

6    guaranteed victory for today, but let's get a very, very

7    reasonable settlement.

8         Their -- the directors simply absolutely refused.  Said,

9    We're not going back to the mediators until after today,

10   perhaps.  We even checked with the mediators.  They were

11   available.  They gave us times.  Absolute, adamant refusal.

12        And the issue is not just that -- I mean, what that speaks

13   to, Your Honor, frankly, is if someone wants to settle --

14   there's a disputed issue today.  One of us will win; one of us

15   will lose.  Even if you say that one side has a 90 percent

16   chance of winning, you still try to talk and see if you can

17   settle before just having it resolved.  Otherwise, you're not

18   trying to settle.  And that's why we kept at it and kept

19   begging them, Please, let us be in front of the mediators,

20   let's put it all on the table, try one more time.  They

21   refused.

22        So I wasn't going to get into all this today, but I feel

23   compelled.

24        I also, and I really hate to do this, because Redeemer did

25   not raise this issue, but just so you know, we also reached

1   out to Redeemers and we said the same thing.  Please, let's

2   get back in front of the mediators.  Like the Debtors, like

3   the directors, they refused to go back to the mediators.  But

4   one of Redeemer's representatives did negotiate directly and

5   start to have some -- what we were hoping will be productive

6   discussions with one of our clients directly.

7        But then we were told, If you dare file a notice of appeal

8   from the approval of the Redeemer settlement -- and we did, we

9   said, Look, we have to file it.  It's a protective notice.  We

10  are certainly hopeful to settle it and we'll never have to

11  file a brief, okay, that actually lays out our grounds for

12  appeal.  But we filed our notice, that was required.  We were

13  told by Redeemer, if you do that, we will stop talking to you

14  completely.  Not one more discussion of settlement if you dare

15  do that.

16       We did it, and we said, Come on, guys, we had to do it.

17  But we didn't file a brief.  We just filed a notice of appeal.

18  Please, let's have discussions before today and see if we can

19  resolve things.  But Redeemer, through their counsel, said,

20  Nope.  We told you if you filed the notice of appeal, no more

21  settlement discussions.

22       So, again, I hate to get into all this.  I do not like

23  talking about this stuff.  I do not like getting into whether

24  there's good faith or bad faith.  But when Mr. Pomerantz gets

25  up and tries to imply to you that there's been good faith

1   efforts to settle, that's why I feel compelled to make this

2   record.

3       And I have many emails that we can provide to substantiate

4   what I'm saying.  I don't like saying it.  But my client

5   really does not like the fact that we were absolutely slammed

6   shut the idea of any further discussions before the mediators

7   before today to see if we could just close what is, frankly, a

8   relatively narrow remaining gap.

9           MR. POMERANTZ:  Your Honor, look, we respect UBS's

10  position.  We respect their desire to go to mediation.  Of

11  course, Mr. Clubok is not explaining it accurately, because we

12  did actually engage in good faith discussions.  There were

13  discussions between two of the board members, UBS personnel.

14  We really made a genuine effort to try to settle.  We didn't

15  think going back to mediation was appropriate.

16      As Your Honor -- as I told Your Honor, we thought several

17  months ago and we think now that the gap is too large, that

18  Your Honor is going to have to make some contested legal

19  decisions.  And that may help and facilitate settlement.

20      So, we appreciate the passion that Mr. Clubok wants

21  mediation, and he's told us that many times.  Hopefully, Your

22  Honor will make some rulings, it'll facilitate settlement, and

23  we'll be able to finally resolve these issues.  And I don't

24  think it warrants any more comments to what Mr. Clubok said.

25      Thank you, Your Honor.

1            THE COURT:  All right.

2            MR. CLUBOK:  Well, the only additional comment is

3    when I --

4            THE COURT:  Well, I'm going to stop this here,

5    because I do want to get on with the arguments.  I'm going to

6    interpret all of this, you know, from both of you -- and Ms.

7    Mascherin has chosen to remain silent in this -- I'm going to

8    interpret this as really nothing more than you all telling me,

9    you know, look, Judge, I know you really hoped we would settle

10   this, you sent us to mediation with two fine mediators, we

11   tried mightily, we just haven't gotten there.  So, almost as a

12   courtesy thing before you start.  But, you know, I think it

13   was August, right, August when I ordered mediation?  And I

14   know --

15           MR. CLUBOK:  It was in July, Your Honor.

16           THE COURT:  Or July?  Okay.  So it's been a while.

17   And, you know, sometimes people, reasonable businesspeople,

18   just can't settle.  You know, you can't -- you can't make

19   someone settle if they feel strongly about one thing or

20   another.

21       So I view this as time for me to make a couple of

22   decisions.  You know, it appears that there might be -- you

23   know, we keep using the word "gating issue" I think in this

24   case, but it's appropriate.  But there are a couple of gating

25   issues that affect -- gating legal issues that will affect how

1   likely it is the claim is X versus Y.

2        So, you all have given me a lot of great written

3   materials.  We've tried to get through it.  And, you know, I

4   don't begrudge anyone if you just couldn't get there in

5   mediation.  I'll give you a couple of rulings that will maybe

6   restart a settlement discussion.  You know, sometimes that's

7   what it takes.  And so that's what we're going to do here

8   today.

9        And I appreciate people wanting to kind of explain to me,

10  I guess, why we're here after all of this urging on my part

11  for you all to try to get this settled.  But, you know, it

12  just -- it just doesn't always work out, and so I'll decide a

13  couple of issues today perhaps that will, you know, kick-start

14  the effort again, I would hope.

15       All right.  Well, let's quickly talk about the format for

16  today.  I don't know if you all have had any discussions.  But

17  what I had been thinking was that there is so much, you know,

18  overlap, obviously, in what you will want to argue, Mr.

19  Clubok, on the 3018 motion and the motions for summary

20  judgment that we would have combined arguments where I have --

21  I'll hear from the Debtor first on its motion for partial

22  summary judgment and then I think it would make sense to hear

23  from the Crusader Funds next and then you'll get time to

24  respond jointly to both of those motions and then they would

25  get reply/rebuttal.

1      I'm not inclined to impose deadlines or time limits on

2   you.  I want you all to have adequate time.  But what have you

3   all discussed, if anything, about the format?  Have you all

4   talked about just having combined argument with the 3018

5   motion?

6          MR. CLUBOK:  Your Honor, we -- we, I mean, I will say

7   we haven't talked about that, but that is the way we

8   envisioned that we'll be able to make sense, so there will be,

9   you know, one consistent argument.  There's so much overlap

10  between the two.

11         THE COURT:  And --

12         MR. FEINSTEIN:  Agreed, Your Honor.

13         THE COURT:  Okay.

14         MR. FEINSTEIN:  On behalf of the Debtor.

15         THE COURT:  So no one had thought, oh, we're going to

16  have live witnesses or anything on that one?  You'd just rely

17  on the summary judgment evidence, correct?

18         MR. CLUBOK:  Oh, yes, Your Honor.  We don't have any

19  -- I don't think either side has live witnesses.

20         THE COURT:  Okay.

21         MR. CLUBOK:  So I don't think that will be an issue.

22         THE COURT:  All right.

23         MR. FEINSTEIN:  Your Honor, there may be -- there may

24  be issues to an extent.  We've had -- we've conferred about

25  exhibits, and there may be some issues about the use of those

1   exhibits in the context of summary judgment versus in the

2   context of voting.  But I think that we can just address those

3   as -- when they arise.

4                THE COURT:  Okay.  Very good.  That sounds correct to

5   me.

6        Time limits?  I mean, do I need to impose them?  Nobody is

7   going to take, say, more than --

8                MR. FEINSTEIN:  I hope not.

9                THE COURT:  -- an hour, right?  Or I wouldn't be

10  shocked if you each took an hour, but do we think that's about

11  what you'll do?

12               MR. FEINSTEIN:  Your Honor, I haven't timed myself,

13  but I have (inaudible) monitor and an hour is probably a good

14  guess.

15               THE COURT:  Okay.  Everyone think that's about how

16  long they'll go?

17               MR. CLUBOK:  Your Honor, we may go a bit longer than

18  that.  I do like to hear a statement that you don't want to

19  put time limits, and certainly we'll keep it as -- mindful of

20  moving along.  I have not timed myself.  But we did -- we were

21  not positive that Your Honor would -- our proposal we had that

22  it would be one combined, so we had prepared both ways.  But

23  we (inaudible), too.

24               MR. FEINSTEIN:  I'm going to go along.

25               THE COURT:  All right.  Well, and Ms. Mascherin?

1           MS. MASCHERIN:  Your Honor, we're comfortable with an

2    hour per side.

3           THE COURT:  Okay.

4           MS. MASCHERIN:  Give or take a bit.

5           THE COURT:  Okay.  Well, then I won't impose strict

6    time limits, but if you go crazy beyond an hour, I'll start

7    telling you to wrap it up.  All right.

8           MR. CLUBOK:  But, and of course, Your Honor, it's --

9    if it's an hour total of Crusade -- of the Debtor and

10   Redeemer, that's one thing.  If it's an hour for one, an hour

11   for another, and then -- then us, obviously, there's a -- it's

12   a different issue.  But regardless of how long the Debtor and

13   Redeemer take, we will try to be efficient with our time.

14          THE COURT:  Okay.

15          MS. MASCHERIN:  Your Honor, just to be clear, I would

16   endeavor to be less than an hour, but I think I would likely

17   be more than half an hour.

18          THE COURT:  Okay.  Well, yeah, I was thinking three

19   hours:  one hour, one hour, one hour.  But Mr. Clubok, I

20   understand, you feel like you're being double-teamed.  So, you

21   know, if you take an hour and a half, fine.  But if you get

22   crazy beyond that, then I'm going to start asking you to wrap

23   it up.  How does that sound?

24          MR. CLUBOK:  I would -- that sounds -- I'm going to

25   try super-hard not to go crazy.

1            THE COURT:  Okay.

2            MR. CLUBOK:  I promise you.

3            THE COURT:  Okay.  Maybe I shouldn't have used the

4    word crazy.  But, anyway.

5            MR. FEINSTEIN:  It's okay.  And Your Honor, at the

6    risk of stating the obvious, if it's our motion, we'll have an

7    opportunity for rebuttal?

8            THE COURT:  Yes.  Yes.

9            MR. CLUBOK:  Well, to be clear, it's also our motion.

10   The 3018 is our motion.  And so I think, to be fair, we should

11   get a brief surrebuttal.  And I know with all these lawyers in

12   the background -- I see Mr. Feinstein nodding to -- you know,

13   we can -- we will all be efficient.  We will not overuse it.

14   Eventually, the argument has to end.  But we would like an

15   additional surrebuttal.

16           THE COURT:  Okay.  Well, only --

17           MR. CLUBOK:  I think I see Mr. Feinstein nodded.

18           THE COURT:  Only on the 3018 issue.  You know, I know

19   it's hard to --

20           MR. CLUBOK:  Right.

21           THE COURT:  -- separate the two.  All right.  Well,

22   with that, Mr. Feinstein, you may begin.

23           MR. FEINSTEIN:  Thank you very much, Your Honor.  And

24   once again, good morning.

25      So, Your Honor, first, I'd like to start just by giving

1    you an overview of where I'm going.  I'm going to start by

2    talking about the summary judgment standards, although I

3    expect Your Honor is very familiar with them.  I want to give

4    you an overview of the procedural history of what is now over

5    eleven years of litigation between the parties.  Then I'm

6    going to go through a statement of facts, Your Honor.  And my

7    intention is that these are going to be undisputed facts,

8    since this is a summary judgment motion.  I'm sure Mr. Clubok

9    will keep me honest if anything I set out is disputed, but I'm

10   going to describe the various agreements and events over time,

11   hopefully in a way that's not controversial, because these are

12   what we view as the undisputed facts on the motion.  And then

13   I'm going to turn to legal argument, and at the end I'll deal

14   with the 3018 motion.

15        So, with that, Your Honor, I'm going to launch into it.

16   And I have no charts or bells and whistles or exhibits.  It's

17   just me talking to you.  So here we go.

18             THE COURT:  Okay.

19             MR. FEINSTEIN:  So, first, Your Honor, on the summary

20   judgment standard.  So, you know, it's hornbook law, summary

21   judgment should be granted if there's no genuine issue of

22   material fact and the moving party is entitled to judgment as

23   a matter of law.  A material factual issue only exists if the

24   rational trier of fact can find for the non-moving party based

25   on the record evidence.  And here, of course, the Court is the

1    trier of fact in the context of an objection to a proof of

2    claim.

3         And the ultimate burden here rests on the non-movant, on

4    UBS, and the motion should be granted if the non-movant fails

5    to produce evidence to support an essential element of its

6    claim or to put facts in dispute.  And the non-movant has to

7    identify specific evidence in the record demonstrating that

8    there's a material fact issue.  Unsupported allegations are

9    insufficient.

10        So, turning to the -- sort of the larger overview, Your

11   Honor, we -- the parties' dispute arises out of a failed

12   securitization transaction that the parties have often called

13   the Knox Transaction.  It really dates back to 2007.  The

14   lawsuit that UBS first filed that initiated the litigation was

15   in February 20 -- February 24th of 2009, which you'll hear a

16   comment again is a very important date because that's the line

17   of demarcation for res judicata.

18        The initial lawsuit was where UBS sued the two Funds, SOHC

19   -- the SOHC and CLO Fund, who were parties to warehouse

20   agreements.  And the Debtor was a signatory to a service

21   agreement.  And the initial complaint as against the Debtor

22   said -- asserted a claim of indemnification based upon that

23   letter agreement.

24        The state court, the New York State Supreme Court,

25   dismissed that claim, and we'll get into it in more detail,

1   but basically dismissed that claim, holding that the Debtor

2   was not liable for the loss incurred by the -- by UBS, that

3   the loss was borne solely by the Funds.  And so the initial

4   approach by UBS was to use a contract with an indemnity to try

5   to hold the Debtor liable, and that failed.  And then, since

6   then, they've come up with other theories, which we'll

7   discuss.

8        After that initial complaint was dismissed, UBS filed a

9   new lawsuit, asserting a breach of implied covenant claim and

10  fraudulent claims -- fraudulent conveyance claims against the

11  Debtor, and added some non-debtor affiliates.  The new suit

12  didn't -- and we're looking at some -- one of them, asserted a

13  claim against the Debtor based on an alter ego theory.  Now,

14  that's critically important, Your Honor, because that's one of

15  the things we're going to be discussing quite a bit today.

16  And the Debtor -- UBS, rather, knew how to assert an alter ego

17  claim because they did so against HFP in this -- the newly-

18  filed complaint, after their first complaint was dismissed.

19  And ultimately those two lawsuits were consolidated.  There

20  has been a long history of motion practice, several decisions

21  by the Appellate Division, First Department, that are going to

22  be relevant to our discussion, particularly as it relates to

23  res judicata.

24       After years of motion practice, the case was ready for

25  trial.  And the Phase I trial was to deal solely with respect

1    to the breach of contract claims that UBS asserted against the

2    Fund Counterparties.  So the Debtor was not held liable in the

3    Phase I trial.

4        Phase II, which was, I guess, interrupted by the

5    bankruptcy, was going to be a trial over the remainder of

6    claims, the remainder of the claims being implied --  breach

7    of implied covenant, fraudulent transfer, the asserted alter

8    ego claim against HFP.  Again, no alter ego claim against the

9    Debtor.

10       The Phase I trial was concluded.  As Your Honor is well

11   aware, the -- in February against -- I'm sorry.  In February

12   of 2020, a breach of contract judgment was entered against the

13   Funds in the amount of $1,039,000,000.  Approximately half of

14   that was principal amount of damages, and then it was doubled

15   for pre-judgment interest.

16       Again, the Debtor was not a party to the judgment that was

17   entered at the conclusion of the Phase I trial.  And then

18   Phase II was about to go forward when the case -- when the

19   Chapter 11 case was filed.

20       Your Honor is, I'm sure, well familiar with what happened

21   in this Court after that.  UBS sought relief from the

22   automatic stay in May of this year, the Court denied that

23   motion in June, and then set a bar date for UBS to file its

24   proof of claim of June 26th.  UBS did file two proofs of

25   claim.  They're essentially identical.  So I'm going to lump

1   them together and call it UBS as opposed to the two separate

2   parties who filed the claims.  UBS filed a proof of claim

3   against the Debtor for the judgment amount, for a billion and

4   thirty-nine million.  I'm just going to call it a billion from

5   now on, Your Honor, for convenience's sake.

6       The proof of claim attached some of the state court

7   pleadings.  And interestingly -- and this is going to be an

8   important point today, Your Honor -- in the proof of claim,

9   UBS deliberately advised the Court and the parties:  We are

10  not asserting an alter ego claim against the Debtor for the

11  billion-dollar judgment.  UBS purports to reserve its rights

12  to do so at a later date, and we'll talk about the viability

13  of that and go over the definition of claim under the

14  Bankruptcy Code and the bar date -- and Your Honor's bar date

15  order.  But that's what their proof of claim asserted.

16      We filed, on behalf of the Debtor, an objection to claim.

17  That's at ECF 928.  And it's a helpful roadmap, Your Honor,

18  that in that objection we laid out which claims we thought

19  were susceptible to summary adjudication -- those are the

20  matters before Your Honor today -- and which other claims were

21  fact-intensive and may require further adjudication outside

22  the summary judgment context.

23      And I think it's kind of appropriate at this point, Your

24  Honor, to kind of stop and tell you that, you know, my plan

25  today, Your Honor, is to peel the onion back from a billion-

1   dollar claim and see which ones fall by the wayside based on

2   issues that we think are appropriate for summary judgment, and

3   then what's left are the claims that we identified in our

4   objection to claim that were fact-intensive and may not be

5   appropriate for summary adjudication.

6       And again, on a high level, Your Honor, and we'll go

7   further into it in due course, by this summary judgment motion

8   we're seeking several rulings that will take the asserted

9   billion-dollar claim down to about $30 million.  And then if

10  you double that for -- I'm sorry.  So, to $60 million.  And if

11  you double that, you get -- I think the number is $119 million

12  with pre-judgment interest.

13      We are not acknowledging that there is a valid $119

14  million claim.  We're simply saying that, for purposes of

15  today, the rulings we're asking Your Honor to make will strip

16  away the claim from a billion down to $119 million.  And then

17  when I get to the voting motion aspect of this, Your Honor,

18  we'll tell you why we think that a good healthy portion of the

19  remaining claims, which are fraudulent conveyance claims and

20  implied covenant claims which are, you know, replications of

21  the fraudulent conveyance claims, that how you get from $61

22  million of principal amount of transfers, what the defects

23  are, where you can get them really down to zero.

24      But notably, of the $61 million of transfers, Your Honor,

25  $18 million, $17 million and change, was actually paid to the

1    Debtor.  All of the other remaining claims that we think are

2    not the subject of the summary judgment motion, which are,

3    again, implied covenant, breach of -- and fraudulent

4    conveyance claims, suffer from a number of defects, most

5    notably that, in order to assert the multitude of those

6    claims, UBS would have to establish that HFP was the alter ego

7    of SOHC and CDO Funds.  And that's very challenging for a

8    sophisticated party like UBS.

9         In any event, Your Honor, just to kind of start from a

10   billion and take it down to $19 million, first, let's deal

11   with the one billion dollar claim.  We have a multiple of

12   arguments as to why that's not viable.

13        First, to the extent that UBS is trying to assert the

14   billion-dollar breach of contract claim against the Debtor,

15   there are a number of problems.  The first one is, to the

16   extent that they're relying on an alter ego theory, they've

17   explicitly disclaimed any intention of bringing that claim in

18   this Court.  We think that their failure to do so, which was

19   obviously deliberate, is unfortunate for them, but there's a

20   bar order in this case that required them to assert any and

21   all claims.  And as I'm sure Your Honor is aware, the

22   definition of claim in the Bankruptcy Code is extremely broad,

23   and that's by intention.  That for -- as a bankruptcy policy

24   matter, a debtor in Chapter 11 is hoped to get the broadest

25   possible discharge available, and the only way to accomplish

1    that is to capture all claims -- actual, contingent,

2    unliquidated, et cetera -- in advance of a bar date, so that

3    when the debtor reorganizes it knows that there is no

4    lingering liability.  It has finality, it has repose, and all

5    rightful creditors are allowed to share in the debtor's

6    assets.

7         There is no way to grant yourself to an exemption from a

8    bar date by reserving your rights.  And we'll talk about more

9    of that later.

10        Beyond the failure of UBS to assert an alter ego claim as

11   a credit to a billion-dollar claim, we also have the res

12   judicata problem.  And this is the series of rulings by the

13   Appellate Division, First Department, in New York, holding on

14   multiple other occasions that UBS cannot recover from the

15   Debtor for claims that arose prior to February 24th of 2009.

16   And that was the date that their first lawsuit was filed.

17        And basically, Your Honor, the concept here is if you've

18   got claims based on events that occurred prior to the date you

19   filed suit, you were obligated to bring them.  And if you

20   didn't bring them, you can't -- you don't get a second bit at

21   the apple or a mulligan down the road for bringing them later.

22   If there were operative events prior to the date you sued,

23   it's incumbent upon you to bring your claims.

24        And obviously, UBS has a problem with that because the

25   breach of contract occurred prior to February 2009.  In fact,

1  the contract was terminated in 2008, and now here we are

2  talking about whether UBS has breached an implied covenant

3  under that contract.

4      But the point being is that the only viable claims that

5  UBS could assert at this point are based on operative events

6  that occurred after February 24th of 2009.  And Mr. Clubok

7  will argue to you that there's language in the Appellate Court

8  decisions that suggests that UBS could rely on evidence of

9  factual matters that occurred prior to February 24th of 2009.

10 And I don't dispute that.  What I do dispute is that they can

11 rely on operative events that occurred prior to that date as a

12 predicate for a claim.  Right?

13     So, as you'll hear from us, Your Honor, the only thing

14 that happened that UBS can point to after February 24th of

15 2009 were the so-called fraudulent transfers that occurred in

16 March of 2009.  The face amount of those amounts transferred

17 is $233 million.

18     So we think we'll get -- we're coming from a billion.  Now

19 we're down to $233 million, because there is no way for UBS to

20 rely on pre-February 24th, 2009 events as a basis for a cause

21 of action.

22     So, now, of that $233 million of transfers, $18 million of

23 that went to the Debtor.  The rest of it did not.  So there

24 are a number of hurdles there, but the first place we'd like

25 to start, Your Honor, in terms of, you know, peeling the onion

1    back and going from a billion to under $18 million, is to look

2    at the releases that -- the settlements that were done in June

3    of 2015 between and among UBS and Crusader and Credit

4    Strategies and the Debtor.  And the settlements were on

5    account of $172 million out of the $233 million of transfers.

6    And obviously you can see from our papers, Your Honor, our

7    view is that the release -- all claims arising from losses

8    from the fraudulent transfers -- I'm paraphrasing, Your Honor;

9    there's a bit that we're going to focus on -- that we -- any

10   and all claims against the Debtor on account of that $172

11   million have been released.  And there is no way to go back to

12   $233 million again because of the language of the releases and

13   the obvious context of what happened in those settlements.

14   And then I'll talk about that some more.

15        But the release language, just to quote it, Your Honor,

16   for the first time, and you'll probably hear it again from me,

17   is that UBS released all claims against the Debtor, quote, for

18   losses or other relief specifically arising from the

19   fraudulent transfers to -- I'm going to paraphrase -- Crusader

20   and Credit Strategies -- alleged in the UBS litigation.  And

21   UBS will argue today that that didn't release the Debtor from

22   a breach of implied covenant claim on account of the $172

23   million in transfers.  We'll talk about that.  We don't think

24   that's a valid argument.

25        So now, if you subtract $172 million of settled transfers,

1    the liability goes from a billion down to $233 million down to

2    $61 million.  Right?  And for purposes of today, Your Honor,

3    that's as far as we're going, because we're seeking summary

4    judgment on the alter ego claim based on the bar date, based

5    on res judicata.  We're seeking an acknowledgement by the

6    Court that the maximum claim, face amount claim of UBS against

7    the Debtor is $61 million, whether it's couched as a

8    fraudulent transfer claim or a breach of implied covenant

9    claim.

10        Your Honor, this -- you know, the $61 million, now we're

11   in the realm of the 3018 motion.  And, again, we, as we said

12   in our papers, based on the numerous infirmities to the

13   fraudulent transfer claims, which require -- except for the

14   $18 million that went to the Debtor -- all the other claims

15   require UBS to overcome a significant hurdle, which is to

16   first establish an alter ego claim against HFP.  And given

17   that UBS is a highly sophisticated institution and can look at

18   the sequence of agreements -- and we're going to go into the

19   facts shortly -- it would be -- UBS was very well aware of the

20   multiple entities that they were dealing with and differences

21   between and among them, which entities were -- had a risk of

22   loss and which did not.  Very important.

23        So for -- it'll be very difficult for UBS to establish any

24   kind of a fraudulent -- a conveyance claim beyond the $17

25   million and change that was actually transferred to the

1   Debtor.

2        And based on, you know, that fact pattern, Your Honor, we

3   have suggested it would be appropriate for purposes of the

4   voting motion to take a 70 percent discount to the maximum

5   liability.

6        So, if you look at the $61 million as the face amount of

7   the claims as to which we have not moved for summary judgment

8   today, and you add to that postpetition interest on the legal

9   amount, then you get to $120 million.  We apply the 70 percent

10  discount, and for purposes of the voting motion, we suggest

11  that the Court allow -- will temporarily allow the claim for

12  $35 million and change, as set forth in our motion.

13       I note, Your Honor, that --

14            MR. CLUBOK:  Mr. Feinstein, I'm so sorry to

15  interrupt.  I think you -- I think said postpetition and you

16  meant prepetition.

17            MR. FEINSTEIN:  Yes.  Prepetition.

18            MR. CLUBOK:  All right.  I apologize for

19  interrupting, but hopefully it helps.

20            MR. FEINSTEIN:  No worries.  No worries.

21       I note, Your Honor, that Redeemer got to a similar number,

22  but by a different path.  And Ms. Mascherin can address this,

23  but essentially they went from the $18 million of funds that

24  were actually transferred to the Debtor as a, you know,

25  potential fraudulent conveyance claim, discounted all the

1    other ones as not being sustainable, and then applied pre-

2    judgment interest to that $17 million number, and came up with

3    a number very close to ours.  And so we kind of -- our

4    analyses kind of confirmed one another, because we got to the

5    same number, it appears, but by different paths.

6        So, with that as the overview, Your Honor, I'd like to

7    start diving into the facts.  So, as I said, this all started

8    with the Knox Transaction in 2007, in April 2007.  At the

9    time, UBS was the twentieth largest bank in the world and one

10   of the most sophisticated players in the collateralized debt

11   obligation, or CDO, market.  And they entered into a

12   securities -- a securitization transaction with the Debtor and

13   two offshore foreign subsidiaries that were special purpose

14   vehicles in which there were warehouse agreements and a

15   service or underwriting agreement with the Debtor.  The

16   warehouse agreements were with the offshore funds.

17       And under this arrangement, the funds were going to --

18   were put on margin to UBS and UBS went -- was going to go out

19   and buy CDO debt that they would put into their own warehouse

20   facility that they owned and controlled.  And those assets

21   that they bought plus the margin that was put up by the Fund

22   Counterparties -- again, not by the Debtor, but by the Fund

23   Counterparties -- that was the collateral to serve -- to

24   protect UBS from market movement and loss.  And, again, there

25   is simply no contractual basis for the Debtor to be liable,

1   again, as the New York State Supreme Court found when it

2   dismissed the indemnity claim.

3       So, we all know that it was a tumultuous time in 2008, and

4   UBS was not able to bring the CDO Fund together at the time,

5   and the original engagement letter with the Debtor and the

6   warehouse agreement -- agreements expired.  And at that point,

7   instead of simply closing shop, they tried again, and at this

8   point UBS and the Funds and the Debtor entered into a new

9   arrangement in March of 2008, pursuant to which UBS would seek

10  to bring another $800 million of CDO Fund -- CDO assets to

11  market.

12      The old warehouse assets that had been accumulated at that

13  point were rolled into the new warehouse agreements, so that

14  as of March of 2008, when this new venture was launched, the

15  warehouses had approximately $185 million in assets, including

16  about $74 million in margin that was provided by the funds as

17  a collateral cushion for UBS.  Those documents provide that no

18  other party, particularly the Debtor, was liable for the

19  losses.  The collateral was put up by the Funds.  The

20  documents are very clear.

21      So, with a Debtor like Highland Capital -- excuse me, a

22  company like Highland Capital in the background, why did UBS

23  look -- agree to look only to the Funds and to this structure?

24  The answer, Your Honor, is dollars and cents.  UBS made a lot

25  of money on this transaction in the form of fees.  $8.1

1    million of fees were paid, plus, you know, trading profit.

2    They had a lot of collateral, or so they thought.  And then,

3    you know, then 2008 came and I guess their collateral wasn't

4    sufficient.  But that was market risk that UBS took, and their

5    counterparties who were available to satisfy the loss were the

6    Funds, not the Debtor.  And they went into that obligation --

7    into that arrangement with their eyes open.  $8 million of

8    fees.  But a hundred percent of the risk at the warehouse

9    facility was in the Funds, and UBS could not look to the

10   Debtor to fund payment.  Not even for half of it or any

11   percentage of it.  Zero.

12        As I said, the first decision rendered by the New York

13   State Supreme Court dismissed a claim to hold the Debtor

14   liable based on a contract theory that the indemnity

15   obligation in the service agreement would support inflicting

16   this obligation on the Debtor, and it was squarely rejected by

17   the state Supreme Court and that claim was dismissed.

18        It's also clear from the documents, Your Honor, that as

19   they moved to this new arrangement in 2008, UBS specifically

20   released the Debtor and the affiliates from anything relating

21   to the original agreement.  So it was a clean bill of health

22   in the past and a set of documents marching forward pursuant

23   to which the Debtor was not liable for the losses that

24   ultimately were sustained.

25        So, again, UBS is a highly-sophisticated institution.  The

1    documents read the way they read.  And then the -- with the

2    great financial crisis of 2008, things really kind of fell

3    apart.  And, you know, through neither of the parties' fault

4    -- we all remember it was a crazy time.  Maybe not as crazy as

5    today, but certainly crazy.

6        So, there were two margin calls made by UBS against the

7    Funds that were -- that were met, and then a third margin call

8    that the Funds simply couldn't answer because of, you know,

9    the tumble and the collapse that was going on around them.

10        At this point, at the end of 2008, in December, UBS

11    terminated the engagement letter and the warehouse agreements.

12    So there were no more contracts in place after 2008, and yet

13    here we are with UBS alleging that there's a breach of implied

14    covenant in 2020.  The contract no longer existed after

15    February 2009, which is when the first lawsuit was filed.  So

16    I'll just put that out there to -- for observation.

17        So, as I indicated, after the engagement letter was

18    terminated, in February UBS brought suit against the Funds and

19    the Debtor, the indemnification claim was dismissed, but at

20    the time there was no breach of implied covenant claim

21    asserted or fraudulent transfer claim asserted.  Those came

22    later.  And the dismissal of the indemnification claim

23    occurred in 2010.  There was a final judgment entered on the

24    merits in favor of the Debtor, dismissing the UBS claims based

25    on the -- on the indemnity in the engagement letter.  And then

1    the language of the -- the language of the Appellate Division

2    where that dismissal was affirmed.

3          And this is significant language, Your Honor.  The

4    Appellate Division said that the warehouse agreements contain

5    no promise by the Debtor, Highland Capital Management, to

6    undertake liabilities, in quotes, with respect to UBS's losses

7    or to ensure or guarantee the Funds' performance.  Right?  So

8    that's pretty strong, inclusive words from the Appellate

9    Division in a -- in a -- you know, affirming a final judgment

10   dismissing contract-based claims against the Debtor for the

11   losses, because the operative documents, in the view of the

12   Superior Court and the Appellate Division, was that those

13   documents did not contain a promise by the Debtor to

14   "undertake liability" for UBS's losses or to ensure or

15   guarantee the Funds' performance.

16         And as you'll hear from me later, Your Honor, UBS can't

17   back into those conclusions that -- you know, different

18   conclusions by relying on an implied covenant claim, because

19   implied covenant claims can't be used to rewrite contracts and

20   the State Supreme Court and Appellate Division have already

21   found that the contracts were clear on their face and did not

22   impose liability on the Debtor.

23         As I indicated, after the -- that dismissal, UBS filed a

24   new lawsuit against the Debtor, added new defendants and some

25   new claims.

1       So the new claims against the Debtor, again, was the

2   implied covenant and fraudulent conveyance claims, and this is

3   where, for the first time, Your Honor, you see now claims

4   against HFP.  HFP was not a party to the warehouse agreements

5   and owed no debt to UBS.  But UBS is now pointing to transfers

6   that were made by HFP, and they could only be liable -- or,

7   excuse me, they could only be relevant to this dispute if they

8   could -- if UBS could somehow link up HFP to the fact pattern.

9   So HFP [sic] asserted, as a (inaudible), an alter ego claim

10  against HFP at the time, asserting that HFP was liable for the

11  debt obligations of the Funds as being the alter ego of the

12  Funds.  That claim has never been proved.

13      But it's important to note, Your Honor:  As I said, UBS

14  would have asserted an alter ego claim, if they wanted to, and

15  it did so, against HFP, but has never asserted one against the

16  Debtor.

17      All right.  The Debtor challenged the new complaint, and

18  this is a series of -- series of rulings on the res judicata

19  point.  So, as I said, the Appellate Division held that res

20  judicata bars UBS from asserting claims against the Debtor

21  that "implicate events alleged to have taken place before the

22  filing of the original complaint" February 24th of 2009.

23  That's the Appellate Division order in -- that was rendered in

24  2011.

25      And then in 2012 the Appellate Division had the

1    opportunity to extend that ruling to the alter ego claim

2    against HFP, once again ruling that UBS's claims for

3    declaratory judgment and fraudulent conveyance against HFP

4    could only be based upon events that happened after February

5    of 2009.

6        So, what happened after 2009, after February 2009?  The

7    only thing that UBS can point to are these fraudulent

8    transfers.  As I said, $233 million of transfers that were

9    made in -- alleged fraudulent transfers that were made in

10   March of 2009.

11       Now, let's break down who those transfers were made to,

12   because that's relevant to where we are today, and, again, to

13   the voting motion in particular.  So, $173 million out of $233

14   million were made to Crusader and Credit Strategies.  That's

15   the transfers that were the subject of the settlement

16   agreements and release.

17       $25 million was made to Multi-Strat.  And Multi-Strat has

18   a multitude of investors.  It's -- that's not the Debtor.

19   There are a bunch of third parties in there.  So that's $25

20   million.

21       Then you've got $17 million of transfers that were made to

22   Citibank.  And nobody has argued that Citibank is affiliated

23   with the Debtor.  It's obviously an independent third-party

24   institution.

25       And then, lastly, $17.7 million was transferred to the

1   Debtor.  And I noted that before.  That's the only transfer

2   out of that $233 million that actually made -- was made to the

3   Debtor.

4       All the other attempts by UBS to hold the Debtor liable

5   for the remaining $215-16 million worth of transfers is based

6   on some combination of alter ego, implied covenant, a lot of,

7   you know, fuzzy theories, as opposed to pointing to a specific

8   transfer to the Debtor, pointing to a specific contract

9   obligation of the Debtor.  It's these various other theories

10  that we'll address when I get to argument.

11      So, the -- so, after the new complaint was filed, after

12  the claims were essentially pared back by Appellate Division

13  rulings saying that you can't rely on pre-February 2009

14  events, we're left with a complaint that essentially asserts

15  those fraudulent transfers.

16      The next operative event in the fact pattern is in June of

17  2015 when UBS settled with the Debtor, Crusader, Credit

18  Strategies, and received -- I'm going to use round numbers

19  again, Your Honor -- $70 million in cash on account of those

20  $172 million of asserted fraudulent transfers.  And in the

21  settlement agreement, UBS released all claims against the

22  Debtor.  I'll quote it again.  "For losses or other relief

23  specifically arising from the fraudulent transfers to Crusader

24  or Credit Strategies."  Not a release of fraudulent transfer

25  claims, but a release of claims for losses or other relief

1   specifically arising from the fraudulent transfers.  And I

2   think a fair reading, Your Honor, is, since they weren't just

3   releasing fraudulent transfer claims, that's -- claims for

4   losses or other relief from those fraudulent transfers, the

5   use of the term fraudulent transfers in that context is really

6   kind of a shorthand of describing which operative transactions

7   we were talking about.  But the release language is clearly,

8   clearly broader than the release of fraudulent transfer

9   claims.  And I'll hit that later in argument.

10      But, anyway, so that -- that settlement happened in June

11   of 2015.  So, and then it goes, again, $172 million of the

12   transfers are settled.

13      So, then came -- the next operative event was taking

14   things, one trial, to trial, and then that was only to

15   adjudicate the claims against the Fund Counterparties.  The

16   decision was rendered in November of 2019.  The breach of

17   contract argument against the Funds was entered February 10th

18   of 2020, for, again, the billion dollars.  And then I don't

19   know if it's postpetition, but in any event this bankruptcy

20   case was filed October 16th of 2019.  And then, as I indicated

21   before, Your Honor, after the stay relief litigation and the

22   special bar date for UBS to file its proof of claim, again

23   asserting the full billion dollars against the Debtor.

24      So I'm not looking for confirmation by Mr. Clubok, but

25   that concludes what I view, Your Honor, as a statement of the

1   undisputed facts.  Again, Mr. Clubok can add whatever he likes

2   when it's his turn, but I'm going to move on now to argument.

3   And I do appreciate Your Honor's patience.

4        So, let me start, then, with this proposition, Your Honor,

5   that there is no billion-dollar claim against Debtor.  And

6   even from the procedural history, you can see that there was

7   never really a billion-dollar claim asserted against the

8   Debtor, except as kind of a funny implied covenant claim that

9   would, if allowed, contradict a ruling that's already in place

10  from the state court that the Debtor has no contractual

11  liability of any kind to UBS for the losses sustained by the

12  Funds.  That was the dismissal of the indemnity claim, and now

13  we're looking at implied covenant and also alter ego.

14       So, let me start with the alter ego, because we didn't

15  deal with the fact that UBS is trying to give itself an

16  exception from the bar date.  And I just don't think that

17  works.  As I've indicated throughout today, UBS has never

18  asserted an alter ego claim against the Debtor.  Ever.  It

19  keeps saying the Debtor is liable for a billion dollars, but

20  certainly not on alter ego ground.  And in their response to

21  the claim objection, they made it clear, they were adamant

22  that they were not asserting alter ego claim.  They said at

23  Page 19 and 20 of their response to our claim objection, "As

24  UBS has informed the Court previously in the (inaudible)

25  hearing, UBS has not asserted and is not asserting that the

1    Debtor is an alter ego of the Fund Counterparties."

2         And then, in opposition to the summary judgment motion,

3    the papers that UBS put in stated at Page 44 that the UBS

4    claim "is not an attempt to enforce the Phase I breach of

5    contract judgment against the Debtor, as UBS has repeatedly

6    made clear."

7         So, look, UBS is the master of its own pleadings.  It can

8    assert whatever purported claims it would like to and not

9    assert whatever claims it chooses not to.  But there is no

10   option when it comes to a bankruptcy bar date.  It's, pardon

11   the expression, put up or shut up, right?  The bar date had --

12   the bar date order, Your Honor's order, required that all

13   claims that UBS had be asserted by the bar date, and UBS

14   didn't assert an alter ego claim.  And, again, as I have

15   quoted, they were pretty adamant that they chose not to.

16        Now, they can't just excuse themselves from the bar date.

17   If you look at the definition of claim under -- and, again,

18   the bar date requires all claims be filed by the bar date --

19   the definition of claim as I note in 101(5) of the Bankruptcy

20   Code is quite broad.  Very broad.  It encompasses any right to

21   payment, any form of liability, whether it's contingent,

22   unliquidated, matured, unmatured, disputed, or otherwise.  And

23   so a form -- it uses the term form of liability, among other

24   things.

25        And there's case law that we've cited in our motion that

1   backs this up.  For example, the *Yan v. Lombard Flats* case

2   held that allegations of alter ego against a debtor asserted

3   post-confirmation to attempt to impose liability on a debtor

4   for claims against the debtor's principal based on breaches of

5   prepetition promissory notes constitute a prepetition claim.

6   Right?

7         So the effort by UBS to give itself the opportunity to

8   hold back a theory of liability, claim there are state court

9   procedural remedy that it might bring someday, cannot work as

10  a matter of bankruptcy law.  And it doesn't matter whether

11  that claim accrued under state law and the removal of CPLR has

12  been invoked, or federal law, because the law is very clear

13  that a creditor need not have a cause of action that's ripe

14  for a suit outside of bankruptcy in order for it to have a

15  prepetition claim for the purpose of the Bankruptcy Code.

16  That's *U.S. v. Williams*, which we cited, a Northern District

17  of Texas District Court case, August 3rd of 2005.

18        So, what UBS put in to try to preserve its ability to hold

19  this claim over the Debtor's head for some future adjudication

20  is its own self-serving and I believe ineffectual reservation

21  of rights.  And thus it just -- it can't work, Your Honor.  I

22  mean, it fundamentally undermines the meaning of a bar date

23  order, the meaning of finality in a bankruptcy case.

24        You know, imagine the chaos that would ensue if any

25  creditor in a bankruptcy case could say to the Court and to

1    the other parties, I've got this other theory of liability

2    against the debtor, but I'm giving myself the option to hold

3    it back and I'm going to assert it at a later date.  It simply

4    doesn't work.  That kind of reservation of rights can't

5    override the plain meaning of a bar order and the broad

6    definition of claim.

7        And I point Your Honor to a case we cited, *In re Entergy*

8    *New Orleans*, July 2008, decided by the Bankruptcy Court in

9    Louisiana, that allowing creditors to assert new claims after

10   the bar date merely by reserving rights in their original

11   proof of claim would permit any creditor filing a proof of

12   claim in a bankruptcy to simply include a short paragraph of

13   reservation of rights language and then have a claim against

14   the debtor for anything that happened between that creditor

15   and the debtor from well before the beginning of the case

16   until the case closed, which could be, you know, many years,

17   thereby negating the role of a bar order in a bankruptcy case.

18   It simply can't -- UBS simply cannot give it -- grant itself

19   an exception to the bar order by putting in this reservation

20   of rights.

21       And, again, as I noted, their failure to assert an alter

22   ego claim was deliberate, and their reservation of rights has

23   been [in]effectual.

24       Beyond the bar date issue, Your Honor, there's also a

25   matter of res judicata.  And this has been where the -- where

1   the Appellate Court Division -- excuse me one second.

2   (Pause.)  That the Appellate Court decisions make it very

3   clear that UBS can't assert any claim against the Debtor that

4   arose prior to February 24th of 2009.

5       Let's remember that the breach of contract occurred in

6   2008.  The contract was terminated in 2008.  Right?  So

7   there's simply no way for UBS to find, post-February of 2009,

8   facts to support their alter ego claim that go back and hold

9   the Debtor liable for a breach of contract that occurred in

10  2008.  It just doesn't work.

11      And, you know, Mr. Clubok can give his interpretation to

12  the various Appellate Court decisions, but there -- for them

13  to have meaning, there must be some meaning to the line of

14  demarcation that the Court drew, that February 2009 line.  And

15  as I indicated before, while it may be possible for Mr. Clubok

16  to seek to introduce evidence of facts that, you know,

17  predated February of 2009 as color or support or whatever, in

18  support of a claim for operative events that occurred after

19  February of 2009, he cannot rely on operative events that

20  occurred in 2008 for an alter ego claim, an implied covenant

21  claim, or anything else, for that matter.  Otherwise, those

22  Appellate Court decisions on res judicata, which are very

23  clear, would be devoid of meaning.

24      We also note, Your Honor, that that -- that the state

25  court already applied that ruling.  Right?  The first time it

1  came up was in dismissing claims against the Debtor, but it

2  also came up in a subsequent decision in 2012, when the

3  Appellate Division dealt with the alter ego claim against HFP,

4  where, again, the -- where a court dismissed UBS's cause of

5  action for declaratory judgment on the alter ego theory

6  against HFP with respect to any claims that arose before

7  February of 2009.

8      So the state court has already applied this rule to some

9  of the other claims that are involved in this case.  And that

10  outside of our own litigation, there is -- there are other

11  decisions that we cited in our motion that are pretty close.

12  I mean, for example, the very important decision on it we

13  think is the *Board of Managers of 195 Hudson Street v. Jeffrey*

14  *Brown Associates*, which we've cited, I think, in every

15  pleading we've filed with Your Honor in this case, Southern

16  District of New York, 2009, applying res judicata to bar a

17  plaintiff from enforcing a judgment against a defendant under

18  this, you know, the CPLR post-judgment remedies rule, to apply

19  that judgment against a defendant who's already named in the

20  underlying lawsuit, because you've had the opportunity, if

21  you've already named that defendant, to assert whatever claims

22  you'd like against that defendant.

23      So that -- the New York court there found that there is an

24  exception to the rule that Mr. Clubok is relying on, that you

25  can try to assert alter ego post-judgment against some other

1    party.  You can't do that if that some other party was already

2    a named defendant in the lawsuit, and clearly, that's the case

3    here.  The Debtor was named in the original lawsuit, so the

4    *Board of Managers* applies.

5        So, again, this -- beyond missing the bar date on this

6    issue, the res judicata rulings certainly support a

7    conclusion, and there really is no other conclusion, that UBS

8    can't someday come after the Debtor after -- in the future

9    based on, you know, CPLR post-judgment remedies as a way to

10   assert alter ego because it's barred from doing so by the fact

11   that Highland -- the financial -- excuse me, that the Debtor

12   was a named defendant in the original lawsuit.

13       So, with respect to the billion-dollar claims, Your Honor,

14   both the bar date and the alter ego -- excuse me, the res

15   judicata rulings mean that there is no billion-dollar claim.

16   All we've got, all that UBS has got are facts and

17   circumstances, operative events that occurred after February

18   of 2009.

19       So what are those operative events?  Right?  Well, we know

20   about the fraudulent transfer claims, right?  $233 million of

21   transfers.  Those are in March of 2009.  So at least there

22   you've gotten past the res judicata rulings because those

23   events actually took place in March of 2009.  But beyond that,

24   there's nothing else.

25       And the motion -- the opposition papers that UBS put in

1    were a bit of a tease, because, you know, for -- to get to

2    what they think they have, besides fraudulent transfers, and

3    we'll see that it's really nothing, but for pages their papers

4    go on saying, Hey, our fraudulent transfer claims -- our

5    implied covenant claims are not identical to our fraudulent

6    transfer claims.  We have more.  And we kept saying, Where's

7    the beef?  Where's the more?  Because we don't see anything.

8    And for pages, they acknowledge that they, you know, that they

9    could plead more, but they never come up with the goods.

10        Really, all that's there, Your Honor, are the fraudulent

11   transfers.  There is no other fact or evidence that they cite

12   that would support an implied covenant claim or a breach of

13   fiduciary duty claim beyond those March transfers.

14        And I don't -- I think they -- you know, we've pointed out

15   in our papers a number of times they've made this

16   acknowledgment and they're trying to rewrite history a bit

17   here.  But, you know, in the opposition to the summary

18   judgment motion, they say at Page 4 of their opposition:

19   Under its implied covenant claim, as UBS repeatedly has

20   explained, UBS is seeking damages not from fraudulent -- not

21   just from the fraudulent transfers of March of 2009.  And

22   again, they state it again in their -- throughout the papers,

23   but they don't point to anything.

24        Importantly, in the 3018 motion, they make it clear that

25   they're not seeking a double recovery.  At least we don't have

1    to rebut that.  Right?  They're saying, Look, we're -- there's

2    an implied covenant theory.  There's a fraudulent transfer

3    theory.  We're not looking to recover the same money twice.

4    Or, well, we'll see when we get to discuss the release that

5    maybe they are, right?  Because they're saying -- they're

6    trying to say that, well, they got paid $70 million to release

7    $170 million of fraudulent transfer claims.  Their contention

8    is to twist the language of the release and say that none of

9    their implied covenant claims were released at all, so that

10   they can bring an implied covenant claim for $233 million, not

11   for $60 million.  We'll deal with that, and it's -- and we

12   don't think it's effectual.

13       Again, Your Honor, after all of the acknowledgement that,

14   you know, they're -- they need to come up with something, you

15   finally get to Page 25 of their opposition to the motion for

16   summary judgment, and -- where they purport to articulate what

17   happened after February of 2009 that they can rely on.  And

18   they say, for example, but this is -- appears to be an

19   exhaustive list, I'm quoting or paraphrasing from their

20   pleading at Page 25, that the Debtor "failed to direct the

21   Fund Counterparties and HFP to pay UBS what it was owed."

22   That they -- that the Debtor affirmatively directed the Fund

23   Counterparties and HFP to withhold payments from UBS.  That

24   they engaged -- that the Debtor engaged in protracted

25   litigation, that somehow litigating that was actionable, but

1    they engaged in protracted litigation that frustrated UBS's

2    right to recover the amount from the Funds.  That they

3    siphoned for the Debtor's benefit funds that were -- that

4    belonged -- funds that belonged to the Counterparties and that

5    HFP should have used to pay them.  That they prevented an

6    additional infusion of value that could have been used by the

7    Funds to make the payment.  And that they kept the Fund

8    Counterparties allegedly undercapitalized.

9        So these are the -- beyond the transfers themselves, this

10    is what UBS has articulated as the other actionable events

11    that purport to support an implied covenant claim of events

12    that were post-February 2009.

13        So, on the merits, Your Honor, we don't think any of these

14    arguments work.  Right?  First, let's talk about what implied

15    covenant claim looks like.  The -- you can't use an implied

16    covenant claim to rewrite a contract, right?  And we've

17    already had a ruling in the state court case about what the

18    contract means.  The, you know, Appellate Division said that

19    the warehouse agreements and the agreement with the Debtor

20    exposed no promise by the Debtor to "undertake liability with

21    respect to UBS's losses" or "to ensure or guarantee

22    performance of the Funds."  Right?

23        So there's a -- that's a ruling that's already been made

24    by the state court.  And if you go back to Page 25, it looks

25    like UBS is trying to argue that anyway, that, in effect, that

1   the Debtor was somehow obligated to cause HFP, to cause the

2   Funds to be more solvent than they were, to ensure that

3   payment would be made to UBS.  That is tantamount to requiring

4   the Debtor to ensure or guarantee payment, something that the

5   state court has already ruled the Debtor is simply not

6   obligated to do based on the contract that UBS signed.

7        So, the -- and, again, UBS is a highly-sophisticated

8   party, these contracts were done and redone, and with

9   explicit language that UBS is not liable -- excuse me, that

10  the Debtor is not liable to "undertake liability" with respect

11  to UBS's losses or "to ensure or guarantee performance."

12       So, you know, all of the documents are replete with

13  language, not just the engagement letter with the Debtor, but

14  the warehouse agreements, all say that to the extent that

15  there are CDS losses, it's the Fund Counterparties that are

16  responsible for the losses one hundred percent.

17       So, turning now to the, again, the contentions that they

18  made in Page 25, that the Debtor should have caused more funds

19  to go into the Fund Counterparties or that there should have

20  been an additional infusion of value or capital to cause the

21  Funds to be able to satisfy obligations to UBS, this does not

22  work.  And there's actually a very interesting decision, Your

23  Honor, and I would encourage you to read the *Board of Managers*

24  decision.  The other, I think, (inaudible) decision on this

25  motion is a decision with directors with whom -- involving

1    Citibank.  It's 270 F.3d at 730 or so.  There, Your Honor,

2    very similar to argument made by Citibank that UBS is

3    attempting today to imply a promise by the Debtor to ensure

4    that cash would be available for distribution by HFP to

5    Citibank, on HFP's notes to Citibank, Citibank argued, as does

6    the Debtor here -- excuse me, as does UBS here -- that the

7    debtor had an implied obligation to ensure that cash was

8    available for distribution to Citibank.

9        The District Court granted summary judgment in favor of

10   the debtor, dismissing that claim.  And I quote, it's -- the

11   Court concluded it was unpersuaded that the Debtor owed

12   Citibank a good-faith obligation to ensure that cash was

13   available for distribution on the notes.  The HFP notes.

14   Quote, "It makes little sense to read into the agreement an

15   implied promise that the Debtor would ensure that cash was

16   available for distribution on the HFP notes.  To the contrary,

17   such an implied promise would impose a duty on the Debtor

18   beyond that which (inaudible) by the Court."

19       Your Honor, that's on -- that's (inaudible), I guess,

20   here, because it's not Citibank.  But, you know, UBS is making

21   the identical argument.  And, again, this is a New York State

22   -- or New York Federal District Court ruling involving the

23   debtor, very similar facts, holding that you can't use an

24   implied covenant theory to impose a duty that is not found in

25   the contract documents.  That's -- that is precisely what UBS

1    is trying to do here.

2         So, and again, Your Honor, we think on that basis the

3    implied covenant claims fail.  And to -- and certainly to the

4    extent that they're relying upon anything other than

5    fraudulent transfers.  All this excess verbiage that, you

6    know, the Debtor had to ensure payments over, it just doesn't

7    work.  Right?

8         So what you're left with now are the fraudulent transfer

9    claims, and Mr. Clubok's acknowledgement nonetheless that the,

10   you know, the fraudulent transfer claims and the implied

11   covenant claims substantially overlap.  I would submit, Your

12   Honor, that they're -- they're certainly identical to the

13   extent that the maximum potential liability are the amount of

14   the transfers.  That's the starting point.  And then we have

15   to talk about the release.

16        So, I would then go from $233 million of implied covenant

17   claims and fraudulent transfer claims, and now we're going to

18   turn to the settlements with Crusader and Credit Strat and the

19   language of the release.  And I'm going to do it for the third

20   time.

21        UBS had $70 million in cash.  And they signed a document

22   that released all, quote, claims, close quote, against the

23   Debtor, quote, for losses or other relief specifically arising

24   from fraudulent transfers to the Settling Defendants that were

25   alleged in the litigation.

1          Now, UBS is asserting today that its implied covenant

2    claim is something other than the fraudulent transfers.  But

3    as I said, if you look at their, quote, additional

4    allegations, they really don't get there.  All they're doing

5    is really asserting a claim dressed in an implied covenant

6    theory for losses or other relief specifically arising from

7    those challenged transfers.  Right?

8          And I took out the word fraudulent and I said challenged.

9    Because as I said before, Your Honor, I think a fair reading

10   of the release is that fraudulent transfers is a reference to

11   a bunch of transactions that were challenged in the lawsuit.

12   But if the release is as narrow as Mr. Clubok alleges, they

13   certainly have very competent lawyers, they could have drafted

14   it to say that, We're releasing the Debtor from fraudulent

15   transfer claims, not for claims for losses or other relief

16   specifically arising from the fraudulent transfers.  That's

17   very different.  And we think that encompasses the implied

18   covenant claims, and that the language is clear.

19         And in order to reach a contrary conclusion, as UBS is

20   urging, you'd have to find language that we just don't think

21   is there, Your Honor.  Again, if it simply said, We're

22   releasing fraudulent transfer claims, that would be one thing,

23   but that is simply not what the documents say.

24         So, you know, on that basis, Your Honor, those claims rise

25   and fall together.  And so the maximum implied covenant claims

1   would be $233 million, because above and beyond that they

2   couldn't show anything other than contentions that would

3   amount to overwriting a contract and imposing on the Debtor an

4   obligation to pay that the contract didn't provide.  And the

5   *Citibank* decision rejected that.

6        All right?  So we're starting with $233 million of implied

7   covenant and of fraudulent transfer.  We think the language of

8   the release is clear, and it takes $233 million down by $172

9   million.  Those are -- that's the face amount of the transfers

10   as to which the Debtor was released, we believe, on all

11   theories, because any claim for losses arising from those

12   transfers was released, and it wasn't limited to a cause of

13   action under the New York Debtor and Creditor Law.

14        So, we don't think anything in UBS's papers contradict us.

15   There is some, you know, verbiage in there -- I'm sure Ms.

16   Mascherin will address this in her opening as well -- we don't

17   think that that changes the outcome at all.  But we think

18   that, on a motion for summary judgment, the language of the

19   release is clear on its face and that the Debtor is entitled

20   to a ruling from Your Honor of summary judgment dismissing all

21   claims, whether sounding in fraudulent transfer or implied

22   covenant, alter ego, anything, above the $60 million of

23   transfers that remained after those releases were executed by

24   UBS and delivered to the Debtor.

25        So, I want to address one more point on summary judgment,

1    Your Honor, and then I'm going to do some work on the voting

2    motion.

3        The other ground that was raised by UBS in opposition to

4    the summary judgment motion was an argument under Rule 56(d)

5    that they need more discovery, and that if they were to get

6    that discovery, it would allow them to plead a genuine issue

7    of material fact and defeat the motion.

8        We think that that is, to be charitable, unavailable, Your

9    Honor, for a number of reasons.

10        First, Mr. Clubok has said more than once he doesn't need

11    any more discovery, he's trial-ready.  And in fact, the trial

12    of the fraudulent transfer, implied covenant claims, the Phase

13    II trial, as Mr. Clubok said in his stay relief motion, that's

14    ready for trial.  All you need to do is lift the stay and then

15    we'll try them.

16        So, obviously, complaining now that there are more facts

17    that he needs to resist this motion is contradictory to what

18    he advised the state court, that he was trial-ready.  It's

19    also contradictory to what he said to this Court.  It was in

20    the context of, really, the status conference about our

21    summary judgment motion, trying to set a briefing schedule.

22    Mr. Clubok said, Let's just bypass summary judgment.  Let's

23    just take the case to trial.  We're ready.  Right?

24        So it just begs credulity for him to argue now that there

25    are some additional facts and he needs from discovery that

1   would, you know, if provided, would give him some way to

2   create a material issue of fact that would result in the

3   denial of this motion.

4        Moreover, Your Honor, there's no nexus between -- anyway,

5   we responded to the discovery requests and we provided what we

6   provided, what we could provide, remembering that HFP, for

7   example, is defunct.  We've worked long and hard.  People at

8   the company have worked many, many hours going through a

9   separate server to try to get these documents to UBS.  But to

10  the extent that -- we don't think there's anything missing,

11  but if Mr. Clubok thinks there is, he still needs to link it

12  up.  There needs to be some nexus between what he alleges to

13  be missing and how that, if those documents existed and were

14  provided to him, how somehow that would form the basis for a

15  defense to this motion.

16       But more to the point, he's already on record twice -- in

17  this Court and in the state court -- saying that he's trial-

18  ready and he doesn't need discovery.  So the 56(d) argument,

19  we think, is make-weight and should not be grounds for denial

20  of the motion.

21       I'm going to stop on summary judgment there and just move

22  over to the voting motion.  So, let me start by saying this,

23  Your Honor.  We believe our summary judgment motion to be

24  meritorious, and on that basis we give no weight to any claim

25  for voting purposes above and beyond the claims as to which we

1   didn't move for summary judgment, which is $60 million in

2   principal amount of transfers.  And as I noted before, Your

3   Honor, of the $61 million, only $17 million went to the

4   Debtor.  Right?

5       And as Ms. Mascherin will explain, their view is that's

6   the only potentially viable claim against the Debtor, and that

7   was the basis for their calculation of a roughly $35 million

8   claim, that $17 million plus prepetition interest.  We get to

9   the same place, as I said, by something of a different path.

10  But, you know, we don't think that there is a strong

11  likelihood of recovery on $61 million of fraudulent transfer

12  claims for a number of reasons.

13      First, as I said, most of these claims require UBS to

14  establish that HFP is the alter ego of the Fund

15  Counterparties.  And that, under state law, Your Honor, is

16  that UBS bears a heavy burden.  We've cited the cases in our

17  brief.  I won't recite all of the law on this.  But, you know,

18  UBS would have to show that there was control or domination,

19  that there was wrong -- that, you know, unlawful conduct or

20  fraud.  Asset-stripping, things like that.  We don't think

21  they're going to have, really, an ability to do that.

22      One of the gating items, Your Honor, is that, you know,

23  there could not have been any confusion on the part of UBS --

24  it was the twentieth largest bank in the world -- about which

25  entities they were dealing with, which entities bore the loss,

1    which didn't, what was -- I mean, it just -- the alter ego

2    claim is just not viable.  And that knocks out, really, all

3    the $60 million, $61 million dollars of transfers, such that

4    all we're left with was $17 million that was actually

5    transferred to the Debtor.

6        So, you know, based on, you know, the fact that the other

7    transfers were made to third parties, like Citibank or Multi-

8    Strat, which were third-party investors -- and that's a

9    critical problem in terms of trying to establish alter ego

10   liability, fraudulent transfer liability.  So, you know,

11   really, Your Honor, the only claim that we haven't truly

12   challenged today is the $17 million claim.  So I've taken you

13   from a billion down to $17 million.

14       But when we approach the voting motion, Your Honor,

15   because it is -- it's not a trial on the merits, it is to try

16   to do kind of a rough justice for voting purposes.  So, you

17   know, given that we're looking at $61 million of transfers,

18   times two for pre-judgment interest, to $119 million, we

19   thought, given the weaknesses and the hurdles that UBS faces

20   in terms of trying to establish alter ego for most of the

21   claims, that it was appropriate to take a 70 percent discount

22   against the $119 million.  And that's how, on the voting

23   motion, we suggested a claim in the amount of $35,742,000.

24       That's it, Your Honor.  I'm happy to answer any questions.

25             THE COURT:  All right.  You went 58 minutes, by the

1   way.  But anyway, --

2          MR. FEINSTEIN:  Good estimate.

3          THE COURT:  -- I did have some questions along the

4   way, and I saved them for now.

5       Let me clarify your statement that the Multi-Strat

6   entities, which received $25,782,000 of the $233 million

7   transferred in March 2009, clarify, you said they're third-

8   party investors.  Is that entity not in the Highland umbrella

9   of companies?

10         MR. FEINSTEIN:  It's managed by Highland, but the

11  fund -- the owners of the fund, there are multiple parties.

12  Including third parties.

13         THE COURT:  So, it -- Highland merely manages it?  It

14  doesn't have any ownership, direct, indirect?

15         MR. FEINSTEIN:  You're testing my memory, Your Honor.

16         THE COURT:  Okay.

17         MR. FEINSTEIN:  Just bear with me for a second.

18         THE COURT:  Okay.  You know, it's either in the

19  summary judgment evidence or not, I suppose.  But --

20         MR. FEINSTEIN:  Yeah.  I guess my -- you know, Your

21  Honor, I know that there are quite a number of third party --

22  you know, unrelated third parties in the fund.  I don't know

23  that Highland has any ownership in the fund, but somebody's

24  going to correct me if I'm wrong.

25         MR. SEERY:  Um, --

1          THE COURT:  Okay.  So we'll --

2          MR. FEINSTEIN:  I see Mr. Seery -- I think he's on

3   mute.

4          THE COURT:  Okay.  We'll --

5          MR. FEINSTEIN:  I gave you the best answer I could.

6          THE COURT:  We may or may not come back to that.

7   But, all right.  Well, just to follow up on the alter ego

8   claim, I understand the Debtor's main argument is that UBS is

9   time-barred because they didn't assert it in their proof of

10  claim by the bar date.

11     I also understand that you're saying that they're barred

12  from asserting that Highland was an alter ego prior to

13  February 24th, 2009 because the New York state courts had

14  ruled multiple times that claims against Highland arising

15  prior to that date are barred.

16     But are you also arguing -- I'm not clear if I heard you

17  arguing this or not -- that UBS is estopped from -- let's say

18  hypothetically UBS is arguing, well, Highland was the alter

19  ego of HFP in March 2009, when those transfers were made, and,

20  you know, that would be like an alternative theory perhaps to

21  hold Highland liable for the $233 million of March 2009

22  transfers.  Are you saying that they would also be barred by

23  res judicata because they never made that argument in the 2010

24  action?  Meanwhile, they did make the argument HFP was the

25  alter ego of the Funds, CDO and SOHC.  Is that part of your

1  argument or not?

2        MR. FEINSTEIN:  It is, Your Honor.  And, again, I

3  point to the *Board of Managers* decision that if you have an

4  alter ego claim against somebody you've already named as a

5  party, you need to assert it.

6        Your Honor, I've gotten good information from my

7  colleagues about your prior question, so let me answer that,

8  that HC Multi does own a significant -- the Debtor owns a

9  significant portion of Multi-Strat, as does Mr. Dondero, and

10 that there are other -- there were other third parties who

11 were, really, imbued in the past, but certainly in the past at

12 the relevant times, they owned a significant portion as well.

13        THE COURT:  Okay.  So they're not exactly in the

14 category of Citibank?  But, all right.

15        MR. FEINSTEIN:  No.

16        THE COURT:  Okay.  So, let me see if I had any other

17 questions.

18        Oh, am I correct in remembering that at one point

19 Highland, in the 2010 action, moved to dismiss the UBS implied

20 covenant of good faith and fair dealing claim, and that the

21 Court held that there could potentially be a claim for this

22 post-termination of the warehouse agreements and post-February

23 24th, 2009?  Has --

24        MR. FEINSTEIN:  Yeah.  You know what, Your Honor,

25 that's honestly -- it's a ruling that I kind of questioned.

1   But the contract was terminated in 2008.

2              THE COURT:  Right.

3              MR. FEINSTEIN:  And so now that -- now, post-February

4   of 2009, UBS is arguing that there was a breach of implied

5   covenant by the Debtor for a contract that was terminated

6   before this operative February date.

7        And you're right, the state court said, No, we're going to

8   let -- we're not going to dismiss it on that basis alone and

9   let it go forward.

10             THE COURT:  All right.  And I drill down on that

11  because part of what you're asking, I think, is the Court to

12  rule that UBS could have no -- or, the maximum amount of UBS's

13  claim here could be, well, $61 million, you know, the $233

14  million minus the amounts that you say it released in the --

15             MR. FEINSTEIN:  Yeah.

16             THE COURT:  -- Redeemer settlement.  But --

17             MR. FEINSTEIN:  Right.

18             THE COURT:  -- let me give you a hypothetical.  I

19  remember somewhere in UBS's papers them saying that they

20  realized in discovery that HFP, I think, had $24 million.  I

21  think that was the number.  Was it $32 million or $24 million?

22  On -- after February 24th, 2009.  Or maybe on February 24th,

23  2009.  Around that time.  So if they -- if they are arguing,

24  as part of their breach of implied covenant of good faith and

25  fair dealing, that that money was dissipated, you know, in

```
 1   addition to this $233 million in March, are you wanting a
 2   ruling that would bar them from making that argument?  Claim?
 3   Isn't that preserved?
 4          MR. FEINSTEIN:  Well, look.  To -- I guess let me
 5   answer it this way.  To the extent that they're looking to
 6   facts that occurred post-February of 2009, then res judicata
 7   really doesn't bar them from making that argument.
 8          THE COURT:  Uh-huh.
 9          MR. FEINSTEIN:  But this is also something that
10   they've known about for nine years, to our knowledge, and
11   they've never moved on it.  The first time I've even heard
12   about it I think was in their voting motion.  But now this is
13   a new pocket of damages or claims that they're asserting.  But
14   they've known about this for nearly a decade.
15      But I can't deny, Your Honor, that if they have something
16   that post-dates February of 2009, that at least they're not
17   barred by the res judicata ruling.
18          THE COURT:  Okay.
19          MR. FEINSTEIN:  They may have other problems.
20          THE COURT:  Okay.  We'll get Mr. Clubok to nail that
21   down.  Because I got the impression they had just learned that
22   somehow in discovery very recently.  But --
23          MR. FEINSTEIN:  Yeah.  Yeah.  And I'll leave that for
24   them.
25          THE COURT:  Okay.  Let me see if that covers all of
```

1   my questions for you.

2        Okay.  That was all of my questions.  Thank you.

3            MR. FEINSTEIN:  Thank you very much, Your Honor.

4            THE COURT:  Okay.  I will now hear from the Crusader

5   Funds.  Ms. Mascherin, are you going to take the lead on that?

6            MS. MASCHERIN:  I am, Your Honor.  Thank you.

7            THE COURT:  Okay.

8            MS. MASCHERIN:  And thank you for your patience this

9   morning.  Your Honor, I will not replow any of the factual

10   ground except to give some emphasis with respect to the

11   contract language.  And I do agree with all the points that

12   the Debtor's counsel has made in their argument.  So I will do

13   my best not to repeat.  But I do think -- and I will focus my

14   argument.  I'm not going to address everything that Mr.

15   Feinstein addressed in his argument.  I will focus my argument

16   on the release issue and on only certain aspects of the res

17   judicata issue.

18        With regard to the release, Your Honor, as I believe we've

19   shown in our papers, and I hope you'll agree with us today,

20   the releases that were given in the settlement agreements with

21   the Crusader Fund and the Credit Strategies Funds released not

22   only the fraudulent transfer claims against Highland Capital

23   Management but also released UBS's claim for implied duty

24   insofar as UBS is seeking damages on that claim for the

25   alleged fraudulent conveyances, the value of the assets that

 1  were transferred to the Crusader Fund or to the Credit

 2  Strategies Fund.  And we're asking for ruling as a matter of

 3  law based upon contract language to that effect with respect

 4  to the release.

 5      With respect to res judicata, I'm going to limit my

 6  comments this morning to two aspects of our res judicata

 7  argument.  The first is, in essence, the *Celotex* argument, if

 8  you will, that we've made and that the Debtor has made, which

 9  is the argument, as Mr. Feinstein articulated it, that takes

10  us from a hypothetical billion-dollar claim down to the $233

11  million of alleged fraudulent conveyances.  As we argue and as

12  the Debtor argues, we believe that needs to be further reduced

13  to exclude the fraudulent conveyances that were claimed

14  against Crusader and Credit Strategies.

15      But as a matter of law, and under the Supreme Court's

16  well-established precedent in *Celotex*, UBS was -- had the

17  burden, in response to the summary judgment motion, to come

18  forward with some proof of other damages claims arising post-

19  February 24, 2009, other than the value of the assets that

20  were transferred, and we believe that UBS has failed in that

21  proof.

22      So that's the first aspect of the res judicata argument

23  that I will touch on.

24      The second aspect that I will touch on is to respond to

25  UBS's argument in its briefing that it should be permitted to

1   reserve the right to bring an alter ego claim against Highland

2   for the one billion dollar judgment that was obtained against

3   the Fund Counterparties from the Knox Transaction under what

4   UBS argues is New York law, which says that alter ego claims

5   don't arise until after the underlying litigation is resolved.

6   And I will touch on the same important New York federal court

7   decision that Mr. Feinstein talked about with respect to why

8   that law doesn't apply in this case, because Highland was a

9   defendant in that New York case that gave rise to the one

10  billion dollar initial judgment against the Fund

11  Counterparties and because the claims that UBS is raising in

12  this case arise from the same transaction or series of

13  transactions as that first case -- namely, the Knox Agreement

14  and the activities that took place, the actions that took

15  place following the Knox Agreement relating to UBS's efforts

16  to collect on its breach of contract claims with respect to

17  the collateral.

18      So I'll start with the release, Your Honor.  And I think a

19  number of things here are undisputed with respect to the

20  release.

21      First, it is undisputed that Crusader and Credit

22  Strategies entered into the settlement agreements with UBS.

23  It is undisputed that the settlement agreements include

24  releases which are identical in language but for the reference

25  either to Crusader Fund or to the Credit Strategies Fund, as

1    the particular agreement states.

2        And for purposes of the argument today, Your Honor, I'll

3    be focusing my argument on the language from the Crusader Fund

4    settlement agreement, which is Redeemer Committee Exhibit #21.

5    And the parties have stipulated that the Credit Strategies

6    settlement agreement, which is Redeemer Committee Exhibit #22,

7    is identical with respect to the release language.

8        It is also undisputed, Your Honor, that Crusader and

9    Credit Strategies collectively paid $70.5 million to UBS,

10   which, to my clients, is a lot of money, to UBS to settle the

11   claims arising from the transfers of assets to the Crusader

12   Fund and to the Credit Strategies Fund, which UBS's expert at

13   the -- in the New York litigation valued at $172.4 million.

14   The settlement agreement, as you will see, Your Honor,

15   includes the common language that the parties have compromised

16   and settled those claims.

17       It is undisputed that UBS provided full releases, broad

18   releases, to the Crusader and Credit Strategies Funds with

19   respect to all claims that had been asserted against them,

20   either arising from the Knox Agreement or as alleged in the

21   New York litigation.

22       It is undisputed that, for their $70.5 million, the

23   Crusader Fund and the Credit Strategies Fund also purchased

24   releases of the Debtor.

25       What's disputed here is how to interpret the portion of

1    the release in Redeemer Committee Exhibit 21 and Redeemer

2    Committee Exhibit 22 which applies to Highland Capital

3    Management as opposed to the Crusader Fund and the Credit

4    Strategies Fund entities.

5        I submit, Your Honor, as a matter of law, this contract

6    can be interpreted based on the plain meaning of the contract

7    and using the definitions that are -- and significantly,

8    aren't -- provided in the settlement agreement.  And Your

9    Honor, I aim to show you that the language of these -- of the

10   release plainly released Highland from the implied duty claim,

11   the claim for breach of the implied covenant of good faith and

12   fair dealing, arising from the Knox Agreement, which -- to the

13   extent that claim is seeking damages for assets that were --

14   the value of assets that were transferred either to Crusader

15   or to Credit Strategies.

16       The rest of the implied duty claim, I won't speak to.  Mr.

17   Feinstein has spoken to aspects of that.  But certainly with

18   respect to that implied duty claim, to the extent that UBS is

19   now seeking to impose liability upon the Debtor for the value

20   of assets transferred to Crusader or Credit Strategies, the

21   release encompassed that claim and it is no -- and UBS can no

22   longer pursue it.

23       Your Honor, I would submit this is the only commercially

24   reasonable way to interpret the release.  It would have been

25   unreasonable for the two Funds to pay a total of $70.5 million

1    for a full settlement, while leaving themselves exposed to

2    potential indemnification claims from their fund manager,

3    Highland Capital Management, in the event that UBS ultimately

4    recovered from or settled with Highland Capital Management

5    relating to the damages arising from the transfers to Crusader

6    and Credit Strategies.

7         Your Honor, while I submit that the Court does not need to

8    look to parol evidence and should not look to parol evidence,

9    even if the Court were to consider the parol evidence that UBS

10   has submitted in response to the claim objections, the result

11   would not change.  The release should still be interpreted as

12   a matter of law to preclude UBS at this point from pursuing

13   damages on its implied duty claim or its fraudulent conveyance

14   claim, to the extent those damages are for the value of assets

15   transferred to Crusader or Credit Strategies.

16        So, let's take a look at the release language.  And I'm

17   going to ask my colleague, Mr. Polcik, to please put up the

18   language of Section 5.3 of the -- of Redeemer Committee

19   Exhibit #21, which is the Crusader Fund settlement agreement.

20   The release reads, "The UBS Releasing Parties do not hereby

21   release and discharge Highland Capital Management and its

22   past, present, or future parents, subsidiaries, et cetera,

23   collectively defined as the 'Covered Persons,' from any

24   claims, except the UBS Releasing Parties do hereby release and

25   covenant not to sue the Covered Persons" -- that includes

1    Highland -- "with respect to such claims to the limited extent

2    the Claims are for losses or other relief specifically arising

3    from the fraudulent transfers to Crusader alleged in the UBS

4    litigation."

5         Exhibit 22 is identical in Section 5.3 except that instead

6    of Crusader it says Credit Strategies.

7         As you can see, Your Honor, I've highlighted the word

8    claims because it's capitalized, which of course means it's a

9    defined term in the settlement agreement.  And for the

10   definition of claim, and I'd like to ask Mr. Polcik to please

11   put that up, we go to Section 5.2 of the settlement agreement,

12   where the word "claim" is defined.  And 5.2 is the release

13   that UBS gave to the Crusader Fund.  And it starts, it begins,

14   "The UBS Releasing Parties hereby release Crusader from and

15   against any, all, Claims, actions, causes of action, demands,

16   liabilities, debts, damages, or obligations of whatsoever

17   kind, name, description, or nature, be they contractual, tort,

18   or statutory, known or unknown, and charges of whatever

19   nature, known and unknown, arising out of or directly or

20   indirectly related to the Knox Agreement and/or the UBS

21   Litigation."

22        And that, Your Honor, is the definition of "Claims" in the

23   settlement agreement.

24        Section 5.2 of Exhibit -- of Redeemer Exhibit 22, the

25   Credit Strategies agreement, is identical.

1          As you can see, Your Honor, the clear contractual

2     definition of the word Claims specifically brings within its

3     meaning contractual claims arising out of or directly or

4     indirectly related to the Knox Agreement and/or the UBS

5     Litigation.  The implied duty claim that UBS asserted against

6     Highland Capital Management is a contractual claim arising out

7     of or related to the Knox Agreement, and it was asserted in

8     the UBS Litigation.

9          So, Your Honor, when we look at the language of Section

10    5.3 and we start with the premise that what UBS released is

11    all claims against Highland, we start with the premise that

12    the implied duty claim is within the scope of the release.

13         So, going back to the language of Section 5.3 -- if you'd

14    advance the slide, Mr. Polcik -- the next part of the release,

15    as Mr. Feinstein pointed out, makes clear that what are

16    released are claims against Highland Capital Management for

17    losses or other relief.  And as we explained in our briefing,

18    Your Honor, losses or other relief must -- is a very broad

19    term.

20         Now, the contract goes on to tell us -- and nothing in

21    that phrase, by the way, claims or for losses or other relief,

22    in any way brings the implied duty claim out of the scope of

23    this release.

24         The next slide which -- that we need to focus on is, okay,

25    what kinds of losses or other relief?  And Mr. Polcik, if

1   you'll advance our slide, please.  The release releases all

2   claims for losses or other relief specifically arising from

3   the fraudulent transfers to Crusader alleged in the UBS

4   litigation.

5       Now, UBS in its brief focuses on the term "arising from,"

6   and UBS argues that the term "arising from" is more

7   restrictive than the term "relating to," and UBS argues that

8   on that basis the release ought to be interpreted somehow as

9   excluding the implied duty claim.  But I would suggest, Your

10  Honor, that that argument is a red herring.  What really

11  matters is what the claims for losses or other relief must

12  arise from.  And what the contract tells us is that the claims

13  that are released are for losses or other relief arising from

14  the fraudulent transfers to Crusader alleged in the UBS

15  litigation.

16      Now, fraudulent transfers is not a term that's defined in

17  the settlement agreement.  And you see it's not capitalized.

18  And so I would suggest that fraudulent transfers ought to be

19  given its plain meaning.  And if we look, for example, to

20  UBS's own pleadings in the New York litigation, we would see,

21  for example, in Redeemer Committee Exhibit #30, which is one

22  of UBS's complaints in the New York case, that the claim for

23  these fraudulent transfers that UBS pleaded is entitled

24  Fraudulent Conveyance.  And we see in Paragraph 178 of Exhibit

25  30, which was one of UBS's complaints -- Paragraph 178 is part

1   of the fraudulent conveyance count -- that UBS uses the term

2   fraudulent conveyance to refer to the claim but uses the term

3   fraudulent transfer or fraudulently transferred to refer to

4   the set of events giving rise to the fraudulent transfer

5   claim.

6       That paragraph begins with the following statement:  In

7   March 2009, after the Highland entity action was commenced by

8   UBS, Highland Capital caused HOSC's alter ego, Highland

9   Financial, to engage in the -- and this is a capitalized

10  defined term -- March 2009 Fraudulent Conveyance, whereby

11  Highland Financial fraudulently transferred assets to the

12  affiliated transferees, as well as to Highland Capital and the

13  CDO Fund creditor.  The affiliated transferees included in

14  that count Crusader and Credit Strategies.

15      So, when UBS referred in its own claims to -- in its own

16  complaint to the legal claim it was asserting against Crusader

17  or Credit Strategies, it consistently used the term fraudulent

18  conveyance.  The same is true if we were to look at UBS's

19  other complaint, which is Redeemer Committee Exhibit #25, the

20  same paragraph, which is, again, part of the fraudulent

21  conveyance count.  Again, Highland -- or, UBS denominates the

22  claim a fraudulent conveyance claim but refers to the facts as

23  involving Highland Financial fraudulently transferring assets

24  to Crusader or Credit Strategies.

25      And that makes sense because the statutory authority

1    underpinning the claim, the fraudulent conveyance claim that

2    UBS brought in the New York action, refers to the claims as

3    fraudulent conveyances.  And that's New York Debtor and

4    Creditor Law, Sections 273-76.

5         So, in sum, Your Honor, we submit that the language that

6    we're looking at here from Section 5.3 of the Crusader Fund

7    settlement agreement released UBS's claim for implied duty

8    under the Knox Agreement insofar as it encompassed damages for

9    the alleged fraudulent transfers of assets to either Crusader

10   or Credit Strategies.

11        But that's not all, Your Honor.  Section 5.3 continues,

12   and there is some important language that follows this portion

13   of the release.  Mr. Polcik, would you please advance the

14   slide?

15        We see there on the first part, Your Honor, of the slide

16   that I'm now showing the familiar release language that we've

17   just looked at.  Immediately following that release is another

18   sentence that begins, "For the avoidance of doubt."  That

19   sentence says that the Claims released -- again using the

20   defined term Claims -- do not include (a) any Claims for

21   losses or other relief arising from the alleged fraudulent

22   transfers to any defendant in the UBS litigation other than

23   Crusader.  And that make sense, Your Honor, because the

24   release, of course, only was for losses or other relief

25   arising from the fraudulent transfers to Crusader.

1   The sentence then goes on:  or (b) any other Claims for

2   losses -- and, again, Claims is the defined term -- for losses

3   or other relief arising from the Knox Agreement, except to

4   the limited extent the Claims are for losses or other relief

5   that specifically arise from the fraudulent transfers to

6   Crusader.

7   Your Honor, this identical language is also in Exhibit 22,

8   which is the Credit Strategies settlement agreement.

9   I submit, Your Honor, that the reference preserving, but

10  within the scope of the release, it -- the language in (b)

11  that says Claims for losses or other relief that specifically

12  arise from the fraudulent transfers, those claims may arise

13  from the Knox Agreement.  So UBS in this sentence again is

14  reaffirming it's not dismissing other claims for losses from

15  -- arising from the Knox Agreement except to the extent those

16  losses arising from the Knox Agreement specifically arise from

17  the fraudulent transfers to Crusader.

18  So I would submit, Your Honor, that this sentence further

19  highlights and makes clear that the implied duty claim, which

20  was a contractual claim arising from the Knox Agreement, is

21  released as part of these settlements to the extent it -- UBS

22  was seeking damages for alleged fraudulent transfers of assets

23  to either Crusader or Credit Strategies.

24  I would submit, Your Honor, there's no other way to make

25  sense of this avoidance of doubt sentence other than to read

1    Clause (b) and the language that follows it to include the all

2    other claims under the Knox Agreement that arise from the

3    fraudulent transfers, and that specifically includes the

4    alleged fraudulent conveyed -- fraudulently conveyed assets to

5    Crusader and Credit Strategies.

6         And it is explicit, Your Honor, in UBS's complaints in the

7    New York action, and you will find this, for example, in

8    Redeemer Committee Exhibit #30, which is the 2010 complaint,

9    the implied duty claim, which is Count Three, beginning at

10   Page 45 of that complaint.  Highland -- UBS specifically

11   included within the scope of its implied duty claim against

12   Highland the following allegation:  Highland Capital also

13   caused the March 2009 fraudulent conveyance which transferred

14   assets to which UBS was entitled to the affiliated

15   transferees.

16        The affiliated transferees, again, are Crusader and Credit

17   Strategies.

18        So, UBS was seeking damages as part of its implied duty

19   claim for the value of the assets transferred to Crusader and

20   Credit Strategies, but in this paragraph of the settlement

21   agreements with Crusader and Credit Strategies, Section 5.3,

22   UBS explicitly released those claims.

23        Your Honor, any other interpretation, I submit, would

24   render the definition, the reference to the definition of

25   Claims, which is used as a defined term in Section 5.3, and

1    would render the avoidance of doubt sentence meaningless.  And

2    it is, of course, a well-known maxim of contract construction

3    that courts should not adopt a construction which would render

4    meaningless any of the language in the agreement.  And we've

5    cited for that in our papers, Your Honor, the decision *Two*

6    *Guys from Harrison New York, Inc. v. S.F.R. Realty Associates*,

7    found at 472 N.E.2d 315.  It's a New York Court of Appeals

8    decision from 1984.

9         So, Your Honor, I would submit the language of the release

10   makes clear that UBS released the implied duty claim insofar

11   as it's a claim for damages for the values of the assets

12   transferred to Crusader or Credit Strat.

13             THE COURT:  And help me to --

14             MS. MASCHERIN:  And --

15             THE COURT:  If I could interject, help me to --

16             MS. MASCHERIN:  Yes.

17             THE COURT:  -- think through this even further.  I

18   mean, in theory, UBS could not even bring a -- well, it would

19   have to go through -- it could never have a per se fraudulent

20   transfer action against Highland for these transfers.  The

21   only way it could make a claim of liability against Highland

22   for these transfers is its implied breach of covenant of good

23   faith and fair duty.  Because Highland was not a transferee,

24   either --

25             MS. MASCHERIN:  Exactly.

1            THE COURT:  -- direct or indirect, so they -- you

2    know, I don't know how it could be referring to anything else

3    other than the implied breach of covenant of good faith and

4    fair duty.  Either that --

5            MS. MASCHERIN:  I think that's exactly --

6            THE COURT:  Okay.  Go ahead.

7            MS. MASCHERIN:  I think that's exactly right, Your

8    Honor.  And if we look at UBS's pleading, you know, UBS

9    alleged that HFP was the party who made these transfers.  And

10   as Mr. Feinstein, you know, explained in his argument, of

11   course, UBS did not bring a claim to the effect that HFP was

12   acting as -- or that Highland Capital Management was somehow

13   HFP's alter ego.  The only -- if you look at the fraudulent

14   transfer claim, you know, it certainly -- Highland is a

15   defendant in -- or the fraudulent conveyance claim, Highland

16   is a defendant in that claim, but that's, of course, because

17   Highland actually received some of the assets.

18           THE COURT:  Uh-huh.  Okay.

19           MS. MASCHERIN:  And I'll get to that when I address

20   the 3018 issues a little bit later, Your Honor.

21           THE COURT:  Okay.

22           MS. MASCHERIN:  So, Mr. Polcik, you can stop sharing

23   the screen now, please.

24       Beyond just the contract language, Your Honor, I would

25   submit that the only interpretation of the release that would

1   be commercially reasonable is the one that we are advancing.

2   If we follow UBS's interpretation of the release, then we have

3   to believe that the Crusader and Credit Strategies Fund paid

4   together $70.5 million for a release of only the direct claims

5   that UBS brought against them, but that UBS preserved its

6   claim for the full value of the $172.4 million against

7   Highland, which is the amount that -- it's the value that

8   UBS's expert gave to the assets transferred to Crusader and

9   Highland.  UBS would still have a claim to pursue that same

10  amount against Highland.  And that, Your Honor, would leave

11  both Crusader and Credit Strategies, which were managed by

12  Highland, exposed to potential indemnification claims by

13  Highland.

14      UBS responds to that argument by disputing that the

15  purpose of the release was to prevent indemnification claims,

16  or to prevent the, if you will, to backstop against potential

17  future liability to Crusader and Credit Strategies.  But that

18  doesn't make any sense, Your Honor.  It's a well-known

19  principle that in -- not -- even putting aside the notion that

20  Highland Capital Management managed -- was investment manager

21  of both Crusader and Credit Strategies, it's a well-known

22  principle that when multiple parties are sued for the same

23  damages in the same lawsuit, there's a possibility of

24  contribution and indemnification claims going forward.

25      But here, as a matter of fact, it was evident to UBS that

1    Highland had indemnification rights against the Crusader and

2    Credit Strategies Funds.  UBS was fully aware of the fact that

3    the Crusader Fund was, by the time this settlement was entered

4    into, was in liquidation pursuant to a scheme and plan of

5    liquidation that was adopted in a public bankruptcy

6    liquidation proceeding in Bermuda.  And the plan of

7    liquidation and the scheme of liquidation that were adopted in

8    that proceeding, which are submitted in our papers, Your

9    Honor, as Redeemer Committee Exhibit #27, specifically

10   preserve claims for indemnification by Highland against the

11   Fund arising from the governing documents, which include the

12   asset management agreement which Highland had with Crusader.

13       Credit Strategies was the subject of a parallel

14   liquidation proceeding, and Credit Strategies had its own plan

15   of liquidation, which we haven't submitted to Your Honor but I

16   will represent specifically preserved similarly Highland's

17   claims for indemnification for actions it took as manager of

18   the Credit Strategies Fund.

19       And if this -- if this wasn't evident to UBS by virtue of

20   the fact that this was a public proceeding, UBS appeared in

21   the Bermuda case and objected to the adoption of the scheme of

22   liquidation that includes this preservation of

23   indemnification.  And we've submitted to Your Honor the

24   Bermuda court's ruling denying UBS's objection to the adoption

25   of the scheme of liquidation.  And that is found in our

1    exhibits at Redeemer Committee Exhibit #29.  And as that

2    Bermuda court order reflects, Your Honor, UBS appeared in the

3    liquidation proceedings and objected to the adoption of a

4    scheme and plan of liquidation on the ground that it would

5    dissipate Crusader's assets and that UBS had this litigation

6    pending in New York, the same New York litigation we're

7    talking about today, in which it was seeking to recover

8    certain assets back from Crusader.  And the Court denied that

9    objection and adopted the scheme and plan over UBS's

10   objection.

11        But as they say in the infomercials, Your Honor, but wait,

12   that's not all.  In addition, UBS was an investor in the

13   Crusader Fund.  UBS signed onto the scheme and plan.  And this

14   is clear in Exhibit 21 to settlement agreement, Section 5.2,

15   which specifically preserves any claims that those UBS

16   entities that are investors in Crusader might have.  So, and

17   carves them out of any release that UBS otherwise gave to the

18   Crusader Fund.  And those nine UBS entities are listed in

19   Schedule 1 to Exhibit 21, the Crusader settlement agreement.

20        So it was patently evident, Your Honor, to UBS that there

21   was a potential for an indemnification claim, and it makes no

22   sense why Crusader -- why would Crusader and Credit Strategies

23   ask to have Highland Capital Management released as part of

24   the settlement agreements if not to prevent this, you know,

25   back door possibility of an indemnification claim?

1        There certainly was no love lost between my clients and

2   Highland Capital Management at this time, Your Honor.  We were

3   -- we were only a year shy of suing them, firing them and

4   suing them, when we settled this case.  It would make no sense

5   to ask for a release of Highland except to prevent future

6   liability.  And how could that future liability come?  If

7   Highland were permitted to pursue a claim against -- or, if

8   UBS were permitted to pursue a claim against Highland for the

9   value of the assets transferred to Crusader and Credit

10  Strategies, and then Highland came back against Crusader and

11  Credit Strategies with a claim seeking to recover those

12  damages under an indemnification theory.

13       Now, UBS also argues that Highland didn't pay anything for

14  a release.  That's, of course, a red herring of an argument,

15  because my client and the Credit Strategies fund collectively

16  paid $70.5 million.  And for that, UBS agreed to compromise

17  its claims in that New York litigation for $170.4 million.

18  That was the deal that was struck.

19       We've cited in our papers, Your Honor, several New York

20  decisions which stand for the proposition that courts should

21  adopt a commercially-reasonable interpretation.  I think

22  that's -- that's an unremarkable proposition of New York law,

23  but it argues here in favor of interpreting the release so as

24  to encompass the implied duty claim for these damages.

25       Just a word, Your Honor, with respect to parol evidence.

1    Mr. Clubok submitted with his objection -- with his response

2    to the claim objection a chain of emails between the Redeemer

3    Committee and Mr. Clubok during the negotiation of the

4    release.  I would submit it's not necessary and in fact would

5    be improper for Your Honor to consider those because parol

6    evidence is not admissible to create an ambiguity in a

7    contract.  We've looked at the language of Section 5.3.  As

8    Your Honor has pointed out, it could have no other meaning

9    other than to release the implied duty claims.  So the parol

10   is inadmissible.

11        But, Your Honor, even if you considered that evidence, the

12   result would be the same.  Those communications centered on

13   whether to structure the release so as to refer to specific

14   legal claims or to leave in the broad language of Claims, the

15   defined -- the defined term, for losses or other relief

16   specifically arising from the fraudulent transfers to

17   Crusader.  Mr. -- UBS didn't want to change the language.

18   You'll see, if Mr. Clubok refers to that parol, the only

19   explanation he gave was that the -- he was further along in

20   negotiations with the Credit Strategies Fund and they don't

21   agree to that language and he wanted the two agreements to be

22   the same.  And ultimately, the language was not changed.  But,

23   as drafted, I submit, Your Honor, the language is clear.

24        So, for all of these reasons, Your Honor, we would ask you

25   to rule as a matter of law that UBS released Highland from all

1    claims for damages, including the implied duty claim, to the

2    extent UBS is seeking damages for the value of the transfers

3    of assets to Crusader or Credit Strat.

4        Now, briefly, on res judicata, Your Honor, and then I'll

5    touch briefly on the 3018 issues.  It's undisputed that, as a

6    matter of law, based on New York courts' decisions, UBS can no

7    longer pursue claims against Highland that arose from events

8    that took place prior to February 24th of 2009.  Your Honor,

9    so where does that leave us?  We're in agreement with the

10   Debtor on that point.  We and -- both my clients and the

11   Debtor moved for summary judgment, arguing that UBS had not

12   come forward with any evidence of any damages that post-date

13   February 24 of 2009 other than the damages arising from the

14   alleged fraudulent conveyances which were set forth in UBS's

15   damages expert's report, Mr. Dudney's report, in the New York

16   litigation.

17       Under *Celotex*, which is found at 477 U.S. 317 (1986), a

18   well-known decision of our Supreme Court, the plain language

19   of Rule 56 mandates the entry of summary judgment, after

20   adequate time for discovery and upon motion, against a party

21   who fails to make a showing sufficient to establish the

22   existence of an essential element to the party's case and on

23   which that party will bear the burden of proof at trial.

24       Your Honor, when we filed our motions for summary

25   judgment, that put the burden on UBS to put up or shut up, as

1    some of the cases we've cited in our briefs phrase it, and to

2    come forward with whatever evidence it had of post-February

3    24, 2009 damages.

4         In its papers, UBS has a long paragraph at Page 26 of its

5    response to the summary judgment motion which claims that the

6    Debtor did or didn't do all sorts of things, like failed to

7    direct the Fund Counterparties, SOHC and CLO, to repay its

8    obligations to UBS, directing the Fund Counterparties to

9    withhold payments, siphoning for the Debtor's benefit valuable

10   assets from the Fund Counterparties, so on and so forth.

11        When you strip down their pleading, though, Your Honor,

12   and you look at what they actually cite for all the other, you

13   know, supposed conduct that they describe, that they

14   summarize, all they cite back to are their own pleadings.  It

15   was incumbent upon UBS to come forward with other evidence of

16   damages.  As Mr. Feinstein has argued, and you can -- you can

17   look through their brief, Your Honor, there is no other

18   evidence of damage other than the claims for the alleged

19   fraudulent transfers.

20        With respect to the statement that Your Honor referred to,

21   the fact that HFP had some amount of assets in late February

22   of 2009, Your Honor, perhaps that might be -- give rise to

23   some sort of a claim against HFP, but HFP is not the Debtor.

24   And as you've pointed out, Your Honor, in your questions to

25   Mr. Feinstein, there's been no argument, there's been no claim

1    made by UBS in the New York litigation or here that somehow

2    Highland Capital Management was responsible for HFP's actions.

3    Highland is a defendant, for sure, in the fraudulent

4    conveyance claim, but only to the extent it received assets.

5    And the fact that Highland -- that HFP may have had some

6    assets on its balance sheet post-February 24, 2009 maybe is a

7    matter for UBS to pursue with HFP, but I don't see how that

8    provides a claim for damages with respect to Highland Capital

9    Management.

10        Finally, with respect to res judicata, Your Honor, I just

11   want to touch on the very important case that Mr. Feinstein

12   cited, the *Board of Managers of 195 Hudson Street Condominiums*

13   case, which is found at 652 F.Supp.2d 463.  It's a Southern

14   District of New York decision from 2009 which -- which cites

15   many New York cases.  And Your Honor, I would just like to

16   highlight this case again for you.  And this goes to the alter

17   ego claim.

18        UBS argues in its summary judgment response that it's --

19   that it has the right to reserve a future claim against

20   Highland for alter ego liability for the billion-dollar

21   judgment because, as a matter of New York law, that's -- alter

22   ego is a post-judgment remedy, it's not a separate claim, and

23   therefore it's somehow not barred either by this Court's bar

24   date or by the prior decisions of the New York court.

25        Mr. Feinstein has addressed the bar date and we won't go

1   into that.

2        With respect to New York law and res judicata, the *Board*

3   *of Managers* decision is clear and it cites controlling state

4   court decisions as well that the doctrine of res judicata does

5   apply to alter ego claims where, as in this circumstance, the

6   potential alter ego defendant was a party to the prior case

7   for which the alter ego plaintiff is now seeking to impose

8   liability and where the alter ego claim arises from the same

9   transaction or series of transactions that were the basis of

10  the prior suit.

11       And that could not be more clear here, Your Honor.  UBS

12  has been litigating with Highland Capital Management since

13  2010.  A decade of litigation, Your Honor.  Highland has been

14  a defendant in that case for a decade.  And all of the claims

15  that UBS seeks to pursue against Highland Capital Management

16  now, including its purported reservation of this alter ego

17  claim, arise from that same set of facts.  It's the Knox

18  Transaction.  It's the structured warehouse agreement.  It's

19  Highland Capital Management's -- you know, whether Highland

20  Capital Management did or did not have an implied duty there,

21  under the same contract.  And that's the same contract, Your

22  Honor, that gave rise to the billion-dollar judgment.

23       So it could not be more clear here that New York law would

24  hold that the alter ego claim is barred by res judicata, even

25  if the bar date didn't already take care of that issue.

1          So, in sum, Your Honor, we would ask that you enter

2     summary judgment in the Debtor's favor, both with respect to

3     the release, the scope of the releases, as I have argued, and

4     also with respect to the summary judgment damages claim that

5     we've asserted, and hold that UBS is limited, at most, to

6     seeking to recover the amount of the fraudulent transfers.

7          Now, I will speak just briefly to the 3018 issues, Your

8     Honor.  And I'll ask Mr. Polcik here to put up a slide.  And

9     we do come at this a little bit differently, Your Honor, than

10    the Debtor does, but I think we do, as Mr. Feinstein said, end

11    up at the same place.  And the Redeemer Committee and the

12    Crusader Fund support Highland's position that the claims

13    should be allowed provisionally in the amount of approximately

14    $35 million for voting purposes only.

15         I want to show Your Honor a couple of things, because I

16    think that we have a bit of a disagreement on some of the

17    numbers with UBS.  I've put up on the slide here Figure 5 from

18    UBS's damages expert's report.  Their damages expert is a man

19    named Louis Dudney.  And this is Table 5 from his report.

20    This is the table that you would find in UBS's 3018 motion.

21    And as you see, it totals up -- this is the listing of all the

22    alleged fraudulent conveyances.  And as you see, they total up

23    to approximately $233 million.  So this is the number that UBS

24    is starting with in its motion.

25         But it's important, Your Honor, to note that this table is

1    not part of Mr. Dudney's damages analysis in his report.  He

2    provides it in his report as factual background.  When he goes

3    on in his report to calculate damages from the March 2009

4    alleged fraudulent conveyances, he submits a different chart,

5    which is Table #12 from his report.  And let's put that up,

6    Mr. Polcik.

7        This is the chart that actually factors into Mr. Dudney's

8    analysis.  And you'll see that the $233 million has now been

9    reduced to approximately just under $203 million.  And Mr.

10   Dudney explains in a footnote to his report, which I've also

11   asked Mr. Polcik here to reproduce on a slide, that he makes a

12   couple of adjustments from the $233 million number.  He

13   excludes transfers to third parties, the $17.5 million.  What

14   is that?  That's the transfer to Citibank that's listed in the

15   chart that UBS refers to in its 3018 motion.  He also makes an

16   adjustment of $13 million to reflect the fact that HFP, which

17   was the transferor on these claims, had only a 45 percent

18   ownership interest in one of the entities that was involved in

19   the transfer.

20       If we go back to Table 12 of the report, we see that the

21   starting point then for the fraudulent transfer analysis is

22   $202 million.  If we deduct from that the amounts of the

23   transfers that were -- of assets that were made to Crusader

24   and Credit Strategies Fund, we would deduct $172.4 million.

25   What remains is approximately $34 million.

1      Approximately $8 million of that, as we see here, was

2  assets transferred to Highland Capital Management.  The rest

3  of it were assets that were transferred to Credit

4  Opportunities Fund and Highland Credit Opportunities Holding

5  Corporation.  Those total approximately $26 million.  That --

6  those entities now, as I understand it, Your Honor, are known

7  as the Multi-Strat Fund.  So when Mr. Feinstein stated the

8  Multi-Strat Fund, it's those two transfers I believe he's

9  referring to.

10      As to anything on this chart other than the $8 million of

11  direct transfers to Highland, Highland would have to prove in

12  order to recover -- or, rather, UBS would have to prove, in

13  order to recover for a fraudulent conveyance against Highland

14  Capital Management, that Highland Capital Management benefited

15  from the transfers.  And UBS has not made a showing of the

16  extent any -- the extent to which Highland Capital Management

17  supposedly benefited from any of the transfers that ultimately

18  went to the Multi-Strat Fund.  As Mr. Feinstein points out,

19  there are third-party investors and non-debtor investors in

20  the Multi-Strat Fund.

21      And in addition, Your Honor, there are other difficulties

22  of proof relating to the fraudulent conveyance claims, which

23  -- some of which Mr. Feinstein spoke to.  In order to -- these

24  alleged fraudulent transfers to the various -- at least the

25  Fund entities, including Credit Ops, the two Credit Ops

1  entities, were transactions in which, in March of 2009, assets

2  were transferred to Credit Opportunities Fund and Highland

3  Credit Opportunities Holdings in exchange for the return and

4  extinguishment of notes that those entities had given to HFP

5  in the fall of 2008.  Because there were notes that were

6  tendered and extinguished in exchange, any damages for the

7  fraudulent conveyances would have to be reduced for the value

8  of the notes.

9      In addition, Your Honor, in order to recover -- to recover

10  for fraudulent conveyances for these transfers, UBS would have

11  to persuade the Court that, in essence, the notes -- in order

12  to persuade the Court that the notes should be given zero

13  value, UBS would have to persuade the Court that the notes

14  ought to be recharacterized as equity.  And there -- Your

15  Honor, I'm sure, is well-familiar with that process.  It's a

16  very fact-intensive and legally-complicated analysis which UBS

17  would have to succeed on to prove that the notes had no value

18  in order to pursue the full amount of these transfers.

19      And as Mr. Feinstein points out, in order to establish any

20  liability for damages arising from these transfers, UBS must,

21  as an initial matter, be able to establish that HFP was --

22  which was the transferor entity, was acting as the alter ego

23  of SOHC and CLO, the Fund Counterparties, and that itself is a

24  multifactor analysis which requires very substantial proof.

25  And for all the reasons that Mr. Feinstein went through, which

1    I won't repeat here, particularly in light of the New York

2    court's rulings that Highland Capital Management should not be

3    held responsible, was not an ensurer of the Fund

4    Counterparties' compliance with the Knox Agreement, UBS was

5    well aware that its only source of recovery was against SOHC

6    and CLO.  UBS had signed contracts that included language

7    explicitly recognizing that UBS is a very sophisticated party.

8    And it would be, I submit, a difficult hurdle for UBS to meet

9    its burden of proof on the alter ego claim against HFP, which

10   is a cornerstone of the claim that UBS is asserting against

11   the Debtor.

12        So we would submit, Your Honor, that while this number

13   reduces down to approximately $34 million if we leave in the

14   two Credit Opportunities entities and the transfers to

15   Highland Capital Management, once we take into account the

16   difficulties of proof of the value of the notes and all of

17   these other issues, that ultimately UBS does not have a strong

18   likelihood on succeeding on any claim in any amount larger

19   than the amount that the Debtor has suggested, which is

20   approximately $35 million.

21        And to borrow a phrase from you, Your Honor, from the

22   perspective of the Redeemer Committee and the Crusader Fund,

23   the $35 million offer is a significant olive branch to UBS for

24   voting purposes.  And we would submit, Your Honor, it would

25   be, in fact, inequitable to the other creditors to give UBS a

1  greater seat at the table.

2      I would point out, among other things, Your Honor, that

3  Highland is offering a claim amount for voting purposes which

4  exceeds even the amount of the allowed claim against Mr.

5  Terry, with whose claims this Court is very familiar.

6      So, Your Honor, I will stop there, and I thank you very

7  much for your patience with the argument this morning.

8          THE COURT:  All right.  Well, thank you.  You went 54

9  minutes, by the way, if anyone is keeping count.

10     Mr. Clubok, I think probably we all deserve a ten-minute

11  bathroom break, snack break, so does that sound reasonable to

12  you?  Is ten minutes enough for everyone?  All right.  Well,

13  I've got five 'til -- no, I've got 12:00 noon Dallas time, so

14  we'll come back at ten after 12:00.

15          THE CLERK:  All rise.

16     (A recess ensued from 12:00 p.m. to 12:15 p.m.)

17          THE CLERK:  All rise.

18          THE COURT:  All right.  Please be seated.  This is

19  Judge Jernigan.  We're back on the record in the Highland-UBS

20  hearing.

21     Mr. Clubok, are you there and ready to begin?

22          MR. CLUBOK:  Yes, Your Honor, I hope so.  A lot of

23  ground to cover, and I'll try to get into it.

24          THE COURT:  All right.

25          MR. CLUBOK:  Your Honor, I guess I want to start by

1    saying just a couple of brief overview points.  And the first

2    one is that, you know, so much of what I've just heard today

3    -- I've been litigating this case now for too long, almost two

4    years or something.  I've lost track.  I heard so many of the

5    same arguments that I've heard over and over again in the

6    multiple trips up and down to the appellate courts in New

7    York.  And I'm going to try -- you know, what's difficult is

8    that two extremely capable lawyers just plucked stuff out of a

9    decision from eight years ago and some evidence from part of a

10   case and part of what's going on in a case.  And I'm going to

11   try the best I can to respond to all of that, but I do not,

12   Your Honor -- and I realize that Your Honor has given them

13   this chance, a potential chance to have summary judgment

14   adjudicate issues.  But I do just want to remind the Court

15   that the starting place is where we left this case off in New

16   York, before the case was transferred, the say -- the

17   automatic stay was asked -- requested -- (inaudible) denied

18   when the case became live here.  What was left was nothing but

19   going to trial on all of these claims, without limitation.

20   And that's where we left it.  The court -- the appellate court

21   in New York had already ruled that our full implied covenant

22   claim could go forward, notwithstanding these various

23   arguments you've heard today.  That the settlement, the only

24   potential impact of the settlement would be a $70.5 million

25   offset that would be reserved for post-trial deliberations

1    because it does not affect in any way, shape, or form the

2    length of the trial, the evidence at trial, the witnesses that

3    you call at trial.  And Highland had vigorously argued that

4    they should get a $70.5 million offset as a result of the

5    settlement.  And they had two different ways of calculating

6    it.  They said either up to $70.5 million or as a percentage,

7    a percentage of that claim, which would maybe, you know,

8    translate to slightly more than $70.5 million.

9         But they never, ever argued to the court the kinds of

10   arguments that I've heard today, in all those years, even when

11   we went to trial, even in post-trial briefing, and, you know,

12   right up until the moment when we were ready to go to trial

13   and where we would be today if not for the automatic stay, et

14   cetera.

15        So I hear and understand we're here because Your Honor is

16   giving them a chance to present their arguments as to why they

17   should get a different result than what they already lost in

18   New York.  But there is, of course, all of the same

19   limitations.

20        And I do think that, you know, Mr. Feinstein really gave

21   away the ghost when he said -- he went through a list of

22   things that he claimed were undisputed facts, and some of them

23   -- remarkable, Your Honor, I think almost all of them, several

24   of them (inaudible).  One of the things he purported -- he

25   told you is an undisputed fact was that the contract

1    terminated in 2008, and, you know, therefore that has some

2    kind of implication, I guess, for our claim in 2009.  As Your

3    Honor noted the tremendous -- that you found records

4    voluminous here, the trial court ruled and the appellate court

5    upheld the ruling that there were post-termination contractual

6    rights that continued into 2009, and that those were the basis

7    of our original implied covenant of good faith and fair

8    dealing.  And we were allowed to go forward on trial without

9    any limitation whatsoever on those claims for conduct that

10   occurred post-February 2009.  For example, refusing -- causing

11   the Fund Counterparties not to pay UBS when they had the money

12   and they could have paid and they should have, in violation of

13   the implied covenant.

14       So Mr. Feinstein said, well, he kind of questioned that

15   ruling.  We're definitely not here today because he kind of

16   questions the ruling of the trial court affirmed on appeal.

17   And obviously, frankly, this Court doesn't even have

18   jurisdiction to do that and I know Your Honor's not planning

19   to do that.  I took that in the nature of a question.

20       The other thing I just want to mention, there was a bunch

21   of other facts that were thrown out as supposedly undisputed.

22   Many of them are immaterial so I'm not going to go through

23   every one.  I -- we do dispute them.  I don't think a lot of

24   them were material for this -- purposes.  But I do want to

25   highlight.  Your Honor correctly noted, and I'll just make it

1   very clear, Multi-Strat is not some innocent third-party,

2   nothing to do, but instead is -- I think he -- I think we were

3   told by Mr. Feinstein, after he consulted with his colleagues,

4   there's significant ownership by Highland, I think of a

5   hundred -- nearly a hundred percent of the equity.  Something

6   in the nineties, at least.

7        And, of course, some of those shareholders in Multi-Strat

8   over the years have been, we understand, Mr. Dondero, friends

9   and family, the usual affiliated involvement.  So Multi-Strat

10  is not some -- as you said, they're not like Citibank.

11       But the other thing, too, that you were told as a

12  statement of fact -- and you know, I don't know if it's

13  necessarily material to the summary judgment, but it really

14  goes to -- I think it's a good example of how we can't fight

15  every one of these claims here, necessarily.  We've already

16  gotten past them in New York state court. But Mr. Feinstein

17  said, at least a couple of times, he said -- and again, I

18  think this is immaterial -- but he said it, so he thinks it's

19  material, and he made a point of saying it:  He said when this

20  contract started in 2008, there were assets that were posted

21  by the Fund Counterparties, by SOHC and CDL Funding.  No one

22  disputes that, I think he said.  Said, and it's clear that,

23  and he said it a couple of times, that these assets were put

24  up by CDL Funding, SOHC, and that's it, not disputable, and

25  therefore, UBS, sophisticated entity, surely must have known

1    that those were the only two parties that they could ever look

2    to for recovery.

3        What Mr. Feinstein, I assume, just doesn't know -- I'm

4    sure he would not intentionally leave this important part out

5    of the story -- but we have a claim that's still live in New

6    York for fraudulent inducement, because it turns out those

7    assets that were presented to us as being put up by the Fund

8    Counterparties really came from another source, another one of

9    Highland's pockets.  And later, when the collateral calls

10    came, time to be making the collateral calls, and the contract

11    required the owner of the Fund Counterparties to make the

12    collateral calls -- this is how UBS contracted the argument

13    the Fund Counterparties are still part of the waterfall, to

14    keep fulfilling its obligation -- again, money was

15    transferred, moved around, so that it was not the Fund

16    Counterparties that ever -- that even posted the entirety of

17    the collateral calls.

18        So it's a relatively minor point, I think, in the context,

19    but, you know, Mr. Feinstein said it a few times.  He thought

20    it was important for you to know that background.  That's the

21    kind of fact that is very much in dispute, and it just really

22    goes to the continuing fraud.  And by the way, that claim is

23    still live against the Fund Counterparties in New York.

24        Okay.  Having said that, if I can make the slides work,

25    I'm going to go and go forward.  There were two issues that I

1  want to get off the table very quickly and we can breeze past.

2  The first is there is this issue about whether res judicata

3  bars pre-February 24, 2009 claims.  A lot of ink was spilled,

4  originally I think by the Debtor, on this.  And there's kind

5  of a -- let's make this very clear.  We do not dispute that.

6  We do not dispute that the current -- you know, that the

7  precedent that we are in the middle of right now, and again,

8  we may very much disagree with that decision, okay, but we're

9  stuck with the precedent that we are stuck with.  And the New

10  York Appellate Division said that res judicata does bar pre-

11  February 24, 2009 claims against Highland Capital Management.

12      And unfortunately, Your Honor, way back in 2011, they used

13  some loose language, and this is the language that you heard

14  repeated over and over again, simply about how what that means

15  is that, you know, you can't pursue your claims to the extent

16  they implicate events prior to February 2009.

17      Now, that's not the way res judicata works.  Res judicata

18  precludes claims, and you focus on claims and not events.  And

19  so we argued for the next seven years:  Highland is

20  misinterpreting that line.  They took out one stray line from

21  that original UBS decision from 2011 where it talked about you

22  can't implicate events.  It was a poorly-chosen phrase -- by

23  the way, in an opinion that otherwise makes it clear they're

24  not doing that.  And we said that is one little line that

25  appears that doesn't mean what they say it means.  Well, we

1    kept arguing that.  We kept winning.  They kept going back.

2    Highland kept arguing.  And we kept hearing this over and over

3    again, that somehow there's some significance to -- somehow,

4    we're precluded from something about events prior to 2009.

5        Finally, the New York Appellate Division settled this once

6    and for all right before we went to trial.  And we -- and we

7    basically said to them, Look, Highland keeps raising this

8    argument.  We need clarity.  And they gave unmistakable

9    clarity.  What they said right before we went to trial is --

10   and this is on, by the way, the final decision on the re-

11   argument of the denial of the motion for summary judgment that

12   Highland brought before trial.  The Appellate Division said,

13   Neither our prior decisions nor the doctrine of res judicata

14   bars Plaintiffs from introducing evidence of pre-February 24,

15   2009 conduct.

16       And Your Honor, you can read the decisions.  It's not like

17   they're distinguishing conduct from events, that there's some

18   event that's different than conduct.  This is in response to

19   Highland's continually trying to tell courts that somehow

20   events that happened prior to February 2009 can't be used as

21   part of our evidence.  The Court put that to bed, and they

22   said, To the extent necessary to prove with respect to post-

23   February 24, 2009 conduct, there are alter ego, fraudulent

24   conveyance, and breach of implied covenant claims.  And that's

25   when the Court upheld -- or, denied summary judgment and

1   allowed us to go forward on those claims.

2       But having said that, the res judicata issue really is a

3   red herring, other than it's being used to put into your head

4   the argument that Highland had made for the last -- or had

5   made for several years, from 2011 until 2018, that somehow our

6   evidence and all the things that we could show that happened

7   prior to February 2009 can't be used to support our claims for

8   post-February 2009 conduct.

9       Okay.  The second one I want to put to bed rather quickly,

10  I don't want to dwell on this too much, is whether or not we

11  are barred from seeking alter ego recovery.  Let me just be

12  very clear on this, Your Honor.  We believe -- we've always

13  believed under New York law that the alter ego claim we would

14  have against Highland is not a claim, but it is -- I even

15  called it there, I slipped and I said the alter ego claim --

16  the use of alter ego that we would have under New York law is

17  not as a claim, an independent claim, but rather as an

18  alternate form of liability that only arises after you get a

19  judgment if you then try to shift the responsibility for.

20  That's the way New York law goes.  It's pretty clear.  We cite

21  *Morris v. New York State Department of Taxation*.

22      It also says the weight of authority says that alter ego

23  is not subject to res judicata.

24      They continually cite the *Board of Managers* case.  If you

25  read the case, you see it's just a very different case.

1    Number one, the claims of this one defendant had been entirely

2    dismissed.  Number two, they had basically brought claims of

3    alter ego that were -- that were dismissed.  And it was in a

4    different context.  There's lots of ways to distinguish it.

5        But let's not forget, there are still live claims against

6    Highland Capital Management.  We still have claims for post-

7    February 2009 conduct.

8        So the time that we would one day, if this was set in New

9    York state court, bring an alter ego claim, or an alter ego

10   theory of recovery -- I keep accidentally saying claim -- an

11   alter ego theory of recovery against Highland has not happened

12   yet under New York law.

13       Now, we understand that under bankruptcy law there is a

14   standard, and it's very strict, for -- that goes to when a

15   claim arises for bankruptcy purposes.  When does a claim

16   arise?  So if it is, in fact, contrary to what we think, a

17   claim, as opposed to what New York calls it, which is a form

18   -- not an independent claim, but just a form of liability,

19   then we think the bankruptcy rules about when claims arise

20   really don't matter.

21       Notably, they cite no Fifth Circuit authority on this

22   particular issue.  I think we heard about a couple of cases

23   that are not -- that were not Fifth Circuit.  It's out-of-

24   circuit authority.

25       But anyway, that is what our view has been.  But we were

1    very clear about what the dispute is.  And, you know, maybe

2    you'll tell us we were wrong about that.  Okay?  Even if the

3    Fifth Circuit hasn't ruled, you'll say, Sorry, it doesn't

4    matter if New York State calls it a claim or not, I'm going to

5    decide it is.

6        Well, it's important to know that we did reserve the

7    rights.  It's not like we hid this.  We said, Look, we think

8    technically it's not a claim so we can't assert it yet, but we

9    expressly reserved our rights.  Everyone has known this was on

10   the table, potentially.  We tried to make it as clear as we

11   can.

12       Worst-case scenario, we should be allowed to amend.  I

13   mean, frankly, we think this issue is not even ripe.  We

14   haven't even brought a claim.  So here we are, we're arguing

15   -- they've brought summary judgment to knock out a claim that

16   we haven't even brought yet because we think it's premature.

17       By the way, we -- of course, when and if we decide to

18   bring that, maybe at that point we'll be told, Too late, out

19   of luck, so sorry.  But we were willing to take that risk

20   because we thought that's the way the law will shake out.

21       They've essentially asked you for an advisory opinion on a

22   claim we haven't brought as to whether you would grant summary

23   judgment had we brought this claim, and what we have said is,

24   If you're inclined to do that, we'd just ask for a chance to

25   amend.  It's -- the *Cornerstone* case says -- proofs of claim

1  can be liberally granted, if there's a defect in the claim,

2  if reserving rights and later then telling them that we think

3  it's not technically a claim but instead it should be, that

4  can be cured.

5      It would certainly not be a new claim.  It's related.  You

6  heard how everything's related, everything's tied together,

7  except their argument for us not being allowed to amend, if

8  you decide it is a claim, if it supposedly it's a brand new

9  theory, brand new claim, and yet it clearly lies out of the

10 same conduct/transaction/occurrence as the original claim.

11 It's clearly related.  Everyone's known about it.  There

12 wouldn't be any prejudice.  So we would ask that we have the

13 right to amend it.

14             THE COURT:  All right.

15             MR. CLUBOK:  But frankly, --

16             THE COURT:  Mr. Clubok, I want to ask a couple of

17 follow-up questions.  Could you go back three slides, where

18 you had -- one more.  One more.  There.  You were there.  Go

19 forward.  Forward.  The slide that showed the New  -- there.

20 Stop.

21     Okay.  Let's take this in chunks.  In that New York case,

22 1993, here's how I interpret this.  And tell me how I'm wrong.

23 In the nonbankruptcy context of that case, the word claim, you

24 know, I think is synonymous with a cause of action.  And so,

25 you know, we hear it said a lot that alter ego is a remedy,

1 not a cause of action.  And there, they say it's a claim.  For

2 some reason, there are blocks over some of that language.  If

3 it's a --

4           MR. CLUBOK:  There's a block where?  I'm sorry.

5           THE COURT:  Yes.  A claim, but rather merely a form

6 of, I think, liability.  It's blocked.  I don't know.  Oh,

7 there we go.  Form of liability.

8      I mean, I can accept that phrasing as making complete

9 sense outside the context of bankruptcy.  It's really saying

10 it's not an independent cause of action so much as a remedy to

11 impose liability on some other party other than the target

12 defendant.  But given the oh-so-broad definition of claim in

13 Section 101 of the Bankruptcy Code, don't we have to view this

14 differently in the world of bankruptcy?  That, you know, it's

15 any argued right to payment that a person is making.

16      So it feels like to me you did have to assert this in your

17 proof of claim, number one.  But number two, you would not

18 argue, would you, that you could argue -- okay, let's set the

19 proof of claim alleged defect aside.  You would not say that

20 you can argue Highland was the alter ego of either the CDO

21 Fund or the SOHC Fund or HFP  prior to February 24th, 2009?

22 You agree that that's off-limits, to make that argument?

23           MR. CLUBOK:  I can't rest on that argument.  I can

24 use that evidence to support the fact that they were also

25 alter ego after February 2009, but I -- if that was my sole

1    claim, then yes:  Under the current precedent, I would not be

2    able to make that.

3          THE COURT:  All right.  But presumably you're wanting

4    to preserve the ability to argue it was the alter ego,

5    Highland was, in March 2009, right?  That's what this is

6    largely about?

7          MR. CLUBOK:  Correct.  Yes.  And the Appellate Court

8    has already said we're -- that claim is preserved.

9          THE COURT:  All right.  Well, what about the argument

10   that, for crying out loud, you made -- you pleaded in 2010

11   that HFP  was the alter ego of the two Funds.  You knew how to

12   plead alter ego there.  You weren't waiting for a judgment in

13   Phase I of the trial with regard to asserting alter ego

14   against HFP.  You could have argued it against Highland then,

15   and you didn't.  Is there -- and I asked Mr. Feinstein, is

16   there an estoppel argument that you never brought the claim in

17   ten years in the 2010 action?

18         MR. CLUBOK:  That's a great question, Your Honor.

19   The difference is -- so, we had to bring -- we accelerated the

20   alter ego claim, HFP and SOHC, because we, as you've heard a

21   little bit and I'm getting to, part of our entire claim to

22   hold HFP responsible for SOHC's debts is to show that they're

23   alter egos.  So that is necessary as a predicate for the rest

24   of our claims, and so that's why we pulled that forward.

25        Normally, you would never in New York need to do this.

1   It's a post-trial remedy.  It's a form of liability after

2   trial.  It's not a claim.  And so, no, if we were still in New

3   York, not in bankruptcy, we -- we'd have, you know, at the

4   rate things are going I guess now because of COVID, we'd have

5   a lot of time before that claim would have to -- or that

6   remedy would have to be sought.  That's the right way to say

7   it.  And so that's the way it would be.

8       In response to your prior question, I -- I absolutely

9   admit I'm not a bankruptcy specialist and so I will -- maybe

10  I'd get this wrong, but my understanding of the bankruptcy

11  rules are that you do look to state law for the existence of

12  claims.  I understand not for the timing of when they arise,

13  but for whether or not they exist at all.  And we think that

14  the New York law is very clear:  It's not a claim.  That was

15  our thinking in our original -- in our proof of claim.  But

16  that's why we reserved rights.

17      We would then ask, if that's true, then simply allow us to

18  amend.  You know, the cases we cite in our brief, should be

19  liberally granted.

20      But it's interesting, Your Honor, that the evidence --

21  basically wants to raise summary judgment arguments that they

22  could have raised seven years ago, certainly five years ago,

23  and they want you to give them a brand-new bite at the apple,

24  after all these years --

25          THE COURT:  But you've never argued alter ego as to

1   Highland in the state court litigation in all these years.

2          MR. CLUBOK:  Understood, Your Honor.  And we never

3   had to.  Because in New York, indisputably -- I was making

4   this point simply about amending our proof of claim.  If we

5   were wrong, like we think it's indisputable, but in New York

6   it would be too early.  It -- it's not a claim.  Okay?  That's

7   what the (inaudible) of the New York State Department tells

8   us.  It's a form of liability that you can seek after

9   judgment.

10      We did pull forward the SOHC/HFP alter ego because we

11  needed that as an element of our other claim, but that -- just

12  because we did that doesn't mean we have to do it with HCM.

13  We always knew that it was something to go forward.

14      And by the way, we had many discussions, including, you

15  know, at the outset of this case when the directors came out

16  about how that's always a possibility.  Our view was it was

17  always a possibility down the road.

18      Now, I totally understand if Your Honor -- there's no

19  Fifth Circuit precedent on this, but if Your Honor says, you

20  know, different bankruptcy rules, we are going to make folks

21  include this in a proof of claim, my simple request is okay,

22  our proof of claim was filed a few months ago.  Instead of

23  calling it a claim, we described it and we reserved our

24  rights.  Everyone knows what we're talking about.  We would

25  just ask the right to amend that proof of claim that's been on

1   file for a few months now.  That's the alternative that we

2   ask.  But I really, you know, this is -- this is a bit of the

3   tail wagging the dog.

4       By the way, Your Honor, I also think this is all

5   immaterial right now.  We did not include a theoretical alter

6   ego recovery against Highland.  That's why our -- in our 3018

7   motion, we're seeking much less, $500 million, much less than

8   a billion dollars.  We're not seeking that, to get that amount

9   of claim authorized for voting purposes or for other purposes.

10  We're not asking you to factor it in in any way, even one

11  penny of it at this time.

12      So it's really -- and that's why, Your Honor, if I may,

13  going forward a little bit, that's why we just think it's

14  premature.  We feel that we served it right.  If Your Honor

15  disagrees and we need to bring it now, we'd ask for you to let

16  us amend.  But it's not a claim that's --  that's live right

17  now, and it doesn't affect our 3018 motion, so it's not

18  something you have to decide.  If you do tell us that we're

19  reading the Bankruptcy Rules, and maybe that case will go up

20  to the Fifth Circuit, but I wouldn't want to go, but that's

21  fine.  But maybe that'll become the Fifth Circuit standard.

22  We just ask for the right to make a modest amendment to our

23  proof of claim to add it in.  Can I move forward to the --

24          THE COURT:  Well, last question on that topic is, I

25  forget the name of the case that Ms. Mascherin discussed in

1    her argument, but the case that says that there can be res

2    judicata as to alter ego when the target of the alter ego

3    theory has been a party in the litigation all along.  I can't

4    remember the name of the case now, but --

5        MR. CLUBOK:  It was *Board of Managers*, Your Honor.

6    It's *Board of Managers*, --

7        THE COURT:  Uh huh (affirmative).

8        MR. CLUBOK:  -- 652 F.Supp.2d 463.  You know, a

9    careful read of that case shows that it's very distinguished

10   from what happened -- very distinguishable from the

11   circumstances here.

12       In that case, the plaintiff had originally sought

13   derivative liability against the defendant on the basis of a

14   close relationship, had basically stated an alter ego claim

15   from the get-go.  That issue was fully litigated.  They lost.

16   After that, they then came and said, Oh, let's call it alter

17   ego instead of whatever it is we called it before.  It would

18   be basically the same claim that they had already had a full

19   chance to litigate.

20       And at that stage, with that defendant now out of the case

21   entirely, and with the facts having already been litigated

22   specifically, the court found and the court held -- and that's

23   a Southern District of New York case.  By the way, it goes

24   against the great weight, the -- you know, the great weight of

25   New York law relevant to the Court of Appeals in New York says

1    never res judicata.  But in that one southern District of New

2    York Case, which is an outlier, very meaningful facts, the

3    federal court interpreting New York law, you know, ruled the

4    way that court did.

5         That is not -- does not really take away from the Court of

6    Appeals decision that I cited, the *Morris v. New York State*

7    *Department of Taxation*, which is the New York -- the highest

8    court in New York, the 1993 case.  And  -- or that -- or the

9    *Careccia* case, which is a -- it was a federal decision that

10   went the other way of *Board of Managers*.

11        So I understand it.  I think a read of that case shows how

12   -- it's pretty obvious how distinguishable it is.  It's also

13   at odds with the other -- the weight of authority, as we say,

14   and so --

15             THE COURT:  But you're saying it matters what type of

16   cause of action is asserted against the defendant who you

17   later seek alter ego remedy against?  In other words, if the

18   cause of action is pretty darn close to -- it's the alter ego

19   of someone, then, um, that's already been litigated.  But

20   here, where the cause of action right now is fraudulent

21   transfer and breach of implied covenant of good faith and fair

22   duty, those are different enough from alter ego, where somehow

23   that *Board* decision is distinguishable?

24             MR. CLUBOK:  Yes, Your Honor.  That's squarely in the

25   normal cases, where courts have said the weight of authority

1  holds that alter ego recovery is not subject to res judicata.

2  That's a normal case.  A normal case in New York is you bring

3  fraudulent transfer -- or, against some defendants.  You bring

4  breach of contract for those other defendants.  You bring

5  implied duty, et cetera, et cetera.  And afterwards, after the

6  judgment, you can then potentially have an alternate

7  possibility of recovery by using the alter-ego/veil-piercing

8  mechanism.  That's right, the ordinary rule.

9      This one unusual case, *Board of Managers*, which is the one

10  outlier, Federal District Court, Southern District of New

11  York, it went through the unusual facts and it did -- it ruled

12  the way it did.  You know, it's not -- I don't believe it's

13  been followed in other contexts, you know, that are similar to

14  this.  You know, it's at odds with the *Caresia* case, which is

15  an Eastern District of New York.  So the federal court is

16  trying to interpret, you know, New York state law.  But then,

17  you know, that's -- that's the normal rule.  And I get it that

18  there was this outlier case.  I also know it's unusual facts.

19  And it -- we were very comfortable, let's just say, in New

20  York, always knowing that we could bring our alternate theory

21  of recovery against HCM for potential alter ego after a

22  judgment, as before, and so that's where we were.

23      You know, we've raised it with Highland -- Highland knew

24  about our claims.  They knew -- I think when we first spoke to

25  the directors, they knew that we might have a potential alter

1  ego claim eventually.  It's not like this has been hiding.

2  It's been hiding in plain sight.  But our -- just our position

3  we put in our proof of claim, it would have been something we

4  get to do later.  If we're wrong about that, --

5          THE COURT:  Well, I mean, just -- and I will -- this

6  is the last question I'll ask on the topic.  But tell me why I

7  am wrong, naïve, to think this sounds -- here I go, using the

8  word crazy again.  But it sounds crazy to me that you could

9  sue Highland in February of 2009, in the, you know, the first

10  lawsuit, arguing indemnification obligations, and you lose,

11  and then you file a new lawsuit in 2010, suing Highland this

12  time for fraudulent transfers and breach of implied covenant

13  of good faith and fair duty -- I think just those two counts,

14  but maybe there was something else, but I think just those two

15  -- and let's pretend there was no bankruptcy case.  Maybe in

16  2021, you know, optimistically, assuming no COVID, you know,

17  you got a jury verdict.  It was supposed to be a jury trial,

18  Phase II.  And whatever way, well, you know, let's say you got

19  some liability against Highland but maybe not everything you

20  were hoping for.  You could, in 2022, bring an alter ego

21  action arguing that, back in 2009, March of 2009, when these

22  $233 million of transfers took place, Highland was the alter

23  ego of both HFP and CDO Fund and SOHC Fund and it ought to be

24  liable for all of those entities' actions?  In 2021, 2022, you

25  could bring a new suit?

1            MR. CLUBOK:  Well, in New York, you can amend your

2      pleadings to conform to the evidence right up to the date of

3      trial, which we have not gotten to.  But what New York says

4      is, yeah, that that's a post-judgment alternative theory of

5      liability.  It's just not a claim in New York.  I just, you

6      know, the law works in mysterious ways, I agree with that.

7            THE COURT:  When you have twice --

8            MR. CLUBOK:  I mean, that's the facts should --

9            THE COURT:  When you've twice sued Highland --

10            MR. CLUBOK:  There's -- there's a --

11            THE COURT:   -- over this set of facts?

12            MR. CLUBOK:  That really doesn't -- the difference, I

13      believe -- the New York Statute is, you know, CPLR 5225(b).

14      It -- in other states, I think it's done differently.  But

15      that is the way -- that's our understanding of the law in New

16      York.  I've surely been wrong before, and I hear you, and I

17      understand.

18         What seems odd about that -- of course, one of the things

19      that's odd about it is that Highland was able to stretch this

20      litigation out for ten years, right?  It seems crazy that you

21      have to go up and down to the appellate courts five times

22      before you finally get to go to trial.  A lot of states don't

23      allow interlocutory appeals like that.  Right?  There's a lot

24      of things in New York -- there's a lot of things in New York

25      that the rest of the country would think is darn crazy, right?

1   And by the way, I'm not a New Yorker, I'm from Ohio, and

2   there's a lot of things in New York I think are crazy.  And

3   one of them is that, you know, some people don't like the fact

4   that you get influence interlocutory appeals.  Some folks

5   would say that's crazy.  That's why your case lasted 11 years.

6   Right?  And that's why you needed to go up and down to the

7   appellate court six times.  We're stuck with the rules that

8   there are in New York.

9       Listen, you know, there's nine percent pre-judgment

10  interest in New York.  There's a high interest.  Crusader, in

11  New York -- and Redeemer, in the New York settlement, part of

12  their settlement was the full hundred percent, hundred cents

13  on the dollar and they're at very high interest.  That's --

14  some people think that's crazy.  Other people think --

15              THE COURT:  All right.  Well, we --

16              MR. CLUBOK:  -- that that makes sense because --

17  because --

18              THE COURT:  We don't really have to go into all of

19  this, but you had just described the *Board* case as an outlier,

20  and it's just shocking to me that that's an outlier, because,

21  you know, frankly, it seems like the reasonable approach here,

22  that if a defendant has been a -- if Highland has been a

23  defendant in litigation for years, that there would be a res

24  judicata concept that would bar alter ego later, post-

25  judgment, --

1               MR. CLUBOK:  Well, but it's not --

2               THE COURT:  -- in that 2010 action.

3               MR. CLUBOK:  But it's -- in New York, it's considered

4    to be execution of a judgment.  In New York, it's just not

5    considered to be a claim.  I'm back to, you know, again, I --

6               THE COURT:  Okay.

7               MR. CLUBOK:  I'm not here to defend the way New York

8    does it, but --

9               THE COURT:  All right.

10              MR. CLUBOK:  -- they don't consider it a claim.  They

11   consider it execution of a judgment.  So you --

12              THE COURT:  Okay.

13              MR. CLUBOK:  You pursue it after a judgment.

14              THE COURT:  All right.  I've belabored this too much,

15   so go on.  I'm sorry.  Go ahead.

16              MR. CLUBOK:  No, no.  It's --

17              THE COURT:  Okay.

18              MR. CLUBOK:  It's interesting.  Look, I hear you.

19   And we -- but it's also really the tail wagging the dog.

20   We're not bringing that claim now.  And we haven't included it

21   in any part of calculation of our 3018 motion.

22              THE COURT:  Okay.

23              MR. CLUBOK:  So, what we have focused on are things,

24   again, that have already been upheld and that were ripe for

25   trial without any limitation.  One is the issue of whether our

1    implied duty claim is more than just the March 2009 transfers.

2    And we will show how it is broader, and that -- and by the

3    way, again, same language, like almost with the exact same

4    words made to the Appellate Court in New York and rejected by

5    the Appellate Court of New York in their decision reopening

6    and denying summary judgment and allowing us to go forward to

7    trial.  But I'll get to that in a moment.

8        The other one is whether or not these settlements release

9    part of UBS's implied duty.  And you know, UBS did not release

10   ever any of its implied duty claim, nor did anyone, as far as

11   we know, ever claim that.  We were in litigation for many

12   years.  That would have been a -- that would have been big

13   news.  That would have been gigantic news in New York if those

14   settlements had given Highland the windfall to get out of its

15   obligations for breach of implied duty of covenant of good

16   faith and fair dealing in a contract that was between UBS and

17   Highland and doesn't involve Crusader at all.  That would have

18   been enormous news.

19       And we never heard that -- could have argued that.

20   There's one statement, stray statement they come to, and I'll

21   get to that.  But it doesn't say the sweeping argument that

22   they're making now.  And when those -- and by the way, in New

23   York, it would just be absolutely -- they would be unable to

24   do this.  We cited cases on Page 22 and 23 of our brief.  You

25   know, any motion for summary judgment filed this late would be

1    denied outright, it said, regardless of the merits.  That's

2    the *Castro* case.  The *Coccia v. Liotti* case says absent

3    newly-discovered evidence.  There's no newly-discovered

4    evidence in the last six years because they haven't made

5    either of the arguments for summary judgment.  This is just

6    old wine in a new bottle.  You know, they're making the same

7    arguments that we dealt with multiple times in state court.

8    And they think -- this is a main reason, frankly, why they

9    want to transfer to bankruptcy court.  They just want yet

10   another bite at this apple.

11       So I do want to take a few -- just a few minutes to step

12   back on how we got here, so it's clear what our claim really

13   is.  Our claim, okay, and what the original claim that we had,

14   is that a promise was made.  And the promise was -- there was

15   a promise between Highland Capital Management, the Debtor, and

16   UBS.

17       And by the way, Your Honor, I just should say, it's not

18   like we brought two different lawsuits.  What actually

19   happened here is that UBS filed a claim.  Originally, all of

20   its claims were upheld against a motion to dismiss.  It then

21   went up -- because in New York, you can do interlocutory

22   appeals -- it went up the first time, and while the case was

23   moving forward, the Appellate Court reversed and dismissed the

24   claims just -- the claim just with respect to Highland, that

25   indemnification claim that was originally made.  That claim

1   got dismissed.

2        Meanwhile, discovery was coming in showing all kinds of

3   fraud, breach of implied duty.  UBS had requested the right to

4   amend, and I think that request was pending when the decision

5   came down.  And so, technically, they got caught up in, oh,

6   you can't amend now because that decision came down.  It was a

7   very strict rule of res judicata.

8        By the way, I don't love that decision.  If we ever had a

9   chance, we'd probably appeal that to the Court of Appeals in

10  New York.  But that's -- we were stuck with that precedent.

11  And the Court said, Sorry, even though you requested leave to

12  amend, you hadn't yet amended.  Our decision was entered,

13  suddenly cutting off your claims, so you now can't amend to

14  add these claims for pre-February 2009 conduct.  That's what

15  the Court held.  It was a pretty -- pretty extreme ruling on

16  the res judicata, because the claim was still live because of

17  the co-defendants.  And you know, anyway, it was a highly

18  (inaudible).  And included this stray language that was very

19  unfortunate about implicating events or something like that.

20  Maybe that was the next UBS decision.

21       But in any event, just so you know, it's not like UBS is

22  out there serially suing Highland.  It was all in the context

23  of one -- originally, what was one litigation.

24       In any event, if you go back before the litigation, there

25  was a contract.  And in that contract was a contract directly

1   between just UBS and HCM.  And there was an engagement letter.

2   And that contract said that, for the securitization, the two

3   parties agree that CDO Fund and SOHC (inaudible) for a hundred

4   percent of the losses.  It's Highland agreeing with UBS that

5   these two other entities will (inaudible) a hundred percent of

6   the losses.  That was the original -- that's one original

7   contract.  But just so we're clear --  and those were parties,

8   okay?

9       Now, Highland was in total control of those parties.  It

10  had investment management agreements that allowed it complete

11  authority over and was a shareholder, a significant

12  shareholder in at least HFP, I presume, and CDO Fund as well.

13  Almost all these Highland entities are all interrelated and

14  connected.

15      So that is the promise, that these two funds of Highland

16  had -- had investment management agreements, and we've

17  attached them.  They're in our papers.  They're so broad that

18  they just guaranteed that Highland had complete control to do

19  anything it needed to do.  And we had this promise that those

20  two entities would pay us if there were losses.

21      And then, by the way, there were two other documents

22  signed, a cash warehouse agreement, synthetic warehouse

23  agreement.  Those two were signed by HCM and the Funds --

24  SOHC, CDO, and UBS.

25      So it was -- really ends up being three documents, all

1   three signed by HCM, two of the three also signed by SOHC and

2   CDO Fund.  And that's the basic promise that's at the heart of

3   our breach of implied duty of good faith and fair dealing.  We

4   had this promise.  Every entity -- fair enough:  The promise

5   is not Highland Capital Management will pay you.  The promise

6   is not Highland Capital Management will indemnify you.  The

7   promise is not even Highland Capital Management guarantees

8   that these two Funds pay you.  It's just that they agree they

9   bear a hundred percent of the risk.

10      And what happened?  Okay, what happened is Highland

11  Capital Management -- in the original agreement, they were

12  called, I think, the Issuer.  They got to pick CLOs and CVSs.

13  UBS put up $818 million to purchase those, okay?  So UBS put

14  out its money and they were, quote, warehoused at UBS.  UBS

15  got to hold onto them, but UBS had, you know, put out $818

16  million.  And the deal was, HCM said CDO Fund and SOHC will

17  bear one hundred percent of the risk.

18      So what happens?  By the fall of 2008, it's down about

19  $500 million.  It's down to somewhere in the $300 million

20  value.  It was, by the way, as -- and this was decided in

21  Phase I, the exact dollar amount, $519,374,149.  After you net

22  out all the collateral and everything else, this was the

23  losses.  This was the risk that was left.

24      And it's very simple under the contract, okay?  To the

25  extent possible, SOHC and HFP and CDO Fund, it just -- the

1    contract just says will bear a hundred percent of the risk.

2    The contract contemplates them paying us the money.  Again, it

3    doesn't guarantee every last penny.  It doesn't say Highland

4    Capital Management will make them invent money if they don't

5    have it.  It just says they'll bear a hundred percent of the

6    loss.  And those funds, we now know, had lots of money at the

7    time.  At least $300 million.  We've gotten some recent

8    documents from the Debtor that suggests they may have had

9    more.  And they had -- supposedly had hundreds of millions of

10    dollars between them.  And to this day, almost 12 years later,

11    they have not paid -- they did not cause SOHC and HFP and CDO

12    Fund, even though they had total control over them, from every

13    day from the day we sued, February 24, 2009, through today,

14    they did not cause them to pay us one dollar.

15        And in fact, we just recently -- we'd been told originally

16    in this case that CDO Fund had nothing left.  Finally, after

17    all the discovery, we find out that they've got an asset that

18    may be worth $10 million or so.  We have a judgment right now

19    for those $519 million, and still to this day Highland refuses

20    to cause CDO Fund to pay us.  They won't even explain why.

21    They've basically held it up as a price of settling the other

22    claims.  The breach of implied duty of good faith and fair

23    dealing started on February 24th when we sued and they had

24    money and they didn't pay, and it's continued right up through

25    yesterday, when they still -- apparently, CDO Fund still had

1   money and hadn't turned it over, except if we, if we, in bad

2   faith, have to litigate with them.

3       So they breached -- that's the breach of implied duty of

4   good faith and fair dealing.  That's the claim we stated.

5   That's what we've explained countless times in New York state

6   courts, the trial court, the appellate courts.  And after

7   hearing all that, within the same impassion that you hear in

8   me, because I'm frustrated after ten years of litigation, not

9   something I planned to do, right, ten years ago, that I'd

10  still be arguing this case.  But Highland has just breached

11  that, breached it, breached it, and continues to breach it to

12  this day.

13      What does the law say?  The law says, under New York law,

14  contractual counterparties -- and that's Highland; there were

15  contractual counterparties -- they can't do anything which

16  will have the effect of destroying or injuring the right of

17  the other party to receive the fruits of the contract.  That's

18  it.  That's the standard in New York for breach of implied

19  covenant of good faith and fair dealing.  We easily have met

20  that standard.  That's why the New York trial court and then

21  the Appellate Division denied summary judgment and said, Yeah,

22  you get to go forward on your entire implied covenant claim

23  without limitation.

24      Now, this claim, by the way, it's complete.  It arose on

25  February 24th, 2009 when we sued them and they still had money

1    and they could have paid us and they chose not to.  Beginning

2    that day, going forward, they were in breach of an implied

3    covenant.  Okay?  And that claim arose because of the contract

4    between Highland and UBS.  It didn't -- before we find out

5    what they did do with the money, that claim arose, and it

6    specifically arose with respect to the contract.

7         Now, we've got lots of evidence of how they breached it,

8    and one big piece of evidence that we have is that they sent a

9    bunch of money to themselves and to other Highland-related

10   entities to settle other scores, to -- because they were

11   investors, because they were trying to get out of trouble with

12   them.  You know, quite frankly, Your Honor, it's déjà vu all

13   over again.  What happened in 2009 is Highland had a lot of

14   little problems and it said, We'll satisfy all our little --

15   we'll pool all our cash, we'll satisfy all of our little

16   problems, and we'll leave the big problem, UBS, out in the

17   cold, because for ten years they just get away with it.  And

18   now the same thing's happened in bankruptcy.  You've still got

19   the big problem of UBS with all these settlements with the

20   other, you know, major creditors, and what's really going on

21   here is that if we can take care of all these little problems

22   or medium-sized problems and we leave that big UBS problem, we

23   can all gang up together to try to deprive UBS of recovering

24   on its big problem.

25        We were told for ten years how -- or seven years, I guess,

1  until we finally got to trial -- how weak our claims were, how

2  we had less than a ten percent chance of winning.  You know,

3  the same -- with the same enthusiasm that you heard the

4  lawyers just tell you that really we'd have a 30 percent

5  chance of winning if we actually got to finish this trial, we

6  heard the same thing for years and years.  And when we finally

7  got to court and then Justice Friedman heard the witnesses, it

8  was just unmistakable, we won virtually every single claim.

9  Every single defense they had was denied.  $518 million in

10  damages, and about $520 million in pre-judgment interest.

11  That's -- was the billion dollar judgment that we now have

12  against CDO Fund and SOHC.

13      CDO Fund still has an asset that's worth $10 or $11

14  million.  The directors could just direct CDO  Fund to give it

15  to UBS, but they're not.  They're holding it out as a

16  condition of us settling our other claims.  Okay?  That's the

17  kind of thing we've been dealing with from the beginning with

18  Highland.  And it's continued, unfortunately, through the

19  current iteration of Highland, the current directors.

20      Before I go on to current directors, though, there was Jim

21  Dondero.  And Jim Dondero controlled all of this.  And he did

22  -- you know, it's still is a little complicated, and that's

23  why it's hard for me to deal with on the fly.  I probably have

24  an hour left or 45 minutes or however long I have.  You know,

25  we said, Let's just go ahead and get the trial on on this.

1  I'll come back to that later.  I do think we could complete a

2  full trial of this claim in a week, and so we wouldn't be

3  doing this prematurely, and I can talk very specifically about

4  that, but also there's not a single thing you're going to

5  decide here today that will take even one witness, I believe,

6  off of the table, except maybe parol evidence regarding the

7  settlement agreements.  But other than that, the main claim,

8  the evidence, it all overlaps with all of the other claims.

9  So we're still going to have the same witnesses talking about

10  what happened in March of 2009, where the money went, why it

11  went there, how Jim Dondero committed actual fraud to move it,

12  why it was a breach of implied duty of good faith and fair

13  dealing, given his knowledge of the contract, et cetera, et

14  cetera.  All that evidence is still going to be there.

15      We have a breach of implied covenant of good faith and

16  fair dealing directly against Highland Capital Management,

17  okay, for all the money that was sitting at HFP, CDO Fund,

18  SOHC, on February 24th, 2009 that didn't make its way to our

19  coffers.  We've gotten zero dollars of that money.  That's our

20  implied covenant.

21      An overlapping claim that's somewhat related, or maybe

22  even you could say largely related, is that some of that money

23  was actual fraudulent transfer made to other limited partners

24  like Crusader and Credit Strat.  And to the extent that there

25  is potential -- realistic potential derivative liability for

1    -- you know, in other words, to the extent that because of our

2    fraudulent transfer claim somehow Jim Dondero could get

3    indemnification from Crusader or Credit Strat, yes, we

4    released that claim.  That was for Crusader and Credit Strat's

5    benefit.  Ms. Mascherin said, I don't -- think in exact words

6    I think she said there was no love lost.  That's a very polite

7    way of saying what I've heard Ms. Mascherin say many times

8    about how, back in those days, that they were at bitter odds,

9    as was Credit Strat.  Very intense litigation.  Very intense

10   accusations.  They certainly were not going to give Highland

11   Capital Management some windfall.

12        What they did want to do is protect themselves, and we

13   agree.  To the extent there's a realistic possibility that

14   because we recover a fraudulent transfer -- by the way, the

15   fraudulent transfer went from, you know, SOHC/HFP to Crusader

16   and Credit Strat, okay?  That's -- (inaudible) is liable for

17   aiding and abetting that fraudulent transfer, okay?  And --

18   but that's not where the claim, the main claim against

19   Highland arises.  We often used loose language in -- because

20   it never mattered, and so we often talked about these in the

21   same breath, but the claim against Highland Capital Management

22   arises from that contractual promise, what they breached by

23   doing a bunch of stuff, and all the fraudulent transfers are,

24   in the context of the implied covenant claim, are evidence,

25   okay?  It's evidence of that claim.

1      Anyway, this is the web of ownership.  You're very

2    familiar with it.  You know, Dondero orchestrated everything.

3    He sat on every side of every transaction.  Some of it, we

4    believe was fraudulent transfers.  Some of it, he was the

5    fraudulent transferor.  Some, the fraudulent transferee.

6    Others, he just caused it to happen in bad faith, in breach of

7    the covenant with respect to the contract he had with us.

8    This is what we -- this is what we dealt with.

9      And by the way, okay, this -- you know, you heard a lot

10   about that phrase, we can't -- we can't, you know, res

11   judicata bars something that implicates events from pre-

12   February 2009.  And if you go back and look at the transfers,

13   it was done as if there's some, like, event.  I mean, things

14   have happened before February 2009 that we're not allowed to

15   talk about or raise in the context of our implied covenant

16   claim.  The Appellate Court in March of 2018 completely put

17   that to bed.  What happened was, back in July of 2011, our

18   implied duty claim was upheld.  Our fraudulent transfer claim

19   was upheld.  But there was that stray language that plagued us

20   for years.  Because Highland kept saying, and it makes no

21   sense under res judicata law, it would be completely

22   ridiculous to say you can go forward but you're not allowed to

23   cite events or evidence or whatever you want to call it from

24   pre-February 2009, just to -- just as a support to a claim

25   that arose in post-February 2009.  And the Court said, You've

1   got a claim that arose post-February 2009, and the day you

2   sued, they had money, they didn't pay you.  That's your claim.

3   Maybe a fraudulent transfer.  That's another claim.  Maybe

4   they just didn't pay you, and a breach of implied duty.  Those

5   are your claims.  You can absolutely save us ten steps that

6   started back, you know, in 2008, all the way through 2009, all

7   the way through February 23rd, 2009, that that was the

8   predicate or that is evidence.

9        And this is what these, you know, seven-year history of

10  going up and down to the appellate courts taught us, and

11  finally, finally, finally, the Appellate Division in March of

12  2018 made it crystal clear.  What they said was, Because the

13  conduct at issue here took place after the commencement of the

14  prior action, there is no res judicata bar to the fraudulent

15  conveyance and breach of implied covenant claims arising from

16  the post-commencement conduct, and by the way, neither our

17  prior decisions nor the doctrine of res judicata bars

18  Claimants from introducing evidence of pre-February 24, 2009

19  conduct to the extent necessary to prove with respect to post-

20  February 24, 2009 conduct their alter ego, fraudulent

21  conveyance, and implied -- or I'm sorry, breach of implied

22  covenant claims, okay?

23       So do not be misled when you keep hearing this phrase

24  about how event -- you know, with that 2011 decision that

25  loosely -- and by the way, if you read the whole decision,

1    you'll see that sentence is just a mistake -- that they

2    loosely used that sentence in one place that contradicts a

3    different part of the decision, and for seven years I've heard

4    Highland's lawyers tell me, That means you can't talk about

5    events that happened in January of 2009.  That means events

6    that happened March, in September of 2009 are off limits.

7    It's just not right.  (inaudible) evidence, the court luckily

8    finally cleared that up.  And that's why we were all set to go

9    to trial, unencumbered by any of these claims, when this case

10   was moved here.

11       So, first issue.  Are our implied duty claims limited to

12   the March transfers?  Absolutely not.  Our implied duty claim,

13   again, it arises from a contract, okay?  And we pointed you to

14   the specific phrase of the contract.  And every appellate

15   court in New York and the trial court, they all treated it

16   differently.  They didn't say it was overlap.  They all said

17   it was different.

18       Our implied duty claim is every bit of conduct that was

19   taken to interfere and to frustrate UBS's recovery rights

20   under the various agreements.  A big part of that or part of

21   it is the fact that they committed fraudulent conveyances or

22   transfers.

23       By the way, it was -- they -- Ms. Mascherin -- it was very

24   well done.  She tried to say that somehow there's a difference

25   when we say fraudulent conveyance and we say fraudulent

1    transfer.  I quickly looked up *Merriam Webster*.  It literally

2    says, under the definition of fraudulent conveyance,

3    parentheses, often called or called a fraudulent transfer or

4    something like that, I think.  I glanced at it quickly, so

5    maybe I reversed those two.  We use those interchangeably.

6    There's no significance.

7        But in any event, our implied duty claim is clearly

8    brought under the fraudulent conveyance claim.

9        The post-February 24th conduct that we have in our implied

10   duty claim, it's that literally every single day starting with

11   February 24th, 2009 that there were assets available in SOHC,

12   CDO, or HFP to pay us, and they instead engaged in wrongful

13   conduct not to pay us.  That's a breach.  And again, that

14   includes up to like this week, and we have letters we've put

15   into the record.  We're going -- for the last few weeks --

16   when we finally found out -- it was only recently.  It was

17   after being told -- we were told there's a ghost fund.  We

18   were told that CDO had nothing left.  Nothing to see here.

19   To the Debtor's credit, at least, I mean, it took them months,

20   but at least they finally produced to us what their

21   predecessors never did, which is it turns there's at least an

22   asset that's worth something like $10 million or so.  I'm very

23   -- rounding it.  Or maybe it's $12 million; maybe it's $8

24   million.

25       I mean, you know, I'm not trying to give exact numbers,

1    but it's that order of magnitude.  And they still -- they have

2    that asset.

3        We asked the Debtors, what's your good faith basis for not

4    just -- you control CDO Fund and you have this investment

5    management agreement.  You could do it.  Why not just turn it

6    over?  They just -- they wouldn't even answer or explain.

7        So, but, you know, more importantly, there were hundreds

8    of millions of dollars on February 24th, 2009, and Highland

9    had total control over the funds.  By the way, we have

10   evidence of that.  We have the investment management

11   agreements.  They're in our record, and they are very broad.

12   And the courts really relied upon those agreements.  That's

13   why we these are -- I mean, we knew that these weren't the

14   greatest counterparties, but they really weren't -- it wasn't

15   that we could directly get to Highland.  Maybe Highland had a

16   billion dollars or two billion dollars and CDO Fund and SOHC

17   had a few hundred million.  So we get it.  But as it turns

18   out, you know, that would have made a full recovery at that

19   time not possible, but we expected good faith in efforts to

20   comply with that agreement.

21       And by the way, Mr. Feinstein kept -- keeps saying the

22   Citibank case here, and says, well, Citibank says it all.  I

23   encourage you strongly to read the Citibank decision.  The

24   Citibank decision was a different situation where Citibank had

25   a contract that specifically said something like:  Highland

1   will encourage its subsidiaries to pay you.  Or recommend.

2   No, it said, Highland will -- Highland agrees that it will

3   recommend to the Funds that control us to pay you.  And

4   Citibank came back and said, It says recommend, but implied

5   duty of good faith and fair dealing means they have to force

6   them into it.

7       And the Court said No, no, no, no.  You have a specific

8   provision that says recommend.  You can't rewrite it to say

9   force.  They lost summary judgment in that same appellate

10  court -- maybe it was the trial court; I don't know if it was

11  appealed -- but we won because our contract is different.  Our

12  contract says those two parties will bear a hundred percent of

13  the risk, and all we need is Highland to act in good faith.

14  We don't need Highland to guarantee it.  We don't need

15  Highland to, you know, backstop it.  What we need right now is

16  Highland to just in good faith cause it to happen to the

17  extent they could.  Well, that's what they should have been

18  doing from February 24th forward.  They've never done it to

19  this day.

20      Anyway, instead they wrongfully (inaudible) payments.

21  They kept them undercapitalized.  Indeed, they siphoned the

22  remaining offsets off and they engaged in protracted

23  litigation with UBS to frustrate their recovery.

24      Now, at summary judgment, the Court is required to view

25  all facts and inferences in the light most favorable to UBS

1    and resolve factual controversies in favor of UBS.  I know

2    you're familiar with that standard.  But, you know, they want

3    to argue this as if we're deciding, you know, a case.  I'd

4    want to just try the case.  If we -- if you could give us a

5    week, I think we could try the case.  But it's not fair to --

6    summary judgment, after mountains of summary judgment evidence

7    were presented, with big appendices in New York, now all of a

8    sudden they're going to get the fifth bite at the apple.

9        Some of the documents, you know, this is just a few that

10   we cited.  This was a document that talked about how, you

11   know, they recognized there was a big shortfall.  This is a

12   good example.  This is a 2008 document.  So they realized in

13   2008, it's like $745 million.  I think it gets up to like $800

14   later.  But by early December, it's at a $745 million

15   shortfall.  Okay?  It's a big shortfall.  They recognize it.

16   We're allowed to cite that.  We're allowed to say that they

17   knew back in 2008, and then thus in February 2009, when they

18   chose not to pay us, it was because they had been informed

19   months earlier.  Highland got all excited when that first

20   events line which was in that decision long ago, they said,

21   Oh, you can't even show the jury this document.  That's what

22   the Appellate Court has now put to bed, that we can use this

23   kind of evidence.

24       This is the predicate for how they knew, like their

25   knowledge -- we don't just start on the day of February 24th,

1   2009 and say we're not allowed to talk about what was in your

2   head starting today.  We're allowed to put in that kind of

3   evidence.

4        This was the Pricewaterhouse, a document -- by the way,

5   it's signed July 21st, 2009 -- where they acknowledged that 49

6   percent of the warehoused goods and losses were absorbed by

7   Highland Financial Partners, okay?  Not SOHC.  Highland

8   Financial Partners.

9            MS. MASCHERIN:  Excuse me, Your Honor.  We have an

10  objection.  The Redeemer Committee and the Crusader Fund have

11  an objection to this exhibit, which is Exhibit AT-43, being

12  used for purposes of the summary judgment motion, as it was

13  not filed in opposition to the summary judgment motion.  We

14  have no objection with it being considered with respect to the

15  3018 motion.

16           THE COURT:  All right.

17           MR. FEINSTEIN:  The Debtor joins in that objection.

18           THE COURT:  Okay.

19      Mr. Clubok?  This wasn't part of the summary judgment

20  evidence.

21           MR. CLUBOK:  Your Honor, we -- we filed on the same

22  day our summary judgment motion and our -- I'm sorry.  We

23  filed the opposition to summary judgment motion and our 3018.

24  I'm checking to see which appendix this was in.  If it wasn't,

25  we -- we certainly put it on our exhibit list earlier this

1    week.  This is the kind of thing that --

2              MS. MASCHERIN:  Yeah, we did --

3              MR. CLUBOK:  If I may?  If I may finish?

4              MS. MASCHERIN:  Sorry.

5              MR. CLUBOK:  Just, I would just -- I'd move to -- the

6    Court, for good cause shown that there's no prejudice, allow

7    us to amend our appendix.  I ask to amend our appendix if this

8    was not included in our 3018 appendix.  This is a document

9    that we've used countless times in court.  This is not a

10   surprise document.  We've used it for years.  If it wasn't

11   technically in our appendix, it certainly was on our exhibit

12   list earlier this week.  There's no prejudice.  And it's, I'm

13   sure, in the record of the summary judgment proceeding in New

14   York.  I'd just ask the Court to allow us to amend, given the

15   absolute lack of prejudice.

16             MS. MASCHERIN:  Just, Your Honor, for the record, we

17   did a -- the parties -- Mr. Clubok didn't participate, but

18   counsel for the parties conducted a conference regarding the

19   exhibits yesterday, and the Debtor and the Redeemer Committee

20   and Crusader made clear our objection to the use of this

21   exhibit with respect to the summary judgment motion for the

22   reasons that I stated.

23             MR. CLUBOK:  Yes.  I should say, I understand that

24   you made this objection yesterday.  We put it on our exhibit

25   list earlier this week.  I'm just saying, what's the

1    prejudice?  We -- I don't think -- and I'm not asking you, Ms.

2    Mascherin.  I'm sorry.  I'm directing this question to the

3    Court.

4         Your Honor, they've --

5              THE COURT:  Let me just stop.  This is obviously an

6    excerpt from Highland's December 31st, 2008 consolidated

7    financial statements audited by PricewaterhouseCoopers.

8    That's what this is?

9              MR. CLUBOK:  Yes.

10             THE COURT:  Okay.  While I hope this doesn't happen

11   again, I'm going to overrule the objection.  I just, I don't

12   think there's any prejudice, when it's Highland's own

13   financial statements.  So -- but I hope we don't have more

14   episodes of stuff being offered that --

15             MR. CLUBOK:  I hope so --

16             THE COURT:  -- is not in the evidence, the summary

17   judgment evidence.

18        All right.  Continue.

19             MR. CLUBOK:  Your Honor, we merged the two

20   presentations, and so it may -- it's possible there's a couple

21   others.  There may be, at most, three or four total.  And so

22   -- but none of them are prejudicial.  They're all things like

23   this.  And I'll try to go one by one, and if you want to

24   exclude them, you can, but I -- but I really hope that, since

25   there's absolutely no prejudice shown, we can -- this is

1    Exhibit -- it's -- maybe one of my colleagues can tell me,

2    because it's my -- I mean, just for the record, so it's clear.

3    This is Exhibit NG-43.

4            THE COURT:  Okay.  And in all instances where this

5    might crop up, they are exhibits that were in fact timely

6    disclosed in connection with the 3018 motion.  That's what

7    you're saying?

8            MR. CLUBOK:  Correct.

9            THE COURT:  Okay.  Continue.

10           MR. CLUBOK:  Yes.  And I should also say, the Rules

11   allow you to allow us to amend our appendix at summary

12   judgment, as long as there's, you know, no prejudice.  So I

13   would hope that we get that leave, if need be.

14       Here's another document.  This was in our -- we don't have

15   the same issue.  This is Motion for Summary Judgment Exhibit

16   8, I see from the chart.  This was an email where this again,

17   this is the scheme that's cooked up in January 2009.  It's a

18   thought that Kevin Latimer, who was one of the employees at

19   the time at HCM, sends to Jim Dondero.

20       And he says, UBS is going to be calling Jim today, asking

21   for all additional collateral that CDO and SOHC have left to

22   cover the obligation left by the March transaction.

23   (inaudible) the collateral over, but make it more difficult

24   for them.  Why it would be helpful (inaudible) whatever entity

25   you want.  Otherwise, they can see us in Court for their

1   additional collateral.

2        Now, Dondero doesn't tell us that, but sure enough, we

3   file our lawsuit February 24th, 2009, and sure enough, that

4   plot that was hatched is executed on them for the next, I

5   guess, 11-1/2 years.  It's still being executed on today.  And

6   so you see HFP had at least -- by the way, this -- this is --

7   you heard a lot about the $230-some million that was

8   transferred to Highland and to Multi-Strat and to Crusader and

9   Credit Strat, and a little bit to Citibank.  You heard about

10  that?  This is 40 -- roughly $45 million of additional dollars

11  that we know, I think as of December -- at year-end 2009, as

12  of December 2009, HFP still had like $45 million.  Okay?  And

13  so they probably -- presumably have even more in February

14  2009, but for sure by the end of 2009 they've got $45 million

15  that is separate and apart, in addition to that $230 million

16  you've heard a lot about earlier this morning.  That should

17  have been turned over to us.  That's an additional breach of

18  the implied duty in good faith and fair dealing that is not --

19  that has nothing to do with the transfers made to Crusader,

20  Credit Strat, Highland, Multi-Strat, or anything else.  It's

21  just additional funds that are left over after those transfers

22  that should have been used.

23       And by the way, there's even more recent documents that

24  were -- that were eventually -- the 56(d) part of this.  You

25  know, we see -- we understand there's at least another, I

1    don't know, $10 to $20 million that was also in CDO Fund back

2    then, as I mentioned.  I think there's still $10 million left

3    in that fund today.  So all of those funds are additional

4    sources of liability for not having just been turned over to

5    us as they should have been.

6         And what happens then?  When we depose Todd Travers in

7    2012, he said -- we asked him, did Mr. Dondero want to delay

8    satisfying Highland's obligation to UBS?  I think the idea

9    was, if we could make it tomorrow's problem instead of

10   today's, we'll do it.  And I said, Is it fair to say that Mr.

11   Dondero devised a strategy to delay the resolution of their

12   obligation as long as possible, correct?  Answer:  Yeah.  I

13   think he would want to delay it, yeah.

14        There's more through Todd Travers you'll hear in a moment,

15   but basically what Mr. Travers -- and by the way, other

16   witnesses, like Mr. Cole and Mr. Daugherty, but the witnesses

17   who -- there's five or six witnesses that we would have at a

18   trial.  I think one UBS witness and four or five ex-Highland

19   employees.  And I believe Highland had like one or two fact

20   witnesses, you know, Mr. Dondero and Mr. Braner.  And what

21   everybody who's not been Mr. Dondero or Mr. Braner says is

22   there was this concerted effort to deprive UBS of its    -- of

23   whatever was due to them.  And all kinds of machinations were

24   done.  That's what those witnesses will testify.  Mr. Braner

25   and Mr. Dondero will obviously testify differently.

1          But look, this was all -- again, this was all argued

2     before.  This was from November of 2017, HCM argued in their

3     appeal -- I forget which appeal -- I guess is the appeal of

4     the denial on rehearing of the motion for summary judgment.

5     They said the only post-February 24, 2009 event that UBS

6     alleges is the assumption that HCM caused the March 2009

7     fraudulent transfer.  Sound familiar?  It's the same thing Mr.

8     Feinstein is trying to tell you today.  We said, No, it's not

9     based entirely on that.  It also includes failure to transfer

10    funds from CDO Fund and SOHC, HFP, that could be used to pay

11    UBS.  That was our response three years ago.  And the Court

12    decided -- and this is another one of these decisions that Mr.

13    Feinstein kind of questions.  But three years ago, or I guess

14    it was March of 2018, so not -- well, only two and a half

15    years ago, HCM's motion for argument was denied.  Our entire

16    implied duty claim was allowed to proceed without limitation.

17    They're just asking you to do this over again.

18         Now, that's our implied duty claim.  In terms of whether

19    or not we're also likely to prevail on our fraudulent

20    conveyance claim, you bet.  I mean, we're on this -- there's a

21    mountain of evidence that shows actual fraud.  Of course let's

22    talk about the alto ego.  You said why did we bring the HFP,

23    SOHC alter ego up front.  We did that because of this -- I

24    agree with Mr. Feinstein, that's -- or maybe it was Ms.

25    Mascherin who said that.  Part of our -- part of our attaching

1    liability requires us to show that -- that alter ego during

2    what we were calling our Phase II trial.  So that's why we

3    were pursuing that in Phase II.

4        That claim, by the way, is still live in New York, HFP and

5    SOHC, outside the bankruptcy.  But there's a mountain of

6    evidence that HFP was SOHC's alter ego.  This is some evidence

7    from --again, this is evidence from pre-February 2009, which

8    we're allowed to use to -- as a predicate, and there's lots of

9    examples of mixing and matching funds.  And they ultimately

10   admit, you know, there's a whole situation where at one point

11   they told us, hey, you know, they finally admitted to us late

12   in 2008 that HF -- I'm sorry, that CDO and SOHC had been

13   undercapitalized and some of the assets that were supposed to

14   be there had been moved to other Highland entities, and they

15   basically told our employee, Tim Leroux, who would testify to

16   this at trial, that, hey, you can -- you can go get collateral

17   from any of the Highland entities.  We just shuffle it all

18   around and you can pick the Highland entity.  It doesn't

19   matter.

20       And look, again, so after 2012, this was all -- oh, that's

21   fancy.  I didn't mean to do that.  In 2012, the Court ruled on

22   this.  And what the Appellate Court said in upholding the

23   trial court's decision back in 2012, in one of the many

24   decisions, the Court said, The motion court correctly ruled

25   that New York law governs Plaintiff's veil-piercing claim and

1    that such claim is sufficiently stated based on the alter ego

2    allegations which allege, inter alia, that SOHC (inaudible) on

3    Highland's financial board.  Highland Financial did not

4    distinguish between its debts and obligations and those of

5    SOHC, and they operated SOHC and Highland Financial as a

6    single economic entity.

7        And by the way, if you go back to that exhibit that you --

8    it just shows that, from Highland's perspective, they're

9    assuming that HFP owes us the money, not SOHC .  And that's

10   the way they always treated us until they, you know, until

11   they get to court and they tried adding something different,

12   but the appellate court said no to that.

13       And by the way, this is post their res judicata decision,

14   right?  This is post that 2011 decision where Highland is

15   saying, oh, you're out of luck because of res judicata.  You

16   can't use this kind of information.  And we said, no, of

17   course we can use this information, even though -- like, the

18   fact that SOHC's sole board member was on Highland Financial's

19   board, that's -- that dates back to 2010 or 2011 or -- I'm

20   sorry, 2007 or 2008.  But that -- that predated, okay?  This

21   evidence that the appellate court was citing, when it said we

22   could continue to pursue our claim for alter ego, is -- a lot

23   of it is pre-February 2009 evidence.  It just shows you that

24   the appellate court never put this limitation on events that

25   that Highland was trying to tell you was there.

1      By the way -- so that's alter ego, okay?  The second thing

2  that we have to show is that that what Highland has told you

3  -- and by the way, it's in their papers, too.  And it -- I saw

4  it in the reply.  I'm responding for the first time.  Look,

5  Highland, and even with the new directors, they keep saying to

6  this day with a straight face, hey, March 2009, all we did was

7  repay a secured note.  We just repaid a -- it was a secured

8  note, and when we -- when we, you know, transferred the money

9  in March 2009, we just paid back a secured note.

10     That is demonstrably false.  We have already won a

11  preliminary injunction, showing that we have a substantial

12  likelihood of success to defeat that claim.  We have a

13  mountain of evidence which we all presented at the summary --

14  we already did this, okay, both at summary judgment and

15  reargument of summary judgment, but this is Highland's expert,

16  okay?  Highland's expert, Dr. David Smith.  We asked him, Sir,

17  are you aware as you sit here today of any other source of

18  repayment other than the success of HFP's business is

19  anticipated?  Answer:  Not that I'm aware of.  Question:  And

20  you think, in your opinion as an economist, that that supports

21  characterizing the transaction as capital contributions,

22  correct?  Yes.

23     A big issue in the case is whether money that was poured

24  into HFP and SOHC in the fall was truly a secured transaction

25  or was it an equity contribution.  And every single factor, I

1  think, except the name of it -- it's called a secured

2  transaction, and there's like an eight-factor test.  And one

3  of the factors is what's it called.  So, on that one, they

4  win.  They called it a secured transaction.  Every other

5  factor goes against them.  This is an example of evidence we

6  have showing that it wasn't a secured loan.  It was a capital

7  contribution.

8     Here is more evidence.  This is their former general

9  counsel.  You heard a little bit about Michael Colvin in Pat

10 Daugherty's argument.  Michael Colvin testified under oath.

11 We asked him, Do you recall ever seeing a security agreement

12 in connection with HFP at its issuance?  He was the general

13 counsel at the time.  He says, No, I don't.

14    We asked their expert who had gone through the whole

15 record:  As far as you know, the transaction reflected by

16 Exhibits 45 -- and that's this thing that they call a secured

17 note, which they claim was just ordinary course, when they,

18 you know, quote, unwound it in March 2009.  And said, As far

19 as you know, that transaction was not secured?  Both

20 transactions were not secured by the (inaudible)?  As far as I

21 know, there was no security agreement or sub agreement

22 executed.  But they had some draft documents that they never

23 executed.

24    So, and there's other factors.  It's in our brief.  I

25 believe it's in the record.  All of this was in the summary

 1    judgment arguments in New York.  All of this.

 2        And by the way, this same evidence won us a preliminary

 3    injunction to freeze assets, and that's what led ultimately to

 4    getting the $7 million back.  But the court -- but both the

 5    trial court and the appellate court in New York already as a

 6    factual matter did think this is not like a 30 percent chance

 7    of winning, but enough to get a very unusual pre-judgment

 8    attachment and freeze of assets.

 9        MR. FEINSTEIN:  Your Honor?  I hate to interrupt,

10    Your Honor, but this is now twice that Mr. Clubok has stated

11    and misstated that there was a finding of substantial

12    likelihood on the merits in that preliminary injunction

13    matter, and there simply wasn't.  This is something you

14    addressed at the last hearing, and he's repeating it, and it's

15    false.

16        MR. CLUBOK:  Okay.  I disagree, but I -- and by the

17    way, and I will say I've got many things that were said in the

18    first two hearings completely false.  I tried to restrain

19    myself, not jumping in.  People get a chance to respond.  I

20    would ask the Court to let me finish.  I'm sure he'll get

21    replies.

22        THE COURT:  I'll let you finish, and someone can

23    either point me to summary judgment evidence or not.  Without

24    seeing it, I don't know how to rule.

25        MR. CLUBOK:  Look, let's leave it at this.  The fact

1   of the matter is we have evidence in the record, deposition of

2   Michael Colvin, that says there was never a security

3   agreement.  Okay?  We have the evidence of their expert who we

4   deposed who acknowledged it was not secured and also

5   acknowledged that because there was no source of impairment

6   other than as a source of the business that supports

7   characterizing the transactions as capital contributions.  We

8   have Mr. Travers who testified that -- by the way, we have the

9   Citibank decision.  The Citibank decision, they gave through

10  some -- thoroughly facts.  Okay?  The Citibank decision that

11  -- talks about this same transaction.  It talks about how it

12  was not under terms that they could have gotten from a third

13  party.  That's one of the questions we look at when we say is

14  it a legitimate secured transaction or an equity infusion?

15  And one key test is whether or not a third party would have

16  loaned on the same terms.

17       As a matter of law, the court in Citibank has already

18  found that that's not the case.  So -- or the factual finding,

19  I guess.  So, but we have plenty with that summary judgment

20  here.  This is where we get into our 3018.  And this is just

21  -- I don't mean to get deep into the weeds on this, Your

22  Honor.  This is -- I'm giving you a taste of the evidence

23  about whether or not it was a capital infusion or whether it

24  was really a secured transaction.  And I don't think you

25  really need to know much more than, in typical Highland

1    fashion, there was no signed security agreement.  They had

2    drafts that they never signed.  The general counsel said they

3    never executed it.  And then they just tried to pretend like

4    they had done it.  They couldn't have done it.  It wouldn't --

5    even if they had signed it, it wouldn't have mattered, because

6    it was not really arm's length.  And we'll see that in a

7    moment.

8         The fact of the matter is these March 2009 transfers were

9    actual fraud.  We have a claim for actual fraud and

10   constructive fraud.  Obviously, actual fraud is harder to

11   prove.  But in this case, when you see the evidence, you'll

12   see actual fraud.  And, you know, we don't need to show this

13   to get past summary judgment, obviously.  This is part of our

14   3018 argument.

15        In New York law, fraudulent intent is inferred from so-

16   called badges of fraud.  I assume that's similar in Texas.

17   (inaudible)  And New York said basically we have at least

18   three of these badges.  That's a very good chance that there's

19   actual fraud.  Okay?  And so here some of the badges.  Close

20   relationship amongst the parties, defendant's knowledge of the

21   claims and the defendant's inability to pay them, time of the

22   transfer.  Those are all indices of fraud.  And in this case,

23   Your Honor, there's no close relationship amongst the parties.

24   This is the agreement.  Okay, Your Honor?  This agreement is

25   what led to these transfers that you've heard so much about in

1   March of 2009.  And you're probably noticing something awfully

2   strange.  It's got Jim Dondero signing on behalf of CD

3   Opportunity.  Also Jim Dondero signs on behalf of HFP.  Also

4   on behalf of Crusader.  Also on behalf of every other entity.

5   In fact, Citibank was the only non-Dondero-controlled entity.

6   And on the Citibank line, Dondero started to sign it and then

7   he crossed his name out, realizing he couldn't sign that one.

8   But he signs for all of them.

9       And if I can, Your Honor, I'm just going to very quickly

10  show, this is the heart, really, of the actual fraud, okay?

11  And this is what we showed the courts in our summary judgment

12  phase.  We showed it when we got our TRO.  What -- and if you

13  look at -- if you go back and look at what the Debtors have

14  told you today, with a straight face, even though they knew

15  the actors in charge, okay, and they should know better, they

16  tell you, It was just a secured loan.  We were just repaying a

17  secured loan and that's it.

18      Well, to have it be a secured loan and to have it be fair

19  and to have it not be actual fraud, it has to be an arm's

20  length transaction.  There had to have been different people

21  negotiating it.  It had to have not smelled funny or looked

22  funny.  And what Jim Dondero and one other person, Phil

23  Braner, the only other person who would support this, Jim

24  Dondero and Phil Braner tried to tell, over the span of many

25  deposition days and in open court and carrying on today with

1  this (inaudible) today that suggests that it's just a normal

2  secured transaction, that their position was that, hey, it was

3  an arm's length transaction, lots of people are involved, we

4  had different people negotiating it, it was other people who

5  negotiated it.  It wasn't me, Jim Dondero.  Even though I

6  signed it on behalf of everybody, it was always other people

7  who supposedly negotiated it.  That's what Jim Dondero has

8  maintained for ten years.

9      But we took depositions of every other person involved,

10  and this is in the record that we put this in, and this is on

11  3018, and I'm just going to -- this is for 3018.  This is not

12  for summary judgment.  We don't need it for summary judgment.

13  But for 3018 purposes, I just want you to see a very short

14  clip of these depositions, if I may.

15      If I can find a way to quickly transfer, I will.  My

16  technical skills have been pretty good so far, so I hope they

17  don't fail me right now.  (Pause.)  Um, okay.

18      (Interruption.)

19          MR. CLUBOK:  Sorry, is somebody talking?

20          THE COURT:  All right.  Would everybody put their

21  device on mute except Mr. Clubok?  Thank you.

22          MR. CLUBOK:  Thank you, Your Honor.  Again, Your

23  Honor, you can judge for yourself.  This is Dondero and Mr.

24  Braner trying to claim that other people were involved in this

25  transaction.  Nothing to see here.  It's perfectly normal.

1   Wasn't me.  Not a fraud.  You'll hear them, and then you'll

2   hear everybody they name and what they say about it.

3        (Note played into the record, 1:36 p.m. to 1:41 p.m.)

4        MR. CLUBOK:  Hopefully I can -- okay, we can take

5   that out now.  Hopefully the technical difficulty did not

6   prohibit you from all seeing that.  That, that is Mr. Dondero

7   trying to justify this transaction in March that he claimed

8   was just (inaudible) secured lending, but to this day the

9   Debtors -- the director, through their counsel, are claiming

10  it's just a repayment of secured note.  There's a mountain of

11  evidence that shows different.  That's part of 3018.

12  Obviously, they're not saying -- we don't need this to --

13  they're not saying we need to show this for summary judgment.

14  But they are saying that you should discount our fraudulent

15  conveyance claim by 70 percent because we supposedly had no

16  evidence or not enough evidence.  That is as suspicious a

17  transaction as you're going to see.  Maybe not in Highland --

18  and everyone, Ms. Mascherin, you know, Mr. Terry, everybody

19  had litigated and they'd seen similar frauds.  This was the

20  fraud that was committed against UBS.  Okay?  And it was done

21  specifically just so UBS wouldn't get repaid and they would

22  could send money to different places.  And it also is one part

23  of the breach of implied duty of covenant of good faith and

24  fair dealing.

25      And that, Your Honor, is -- you know, I -- we're flipping

1   back and forth between summary judgment and 3018, but that's

2   why just agreeing to a 70 percent discount for whatever claims

3   that you say remain after today, if you do go against the New

4   York courts and you strip our claim further, Highland tells

5   you, oh, and then knock another 70 percent off because we

6   could never show fraud or we could never show -- we couldn't

7   show that there wasn't a secured lender and we couldn't show

8   that it was really an equity infusion or we couldn't show the

9   alter ego.  You've seen the evidence, and we know how Highland

10  comingled stuff, and you saw their own admission of more

11  documents that treated HFP and SOHC as one and the same.

12      Getting back to -- sorry.  Back to the -- just a o-- from

13  the PowerPoint.  That supposedly, you know, arm's length

14  transaction that supposedly all those other people had been

15  negotiating, that results in a signature page that looks like

16  this, a signature page that, in my 25 years of practice, I've

17  never seen something quite like this, given those

18  circumstances.

19      Now, Mr. Dondero creates some liability for himself or for

20  his entities.  Some of it is direct to HCM.  So you can see

21  right in the middle there HCM signs the contract -- sorry,

22  signs this agreement.  Apologize, Your Honor.  Signs this

23  agreement right there.  HCM signs the agreement.  And that,

24  signing this agreement, is the breach of implied duty of good

25  faith and fair dealing.  Others that he signs on behalf of,

1    where he signs on behalf of Crusader or Credit Strategies and

2    causes money to move to and fro them, that's fraudulent

3    transfers that are related to them, and those claims we have

4    released Highland to the very related extent that he could

5    turn around and get indemnification on those fraudulent

6    transfers, that this -- this whole exercise is more than just

7    fraudulent transfers through Crusader and Credit Strat, it was

8    also fraudulent transfers to others, including directly back

9    to Highland, and it was separately, independently, arising

10   from the Knox Agreement, from the contact between Highland and

11   UBS that nobody else was a party to, a breach of the implied

12   duty of good faith and fair dealing.  So, continuing, --

13        THE COURT:  Let me zero in.  And I understand that

14   you are making a strong argument that there wasn't

15   consideration given back.  You know, it is argued by Highland

16   that there was consideration given back by HFP for these

17   transfers.  But let me break this down.  Okay.  You have --

18   I'm trying to get to the liability angle of Highland here.  If

19   you show HFP -- one day you show it is the alter ego of the

20   Funds, CDO Fund and SOHC Fund, then you could say that the

21   transfers from it to these different entities, you know, the

22   entities maybe got fraudulent transfers, but only -- with

23   regard to Highland, its liability for fraudulent transfer can

24   only be the $17,778 million, which Ms. Mascherin says your

25   expert adjusted down to $8 million.  But your argument would

1  have to be that Highland nevertheless bears liability for

2  these alleged fraudulent transfers because of the breach of

3  covenant of good faith and fair duty.  Okay.  You with me so

4  far?

5         MR. CLUBOK:  Yes, I would -- I don't adopt all the

6  words in those, because some of them we'll be accused, then,

7  of having known.  But that's the general gist.  And normally

8  I'm not so picayune, and so normally I would tell the Judge,

9  yeah, you've got it.  But because of the arguments that

10 they've made, I have to be very careful with my words.  So

11 that's the gist of it.  The language is not quite exactly

12 right, given the arguments that Highland is now making.

13         THE COURT:  I guess what I'm -- I'm following up on a

14 point that I discussed with Ms. Mascherin.  Highland can only

15 have potential fraudulent transfer liability for the $17.7

16 million it got from HFP, the alleged alter ego, in March 2009.

17 Yes or no?

18         MR. CLUBOK:  No.

19         THE COURT:  Okay.  What -- why am I wrong?

20         MR. CLUBOK:  Okay.  So, number one, Highland -- first

21 of all, it's $17.7 million, and then it's times roughly two

22 for pre-judgment interest, so it's about $35 million --

23         THE COURT:  Okay.  I'm just looking at the transfers.

24 Uh-huh.

25         MR. CLUBOK:  Yeah, understand.  But everyone -- no

1   one objected to the fact that we'll get pre-judgment interest

2   like Redeemer got, so it's $35 million for that transfer.

3       Also, the transfer that went to Multi-Strat, which was

4   roughly let's call it $26 million, that's to an entity that

5   Highland substantially owns.  I think Mr. -- I think it's

6   actually like 90-something percent.  And Jim Dondero is a big

7   shareholder, et cetera.  So, that transfer also they could be

8   liable for.

9       We also have argued that it is live in New York, that even

10  though they weren't the direct transferor or transferee,

11  there's a (inaudible) aiding and abetting theory, and we had

12  always talked about Highland potentially being liable for the

13  rest, and I think fair to say that technically this is right,

14  that Highland is liable, for fraudulent transfer theory, for

15  the $17.7 [million] times two and for the money in Multi-

16  Strat, the $26 million times two.  And that gets -- by the

17  way, I guess Multi-Strat is still live in New York and nobody

18  has said that we do not have our full claim against Multi-

19  Strat.  To the contrary, the Second Circuit -- I'm sorry, the

20  -- not the Second Circuit.  The Appellate Division has said we

21  do have that live claim.  So that's the fraudulent transfer.

22          THE COURT:  Okay.  So, what was UBS releasing with

23  regard to the settlement agreement with Crusader Fund?

24          MR. CLUBOK:  Well, I can jump to the release.  I'm

25  almost there.  And if you need me to jump right to that, I

1   will, but there's one last slide I would just -- maybe show

2   this is the predicate, and then I'll jump to that, if that's

3   okay with you, Your Honor.

4          THE COURT:  Go ahead.

5          MR. CLUBOK:  Okay.  So, again, what we have up here,

6   as you can see, is Todd Travers.  At the end of 2008 -- and by

7   the way, it's not like our alter ego claim is going to be that

8   hard to prove.  He was the CAEO of HFP.  We asked him, Fair to

9   say, at the end of the year 2008, Highland Financial Partners,

10  not SOHC, Highland Financial Partners and CDO Fund

11  collectively owed UBS hundreds of millions of dollars in

12  connection with the (inaudible)?  I think that's the case.

13     Okay?  That is a party admission from the person who was

14  the CAEO at the time of HFP.  All right?

15     So, going into 2009, they knew they owed us hundreds of

16  millions of dollars, and then we never see a penny of it.  One

17  of the things, they orchestrate this fraudulent transfer.

18  Okay?  But they also had $40 million or $45 million, whatever

19  that number was, in HFP.  We now know there was maybe another

20  $20 million in CDO Fund, of which maybe $10 or so is still

21  there.  (inaudible) necessary to see whether -- you know, we

22  were told we would get all the documents, and that's why I

23  said that I discovered them because they had represented to me

24  they'd given all the documents.  Turns out they didn't.  But

25  regardless, that -- those were our claims.

1          So, to your question -- oh, and by the way, by the way,

2     this is the other thing:  They said we were going to have a

3     hard time proving insolvency.  This is a letter HFP sent to

4     its investors in January of 2009 admitting it is insolvent. I

5     think one of the earlier hearings Mr. Feinstein said, oh, this

6     trial will go on for weeks because we're going to have to have

7     -- prove insolvency.  They admitted insolvency in a letter to

8     their investors.  That's UBS AG-844.

9          I'm going to skip through these other things just because

10    you asked me a question about the -- about this.  Okay.  So

11    this is the issue.  Let's move on.  What did we release?

12    Didn't we release our implied duty claim against HCM?  Well,

13    the answer is no, absolutely not.  We released -- and let's

14    talk about what happened.  First of all, --

15               THE COURT:  Let me stop you.

16               MR. CLUBOK:  -- the settlement --

17               THE COURT:  Let me stop you.

18               MR. CLUBOK:  Yes.

19               THE COURT:  That's the only claim you've alleged

20    against HCM, with regard to --

21               MR. CLUBOK:  No, Your Honor.  We're --

22               THE COURT:  I mean, help -- well, no.  You just told

23    me earlier that the only technical fraudulent transfer claim

24    you would have against HCM is the $17.7 million, and, well,

25    maybe Multi-Strat, I guess, arguing that it's the alter ego,

1   you know, taking a leap ahead.  It's the same thing as

2   Highland.  Okay?  You've told me you don't have a fraudulent

3   transfer claim against Highland per se with regard to the

4   $170-plus million of transfers to the Crusader Funds and

5   Credit Strategies.  Okay?  So you didn't have a fraudulent

6   transfer claim against them.

7          MR. CLUBOK:  I mean, --

8          THE COURT:  It's Highland with regard to them.  So

9   what else would --

10          MR. CLUBOK:  We did have that claim.  We did have

11   that claim.  It is not the strongest claim, but we had that

12   claim live.  Our claim -- and always said our fraudulent

13   transfer claim included those transfers.  There was this

14   question whether if we could pursue aiding and abetting

15   liability, basically, from a fraudulent transfer.  Okay?  But

16   that was --

17          THE COURT:  In other words, you didn't have a pure

18   fraudulent transfer claim against Highland with regard to

19   those $170 million of transfers?

20          MR. CLUBOK:  We technically did, Your Honor.  What

21   I'm saying is I'm acknowledging to you today --

22          THE COURT:  Let me break this up.  Let me break this

23   up.  They were not a transferee, direct or indirect.  Highland

24   was not a transferee with regard to that $170 million.  Yes or

25   no?

1          MR. CLUBOK:  Yes.

2          THE COURT:  All right.  I have --

3          MR. CLUBOK:  And that's why I conceding -- that's why

4    I conceded that our claim was weak.  Okay?  We technically had

5    the claim.  At the time of the settlement, whenever we

6    described our claim, it included those fraudulent transfers.

7    It has been pointed out to us that -- that very point that you

8    just made.  But it hadn't been dismissed yet.  It was still a

9    live claim.

10      I just, I agree with you it's very weak for that -- with

11   that respect, unless you agree that, for aiding and abetting

12   of fraudulent transfers, we have a liability and (inaudible)

13   didn't really matter much, but it was still technically live.

14   So it's a little -- this is why it's a little more

15   complicated.  I'm not trying to be -- I'm not being very

16   particular here because otherwise my words will be used

17   against me when I'm conceding things.  I'm trying to be candid

18   here today that we're not claiming any value of our -- you

19   know, we're not claiming any real value.  We don't need to

20   really claim value for the transfers that were made to

21   Crusader and Credit Strat with respect to our fraudulent

22   conveyance claim.  We're not seeking that in our 3018 motion.

23          THE COURT:  I'm going to --

24          MR. CLUBOK:  So I'm conceding --

25          THE COURT:  I'm dealing with the summary judgment

1    argument in my head.  Ms. Mascherin --

2                MR. CLUBOK:  Oh, okay.

3                THE COURT:  -- has said this release in 2015

4    precludes UBS from bringing any kind of claim, any sort of

5    allegation of liability with regard to this $170 million.

6                MR. CLUBOK:  Yes.

7                THE COURT:  And I think your argument has been, oh,

8    we released fraudulent transfer claims with regard to that

9    $170 million but not anything else.  And that seems like an

10   absurd position, because there were no fraudulent transfer

11   claims against Highland with regard to that $170 million.  So

12   you had to have been releasing the other stuff, the other

13   theories of liability.

14               MR. CLUBOK:  No, Your Honor.  It's not absurd at all,

15   Your Honor.  It's what happened. (inaudible)  That's not just

16   not absurd, that's exactly what happened, and I will show you

17   as I walk through the documents how that -- and Ms. Mascherin

18   knows it.  And if we have to get into parol evidence, we would

19   call Ms. Mascherin, although I guess -- so I might be called

20   as a witness.  And we'd call the other lawyer from Credit

21   Strat as a witness.  So, it is -- it is -- sorry.  I don't

22   know if --

23               THE COURT:  All right.  And I am going to ask you to

24   hurry along.  You've been going one hour and 41 minutes.  And

25   I know I've stopped you a couple of times, but let's really --

1          MR. CLUBOK:  Okay.  Can --

2          THE COURT:  Let's get to the end.

3          MR. CLUBOK:  That's what I'd like to do.  Can you see

4    the screen that says 2015 Settlements?  Has that shown up for

5    the record?

6          THE COURT:  Yes.  Yes.

7          MR. CLUBOK:  Okay.  Thank you.  The history here,

8    Your Honor -- first of all, by the way, we negotiated the

9    agreement with Credit Strategies, we negotiated all the

10   language with Credit Strategies, and then Crusader had to

11   accept all the language as is.  Okay?  That was the -- that

12   was how the settlement came about.  And the deal was that

13   collectively they paid $70.5 million.  The deal was that we

14   would give full releases to them.  Highland paid zero and we

15   were only going to give the most limited and narrow release to

16   Highland, and it was -- it was only to the extent it needed to

17   happen to protect Crusader and Credit Strat from what would

18   have probably been a nonsensical claim of indemnification, but

19   knowing Highland, we all knew Highland, we all knew they loved

20   to make lawsuits, we accepted the fact that maybe Highland

21   would try to pursue indemnity from them with respect to

22   fraudulent transfer claims.  And so -- and so -- and you'll

23   see this.  This is why the language says what it does.  Okay?

24   And we think the language is unambiguous in our favor.  I

25   understand that Ms. Mascherin says it -- and, you know, Mr.

1   Pomerantz has jumped on board now.  Or Mr. Feinstein, I should

2   say.  You know, they've jumped on this Redeemer argument.

3        By the way, we had never really heard this Redeemer

4   argument until this bankruptcy litigation.  But Ms. Mascherin

5   does a nice job of it.  But the -- but anyway, the idea was

6   we're going to release very broadly as to Crusader and Credit

7   Strat so they're totally free and clear, very narrow release

8   to Highland.  And it is because exactly what Ms. Mascherin

9   said, because no love lost with any of them.  Basically what

10  we got from Ms. Mascherin and the lawyer from Credit Strat

11  was, We hope you nail them.  Good luck.  We're suing them,

12  too.  In fact, everybody -- nobody was trying to give Highland

13  a windfall.  And that, by the way, is the commercially absurd

14  thing that will happen.  If the language is read the way Ms.

15  Mascherin is telling you supposedly was mentioned -- the

16  people who will get a windfall are Highland and now Redeemer,

17  not because they're worried about indemnity but because it

18  just pushes down our claim amount and that means their claim

19  is more valuable.  It has nothing to do with what she kept

20  telling you, is, oh, they have to protect themselves from some

21  indemnity claim.

22       Let me walk through the language very quickly.  First of

23  all, 5.3.  Okay.  5.3 -- 5.2 is the super-broad release where

24  it says UBS Releases Parties due a release, Crusader or Credit

25  Strat, for everything under the sun.  Then in 5.3 is a super-

1   narrow release.  And it starts out -- and by the way, Ms.

2   Mascherin read this language.  If you read the Debtor's brief,

3   both their opening brief, their reply brief, and Mr.

4   Feinstein's argument, they never once say this first sentence.

5   The first sentence is, of 5.3, The UBS Releasing Parties do

6   not hereby release and discharge HCMLP.  Okay?  Do not.  And

7   it goes on and picks up with, except we hereby release and

8   covenant not to sue the covered persons to the limited extent

9   the claims are for losses or other relief specifically rising

10  from fraudulent transfers.  Were there any losses or other

11  relief specifically arising from fraudulent transfers?  Well,

12  remember, we had gotten an injunction against Credit Strat at

13  the time and Crusader.  So that's the other relief that you

14  can get from a fraudulent transfer.

15      There was also a possibility of a constructive trust.

16  There's other relief you can get with respect to fraudulent

17  transfers.  That's what losses and other relief specifically

18  arising -- and that -- those words have meaning in New York,

19  okay?  Again, it's New York law, and New York law says

20  specifically arising.  The *Phillips v. Audio Active Limited*

21  case that we cited in our brief, Page 31, it says to arise out

22  of means to have (inaudible) from a specific source, okay?

23  And *Allstate Property & Casualty Insurance v. Squires* and

24  other cases we cited, they all make it clear that arising out

25  of is something that is very different, and particularly when

1   you say specifically arising, and there's cases that say that

2   means it's even more narrow.  What they're trying to say is,

3   when we say we're only releasing to the limited extent that

4   specifically arises from fraudulent transfer, and that means

5   from the fraudulent transfer liability, they're saying, oh, it

6   also sweeps in our implied duty of good faith and fair

7   dealing.  Why in the world would Highland, who's paying zero

8   dollars, get a release for that?  Why would Crusader and

9   Credit Strat want them to get a release?  They wouldn't.  They

10  didn't.  It didn't happen.

11      And how do we know?  You compare the two different

12  releases, and we would see.  We very really carefully chose

13  different words to show that there was different subject

14  matter.  That is, the very broad release in 5.2 for Crusader

15  versus the very narrow release in 5.3 for HDM.  And, again,

16  words matter.  We use different words to show that there's

17  different subject matter, different (inaudible).

18      Look at 5.2.  5.2 releases Crusader from and against any

19  and all claims arising out of or directly or indirectly

20  relating to the Knox (inaudible) litigation.  Very broad.

21  Okay?  Then we go on and when we get to the Highland release,

22  we see with respect to such claims -- so it's still with

23  respect to those broad claims, it's to the limited extent the

24  claims are for losses or other relief specifically arising

25  from the fraudulent transfers to Crusader alleged in the UBS

1    Litigation.  Okay?

2        We don't intend just to get them out, to just let them

3    walk off scot-free from a breach of implied duty of good faith

4    and fair dealing.  Why would we do that?  That arises from a

5    contract between us and Highland.  There's no indemnity

6    rights.  Highland can't -- breach of implied covenant in a

7    contract with us.  How could they pay back an indemnity from

8    Crusader or Credit Strat?  That's a ridiculous hypothetical,

9    by the way, that I told Ms. Mascherin, come on --

10            MS. MASCHERIN:  I -- this, I object to.  This is

11    testimony, Your Honor.

12            THE COURT:  Sustained.

13            MR. CLUBOK:  Well, I --

14            THE COURT:  Sustained.

15            MR. CLUBOK:  Okay.  Let's look at the language.

16    Arising out of, directly or indirectly relating, versus

17    specifically arising.  These are very different languages that

18    are different legal standards.  And again, if you look at

19    Black's Law Dictionary, if you look at *Phillip's v. Audio*

20    *Active Limited* and other cases, you see that it's -- they are

21    very different.

22        A release for liability, by the way, this is the Second

23    Circuit, is not in effect under New York law unless it is

24    explicit and unequivocal.  The fact that we're having so much

25    debate about what this language means clearly means it doesn't

1    -- it doesn't mean what they say, at best.  It's not explicit

2    or unequivocal.  And we released our implied covenant claims

3    against Highland?  Why would we do that?  Highland wasn't

4    paying a penny in settlement.  Highland gave no consideration.

5    We had to release the pass-through fraudulent transfer claims,

6    we understood that, because we didn't -- as Ms. Mascherin

7    said, why would they pay $70 million if Highland could turn

8    around and sue them?  That's fair.  That's why we said

9    anything that relates to fraudulent transfer.  But not claims

10   arising from our contract we have with Highland.  That's not

11   something they -- that they're agreeing with us to go after

12   Highland for.  And courts applying New York law construe

13   arising from more narrowly than related to.  We specifically

14   chose arising from, not related to.  Same thing for the *Golden*

15   *Pacific Bancorp* case and *Phillips v. Audio Active Limited*.

16       There's more case law.  *Pete v. Hayes* in the Fifth

17   Circuit, they look at the same way.  The Fifth Circuit has

18   held the term specifically is restrictive.  Why do we add

19   specifically?  It's not just -- and I know it didn't say

20   arising from the fraudulent transfer as opposed to arising

21   from the Knox Agreement or arising from the contract.  We said

22   specifically.  And as in *Petes v. Hayes*, the Fifth Circuit

23   case says specifically results from reflects a specially

24   (inaudible) causation requirement.  Relates is much broader.

25   That means just some possible relation to.  We intentionally

1    did not choose that word with respect to the specific release

2    given to Highland.

3        There were different legal obligations.  The fraudulent

4    transfer, it's transfers by a solvent entity without fair

5    consideration and actual intent.  Implied duty comes from the

6    contract, okay?  There is overwhelming evidence -- and by the

7    way, here's something in 5.3 that made it clear.  Nothing in

8    this agreement shall limit in any way the ability of UBS to

9    submit evidence about or refer to the fraudulent transfers.

10   Why would we include that?  Why would we reach a -- refer to

11   fraudulent transfers to Crusader, I would ask, except to

12   support our implied duty claim?  It's an overlap of evidence,

13   and that's why we (inaudible), okay?  We want to say, hey,

14   you're going to hurt our implied duty claim because now we

15   can't talk about the fraudulent transfers.  Why is this

16   language in here, I mean, for this specific important purpose?

17   Okay?  That's what it is there for.

18       In 5.3, that final sentence, the avoidance of doubt, that

19   just confirms.  That is like belts and suspenders, we thought,

20   to make sure completely that no one would ever make this

21   argument.

22       For the avoidance of doubt, the releases does not include

23   any other claims or (inaudible) anything related to transfers

24   to other defendants, and (b) is any other claims for losses or

25   other relief arising from -- and then this is the Knox, you

1  know, any other claims that is arising from the Knox --

2  warehouse agreements.  If we have losses and relief that arise

3  from the contract, like a breach of implied covenant, that is

4  specifically not released.

5      By the way, this position -- you know, we -- summary

6  judgment was filed in 2013 and we entered into settlements in

7  2015 and we told the judge -- by the way, what happened was,

8  after we filed summary judgment, there, unlike here, at least

9  there we told how -- what we said to the Court was, Hold off

10 on a ruling.  We're going to all try to settle.  And we had

11 settlement discussions, all the parties did.  And all those

12 parties -- we employed a -- and we had a mediator and we

13 reached settlement agreements ultimately with Credit

14 Strategies and Crusader, but not with Highland.  Not one penny

15 from Highland.  Settlement discussions were brought.  They

16 went away.

17     So in June of 2015, we entered into settlements, and the

18 next month we sent a letter to the Court, copying Highland.

19 We showed it to them in advance.  And the letter said, hey,

20 pick up your motion for summary -- you know, settlements were

21 done, but only with Credit Strat and Crusader, Judge, so go

22 back to your summary judgment.  No way did Highland say, Hey,

23 by the way, great news, we just got released from, you know,

24 three-fourths of the claim against us.  Almost all of the

25 claims against us, 80 percent of the claims against us are

1  gone now.  And of course they would have told the judge if

2  that was the case.  And they would have been able to -- you

3  know, in New York, you certainly wouldn't be able to amend

4  your summary -- you wouldn't be able to bring a new summary

5  judgment today, but this would have been a perfect example in

6  July 2015 of good cause shown, of how they could have amended

7  their summary judgment if they had wanted to.  They would have

8  said, These are new facts.  New fact is we just settled -- you

9  know, we had a settlement last month.  It gave us a massive

10 release of 80 percent of our claims.  Judge, that's pretty

11 important to let you know.  But no, instead, we just said, Go

12 ahead and rule on the motion for summary judgment.

13     And then there is a joint letter a couple years later, and

14 we get a decision, and none of these arguments were made,

15 okay?  In a joint letter in January of 2017, we talked about

16 how, after the decisions on summary judgment, the settlements

17 might be applied to offset the remaining damages.  It was

18 always are we going to get a $70.5 million offset from their

19 claims.  That was what was always raised.  There was this one

20 stray line that they point to that they say is so important.

21 And I want you to look at this whole timeline.  Okay?  We were

22 -- we were in front of this Court for four years after the

23 settlement and spoke to the judge a lot and went up and down

24 to the appellate courts and their summary judgment issue is

25 live.  And never do they say, oh, guess what, your implied

1    covenant claims are mostly gone now.  You know, why are you

2    still here?  The deep pocket, Highland, Highland's the one

3    with deep pockets.  You know, why -- why -- you know, 80

4    percent, 90 percent of the claims are gone, all you have left

5    is $17 million, so, you know, let's call it a day.  They never

6    said that to the court.

7        What they said was -- we filed a motion in limine, I

8    think, to keep out the settlement agreement in the initial

9    trial.  In opposition to that motion to limine, they had a

10    whole section that was all about how it was going to require

11    the Court to offset the damages, if any -- this is the

12    headline -- by the amount of UBS's previous settlements.  And

13    that whole section in that brief goes on and on about how it's

14    supposed to offset.  At the very end, there's a sentence, and

15    this is the one sentence that they point to in five years of

16    litigation, or four years, I guess, of litigation prior to the

17    settlement, where they say, and this sentence at the end of

18    Section B of their opposition to a motion in limine -- not

19    even a motion they brought, but just an opposition to a motion

20    in limine -- they say that that supposedly -- you know,

21    (inaudible) say implied covenant.  We should have inferred

22    from that that they were making this argument back then.

23    Well, that flies -- if that's the case, then they -- that's a

24    dog that doesn't bark, because they never made it clear.  And

25    the next time we had talked about this, post-trial motions, at

1    closing argument we argued and we talked about what the

2    settlements do, and what they said to the judge in October of

3    2018, they said, because the settlement agreements provide

4    remuneration for closure as of the same economic harm UBS

5    allegedly sustained by virtue of implied covenant (inaudible)

6    breach, Section 15, you know, it applies, and the settlement

7    must offset any damages award to avoid a double recovery.  Or

8    just say, hey, give us $70.5 million offset.  We said, don't

9    give them a $70.5 million offset up front.  We agreed we had a

10   double recovery.  So if we ultimately recover $177 [sic], we

11   agree they get the 70.5.  They said no, no, no.  You get the

12   70.5 in the beginning.

13       And what did the Court do?  The Court said, I'm going to

14   agree with UBS and then just -- and then decide this after the

15   trial, not before.  The determination of the offset issue --

16   this is the Court's decision in Phase I -- will therefore be

17   deferred pending a jury trial.  She notes, she explained what

18   the issue was.  It appears Highland may be entitled to an

19   offset of some or all of the settlement amounts.  So the --

20   I'm staying punishment to the extent of the settlement amount

21   of $70.5 million.  So that billion-dollar judgment, we

22   actually could only collect theoretically right now $930

23   million, because there is a possibility, she recognized, that

24   they would ultimately get an offset for up to $70.5 million

25   because that's what they argued.

1      And they never said, hey, Judge, by the way, the massive

2   liability is going away in Phase II.  They never said anything

3   like that.

4      But, and what I have up here now is an exhibit that --

5   again, this is a June 1, 2015 email from Credit Strategies,

6   and they say, why would we do it this way?  This is the person

7   --

8           MS. MASCHERIN:  Your Honor, I'm sorry.  I must

9   interpose an objection here.  This is hearsay.  It's a

10  communication -- and we've objected before the hearing.

11  Perhaps Mr. Clubok's partner didn't inform him, but we

12  objected to this exhibit.  It's hearsay.  It's an out-of-court

13  statement by Mr. Clubok and by someone representing Credit

14  Strategies.  There's been no evidence and there will -- and

15  there can be no evidence that the Crusader Fund was in any

16  way, shape, or form involved in the out-of-court communication

17  that is the subject of this email.  And we object to it on

18  that basis, Your Honor.

19          THE COURT:  Okay.  I sustain.

20          MR. CLUBOK:  May I respond, Your Honor, briefly?

21          THE COURT:  How --

22          MR. CLUBOK:  Because that just -- that's a new case

23  of Fifth Circuit law.  It's reversible error, the Fifth

24  Circuit says.  At the summary judgment phase, under Rule

25  56(c)(2), a party can only -- you cannot just object because

1    it's hearsay.  You can only object if there's a fact that

2    cannot be presented in a form that would be admissible in

3    evidence.  Here at the summary judgment phase, I do not have

4    to show -- I'll tell you what we'll do at the trial, if we

5    have to, is we'll call Mr. Feinstein and we'll call Mr. Stern

6    up, or if I have to become a witness, there's ways to make

7    that happen.  But the Fifth Circuit has said -- because this

8    is a new rule, the Fifth Circuit has said this rule has led to

9    lots of confusion.

10        In *Lee v. Offshore Logistical and Transport*, the Fifth

11   Circuit said it was reversible error for a trial court to

12   exclude evidence on summary judgment without deciding whether

13   a proponent would be able to introduce the material in

14   admissible form.  I don't have to introduce it now.

15        In the *Maurer* case, Fifth Circuit 2017, the Court said, At

16   the summary judgment stage, evidence need not be authenticated

17   or otherwise presented in admissible form.  In *Maurer*, the

18   Court explained there's been confusion about the rule change

19   to Rule 56, (inaudible) comments, so that's why a lot of

20   people make this mistake.

21        In *LSR Consulting*, that's a Fifth Circuit 2016 case, the

22   Court said at summary judgment stage material cited to support

23   or dispute a fact need only be capable of being presented in a

24   form that would be admissible evidence.  I do not have to have

25   a witness today testify about this.

1           THE COURT:  Okay.

2           MS. MASCHERIN:  Your --

3           THE COURT:  What about the fact that it seems to be

4    extrinsic evidence beyond the four corners of the 2015

5    settlement agreement, parol evidence --

6           MR. CLUBOK:  Yes.

7           THE COURT:  -- that I don't need to consider, that I

8    should not consider, unless I find the agreement is ambiguous,

9    and I'm not there.  I don't think it's ambiguous.

10          MR. CLUBOK:  Yes.  And -- absolutely.  That, we agree

11   with.  This is parol evidence, just like Ms. Mascherin telling

12   you about the indemnification agreement that she has with

13   Highland, Highland-Crusader, just like Ms. Mascherin talking

14   about the communication that she and I had.  It's all -- there

15   is parol evidence.  Judge, and as so often happens with

16   contracts, both parties tell the Court it's unambiguous.  We

17   think it's unambiguous our way.  They think it's unambiguous

18   their way.

19     If the Court ultimately finds that it is ambiguous, and

20   there's case law that suggests this is the kind of case that

21   you probably would do that, then you'll -- then you'll hear

22   parol evidence.  And that's why summary judgment shouldn't be

23   lightly granted.  If there's any capability, under the summary

24   judgment standard on releases, under New York law, and this is

25   -- New York law governs it, is very forgiving.  It basically

1    says that -- and I can pull up the exact quote, but it's in

2    our brief.

3        The bottom line is that summary judgment is not

4    appropriate unless you are absolutely certain that there's no

5    reasonable construction -- that the construction we're

6    offering could not possibly be reasonable on the plain face of

7    the language.  I don't see how that can be, given the

8    difference between 5.2 and 5.3 and what we've laid out.

9    Ultimately, this probably will get decided by parol evidence,

10   but agreed, this -- this exhibit is only here if you decide

11   parol evidence should be taken.  That, I absolutely agree

12   with, to just be very clear.

13           THE COURT:  Okay.

14           MR. CLUBOK:  And I'm speaking about the June 1st,

15   2015 email from Credit Strategies.  You can decide at the end

16   or whenever you make your decision whether -- I mean, what you

17   -- you can even decide today if the agreement is ambiguous one

18   way or the other.  We think, because it's a release, you have

19   to decide it's more (inaudible) than it's unambiguously to not

20   sweep in on our applied covenant claim.  But if you don't

21   agree that it's unambiguous in our way, then we would hope

22   that you will acknowledge that, at best, it's ambiguous, and

23   then you'd look to parol evidence like this, like Ms.

24   Mascherin telling you about indemnification, like her showing

25   you the indemnification agreement that she says that UBS --

1  you know, she started talking about how UBS showed up in

2  Bermuda and objected, and I didn't completely follow the

3  thread there.  Well, all of that is extrinsic evidence, and

4  she's telling you, and I, you know, in case you decide you

5  think it's ambiguous.  And if you do decide you think it's

6  ambiguous, then obviously summary judgment can't be granted.

7  And we could settle it, because a document like this which you

8  see, you said -- you asked the hypothetical --

9          MS. MASCHERIN:  Your Honor, I'm sorry to -- I

10  apologize for interrupting, Your Honor, but I must object

11  again to reference this document.  It's -- putting aside the

12  issue of authentication, which it -- you know, which I agree

13  Mr. Clubok would need to do at trial, it's hearsay.  It's an

14  out-of-court statement by -- by, you know, a representative of

15  Credit Strategies.  It's not an admission by a party opponent.

16  It's not a statement on behalf of the Crusader Fund.  It's

17  third-party hearsay and it's inadmissible.

18          THE COURT:  Okay.

19          MR. CLUBOK:  So, it's not hearsay.

20          THE COURT:  I sustain that objection.  Mr. Clubok,

21  you've now been going two hours and one minute, so we really

22  need to wrap it up, okay?  Can you wrap it up in five minutes?

23          MR. CLUBOK:  Sure, Your Honor.  And I'm sorry, just

24  so I note for the record, you're sustaining on the basis of

25  hearsay?

1      THE COURT:  I am sustaining it on the basis of

2  hearsay and the basis that I don't find the document ambiguous

3  to consider extrinsic evidence.

4      MR. CLUBOK:  Ah, okay.  That, I understood.  I hoped

5  that (inaudible) for us.  This is the -- well, this -- this --

6  this is more extrinsic evidence, this would be on negotiations

7  between Redeemer and UBS, but this was cited by both parties,

8  I believe.  And I don't think that when Redeemer noted that

9  they specifically asked for this language.  This is a redline

10  that they asked for it and it was rejected.  They wanted us to

11  change the language to do what Ms. Mascherin is now asking you

12  to do.  And this is A-341.  They asked us to add in to make it

13  clear that it would include the alleged breach of good faith

14  and fair dealing in connection with transfer, but we rejected

15  that, okay?  And when we rejected it -- and Ms. Mascherin,

16  what they said is, you know, it must have been because it was

17  a hypothetical.  You can draw inferences in our favor on

18  summary judgment, okay?  A much more releasable inference, the

19  only commercially reasonable inference is that what we were

20  talking about in this exchange is that it's a crazy

21  hypothetical to think that Highland could ever get

22  indemnification through Crusader for a breach of its covenant

23  of good faith and fair dealing.  Why would we ever have to

24  release the breach of covenant of good faith and fair dealing,

25  that's our big hook, so that Highland -- why would we have to

1    give them a release just because hypothetically somehow

2    they're going to sum up some type of claim to go after your

3    client for indemnification on a contract that you were a part

4    of?  That makes no sense.  And that's why it wasn't included.

5         And sure enough, this is the other extrinsic evidence,

6    Your Honor.  Ms. Mascherin puts in extrinsic evidence of the

7    Crusader liquidation plan and she shows how -- you know, she

8    started talking about how UBS showed up there, what UBS

9    argued.  But, you know, that indemnification allows Highland

10   to get indemnification based on Highland's work with respect

11   to its (inaudible) connection to Crusader Funds.  Okay?  By

12   the way, unless -- unless they determine that it is primarily

13   attributable to Highland's willful misconduct or gross

14   negligence.  Okay?  So even, by the way, if -- they wouldn't

15   even have gotten, frankly, indemnification, even if we hadn't

16   released the fraudulent transfer claim to them, but they sure

17   as -- this language that Ms. Mascherin pointed to, when you

18   look at it, you know, that's extrinsic evidence, and what's

19   sauce for the goose and gander and all that, but this language

20   doesn't mean that Highland had any possibility of getting

21   indemnification against Crusader if Highland breaches a duty

22   of good faith and fair dealing when it's in a contractual

23   relationship with UBS that Highland -- that Crusader is not a

24   part of.  It just makes no sense at all.  It's just a

25   windfall, okay, that Redeemer and the Debtor want to achieve

1    in this bankruptcy court.

2        And what Ms. Mascherin said, and which we agree, at least

3    on the principle, is that you can't read a contract in a

4    commercially unreasonable manner.  Why in the world would we

5    have released this incredibly valuable claim against Highland

6    Capital Management, who didn't sign on the settlement

7    agreement, for no consideration, when it doesn't Crusader or

8    Credit Strategies any good?  It turns out it will have a

9    benefit to Redeemer because in this court our claim will get

10   knocked down and their claim will be more valuable.  But

11   that's not a thing that they can -- they weren't saying, oh,

12   you've got to release it so that one day, if there's a

13   bankruptcy, you'll have a smaller claim than other claim.

14   They were saying you need to release stuff that they can

15   realistically indemnify us from.

16       So, bottom line, what's the impact of the settlement?  The

17   impact of the settlement is it released the fraudulent

18   transfer claims with respect to transfers to Credit

19   Strategies, Crusader, the Crusader Optional Hold -- Crusader

20   Optional -- Crusader entities.  And this is Slide 53.  I've

21   listed the actual dollar amounts.  We do have claims.  And we

22   had fraudulent transfer claims with respect to those

23   transfers.  You know, they were released.  They've been

24   released.  We still have a fraudulent transfer claim with

25   respect to the Citibank transfer.  And, you know, that's going

1    to be harder for us to prove, because at least Citibank is a

2    third party.  But I think there is also evidence to show that

3    Citibank -- that that transfer also is suspect.  And the

4    reason it constitutes actual fraud, that even if we can't go

5    after Citibank, we could go after Highland.

6        But those claims are all live.  We won those summary

7    judgment motions years ago.  Whether you like them or not,

8    those are live.  We're not asking for a lot for those claims

9    in a 3018 motion, but they can't be just summarily dismissed

10   on summary judgment.

11       And this is what our total claim is, $455 million.

12   Whether you call it fraudulent transfer, if it's Multi-Strat,

13   the Debtor, or Citibank, or if you call it a breach of implied

14   duty, which is live against all six -- with respect to all the

15   transfers, it's a total of about $455 million.  And then there

16   is another -- and this is with interest, so it's really half

17   of this.  That's why the numbers are here.  It's, you know,

18   $270 or $225 [million], whatever the math is.

19       And then there's another $87 million, that counts

20   interest, of the -- of the monies that we know of, at least,

21   that are in the record that HFP had.  And HFP's COO, as you

22   saw earlier, knew that there (inaudible) dollars.  Pursuant to

23   Dondero, we sued them, and they've never paid us.  And in

24   fact, there is a potential offset of $70.5 million.  But by

25   the way, there's also potential punitive damage and attorneys'

1    fees.  With respect to punitives, we know we'll never get

2    punitives.  Will be -- if the Debtor -- of creditors.  But I

3    heard Mr. Seery a couple times say that, you know, maybe the

4    -- maybe the Debtor will be solvent.  If the Debtor is going

5    to be solvent, our punitive damages claim should be live,

6    because you saw just from that snippet that I was able to show

7    in five minutes there was some real actual fraud that went on

8    there.  And then we also get attorneys' fees.  I know with

9    respect to Mr. Daugherty you said no attorneys' fees is the

10   *American Rule*, but with fraudulent transfers and breach of

11   implied duty under New York law, we can get attorneys' fees if

12   there is actual fraud like there is here.

13       The 56(d), just very briefly, Your Honor.  All I'm going

14   to say about this is that this is how long we've spent --

15   we've spent trying to get these assets.  Back in our original

16   trial phase back in April, we tried to get the asset

17   information for post-February 24th, 2009, and the special

18   master in that case just said, Sorry, that's premature.  This

19   -- by the way, Judge, you know, you say that it's crazy that

20   we -- that we would wait to bring an alter ego claim until

21   post-judgment.  This was crazy to us.  In April 2012, we

22   wanted to get all the information about the post-February 2009

23   assets, and the special master said, No, it's premature,

24   that's post-judgment discovery.  So we didn't get it, and we

25   stopped trying in that case.  But once we got here and we

1   heard Mr. Seery tell you that he was going to make discovery

2   available, we started asking for it.  And this shows you the

3   timeline of all the requests we've made.  I did tell this

4   Court a month or so ago, I said, Hey, Judge, I was just told

5   that the Debtor is substantially complete.  I think this was

6   October 28th.  The Debtor told me that they had fulfilled its

7   obligation and they -- they were done, so I -- and they said,

8   oh, you're going to get the final documents, you know, this

9   Thursday or something.  So I said to you, Hey, Judge, good

10  news.  It looks like we won't need any more discovery because

11  I was just told that we'd get the final documents.  It turns

12  out we haven't quite gotten the final documents, but we don't

13  really care.  Okay?  The fact that we won't have the final

14  documents, frankly, you can draw inferences against them.

15  It'll probably work to our favor.  If you're not going to give

16  us more discovery, that's one thing.  The reason we care about

17  it is if you're going to let them both hold back on giving us

18  discovery and then grant summary judgment because we don't

19  have the evidence.  We're willing to go forward with trial

20  without the discovery, even though we should have it.  What

21  we're not willing to do is say, because they withheld this

22  discovery all this time, then they can then use the lack of

23  discovery of the additional assets -- and we think, by the

24  way, it's up to like $65 million or more.  And we've gotten

25  some more dribs and drabs.  But that's not something that

1    should be allowed to -- and this, by the way, just goes to the

2    breach of implied duty claims that go beyond the fraudulent

3    transfers, the other $65 million that was there and then

4    knowing (inaudible) in February of 2009, that should have been

5    sent to us but wasn't.

6            THE COURT:  All right.

7            MR. CLUBOK:  And I think that's it that I wanted to

8    say.  Yes, Your Honor.  Thank you.  And I appreciate your

9    indulgence.  I know I went over.  Lots to cover there.

10           THE COURT:  You went two hours and ten minutes.  All

11   right.  I will take rebuttal, which I hope will be very short,

12   Mr. Feinstein.

13           MR. FEINSTEIN:  I'm going to apologize in advance if

14   my rebuttal is a little disjointed, but that's kind of the

15   nature of rebuttal.

16       You've heard and made notes along the way, but I'm going

17   to start here.  For the entirety of the bankruptcy case, since

18   we filed, UBS has waved around a piece of paper that said, I

19   have a billion-dollar claim against the Debtor.  A billion-

20   dollar claim in this case breaks the bank, right, and it has

21   held up the disposition of the bankruptcy case.  Mr. Clubok

22   advocated that we have a state court -- we know that's a

23   closed door at this point.  Unfortunately, the New York state

24   courts closed again, so everything is shut down.  There are no

25   jury trials.  The judge retired.  But all the while, we've

1    been told there's a billion-dollar claim.  And I think it's

2    time to look at the credibility of that assertion in light of

3    the arguments made today, in light of some of the statements

4    made by Mr. Clubok on the record.

5        And I'm going to start again by apologizing, Your Honor,

6    where I interrupted him before.  And it is this issue of

7    whether or not the state court found a substantial likelihood

8    of success in the context of a preliminary injunction motion

9    with respect to Credit Strat and Crusader.  It's simply not

10   true.

11       The first time I met Mr. Clubok, he told me it was -- we

12   have a great case because, really, it's a slam dunk.  The

13   state court has already found the substantial likelihood of

14   success on our claims.  And I went back to the office and we

15   looked at the state court pleadings and the state court

16   rulings, and it's not true.  And in fact, Your Honor, I just

17   want to say to Your Honor, you know, read the decision, *UBS v.*

18   *Highland Capital*, 977 N.Y.S.2d 610, and look at Page 621.

19   That is a decision November 25th of 2013.

20       So what happened, Your Honor, is that UBS sought a TRO

21   against Credit Strat and Highland Crusader to prevent them

22   from transferring funds.  And that raises issues under the

23   Supreme Court's decision under *Grupo Mexicano* and under the

24   *Credit Agricole* decision in New York State.  The New York

25   State trial court -- and again, Mr. Clubok -- not to respond,

1  but I think I know this now, but pretty clearly the trial

2  court let the TRO stand so there could an appeal, given the

3  lack of specific authority in New York State law beyond the

4  *Credit Agricole/Grupo Mexicano* issues as to whether you can

5  get, you know, equitable relief to stop a defendant from

6  transferring assets before you have a judgment, and those

7  decisions say you can't.  Right?

8      So it went to the Appellate Division, and the court said,

9  following *Grupo Mexicano* and *Credit Agricole*, said you can't

10  do that.  Now it goes to the trial court, and the trial court

11  said, in view of the disposition of the preliminary injunction

12  matter by the Appellate Division, quote, The Court does not

13  reach the issue of whether UBS otherwise meets its burden of

14  demonstrating that the elements for a preliminary injunction

15  were satisfied.

16      Okay?  So there simply was no finding of substantial

17  likelihood of success.  And Mr. Clubok asserted that twice

18  today, that there was a finding.  So that's just not credible.

19  And it's wrong.  It's contradicted by the (inaudible)

20  decision.  And I think you should look at the entirety of

21  UBS's case and their conduct since the beginning of the case,

22  trying to hold up this case over a putative billion-dollar

23  claim that may be for not even $18 million on a good day.  But

24  it's been holding up the case.  And it's this kind of loose

25  rhetoric and, frankly, misrepresentation of an eight-year

1   state court record that's created a lot of mischief here, and

2   it's time to put it to an end.

3       So, Your Honor, let me go back to one of the things that

4   Mr. Clubok said about the other matters along the way and see

5   if I can gather my thoughts quickly.  Let's talk about the

6   *Board of Managers* decision, because, again, we thought that

7   was a very critical case.  Mr. Clubok, his effort to

8   distinguish it I thought was really unconvincing.  He tried to

9   point out that in *Board of Managers* the defendant that they

10  tried to bring in on alter ego theory had been fully dismissed

11  out of the case at the beginning.  That's true here.  That's

12  true here as well, because remember:  The first decision by

13  the trial court in New York state was dismissing Highland

14  Capital Management on the indemnity claim.  And then he

15  explained and it's true that there were a number of things

16  that, you know, that were happening that led to him starting a

17  separate new action.  But to be clear, Highland Capital was

18  dismissed out.  So, the *Board of Managers* is very on-point.

19  And his other efforts to distinguish it are really just simply

20  unpersuasive.

21      So, you know, on that basis alone, the alter ego claim is

22  dead.  If he -- if he's bringing that.  He's acknowledged

23  again today that he's not bringing it.  And Your Honor, in

24  terms of leave to amend, again, this is just more

25  gamesmanship.  There is a very clear obligation on UBS's part

1   to speak their piece by the bar date.  And we've told them all

2   along that, no, you made these alter ego (inaudible), it's

3   time to put up or shut up.  And Mr. Clubok thought it would be

4   appropriate in bankruptcy court to give himself a reservation

5   of rights and create an exception from the bar date for a

6   theory of liability.  And I won't repeat myself about the

7   definition of claim, but you should consider it misconduct,

8   Your Honor, in light of his request for a do-over.

9       We've had extensive litigation with UBS.  Today was the

10  day to put up or shut up.  And it just simply doesn't work to

11  create an exception for a theory of liability, given the broad

12  definition of bankruptcy claim and the very clear input or

13  Your Honor's order.

14      Let's see.

15          THE COURT:  Before you move on, is it premature for

16  me to be ruling on the alter ego issue?  Mr. Clubok says it's

17  almost like you're asking for an advisory opinion.

18          MR. FEINSTEIN:  Yeah.  I completely disagree.  I

19  completely disagree.  In fact, the question is, is his alter

20  ego theory of liability a claim?  Undoubtedly, yes.  If you

21  look at the definition of claim, contingent claim.  And, you

22  know, under the New York CPLR -- and I practiced in New York;

23  I understand the provision -- you can bring an alter ego claim

24  as a post-judgment remedy, again, against someone you haven't

25  sued before, under *Board of Managers*.  But to be clear, it's a

1   theory of liability to hold another party liable, right?  So I

2   think that falls squarely within the definition of contingent

3   claim, and I think Mr. Clubok is telling you, I'd like another

4   chance, Judge.  If you're finding that it is a claim, and

5   unquestionably it is, then I'd like to go amend it.  So we're

6   going to start another round of litigation after another 11

7   years.

8        But I think the contingent claim concept, it falls

9   squarely within the definition of claim.  The bar -- Your

10  Honor's bar order required them to bring forward any claims,

11  and it simply -- it was deliberate and it was gamesmanship not

12  to include that, and I don't think they deserve another chance

13  here.  They had their chance.

14       You know, we came at this -- this litigation in this court

15  in a very deliberate manner.  We've spent a lot of estate

16  assets litigating.  It is unfair to the Debtor and the

17  creditors, Your Honor, to (audio gap) a further round of

18  litigation based on a newly-constructed claim, when UBS had

19  the clear opportunity to put this in the record.  While Mr.

20  Clubok's not a bankruptcy lawyer, he's got plenty of

21  bankruptcy lawyers in his firm.  They should have considered

22  the impact of Your Honor's bar order under 101.5 of the

23  Bankruptcy Code in terms of what kind of -- what claims were

24  encompassed in Your Honor's directive to file a claim.

25       And in all other respects, I think his efforts to

1    distinguish *Board of Managers* are really just unpersuasive.

2    And like I said, on a factual matter, it's not distinguishable

3    in that Highland Capital Management was dismissed out, just

4    like the defendant, the party in *Board of Managers* who was

5    dismissed out and then later subjected to a suit.

6        I'm going to defer, I think, to Ms. Mascherin about the

7    construct of the release language, but I do want to say this.

8    We both argued that the language says, you know, it's a

9    release of claims for losses, you know, relating to the

10   fraudulent transfers, as opposed to a release of fraudulent

11   transfer claims.  As Your Honor knows, what could have been

12   intended other than to release all the claims for losses

13   relating to that $170 million in transfers?  And given Mr.

14   Clubok's rather candid admission now that the fraudulent

15   transfer claims are weak, and Ms. Mascherin's overlay, if you

16   will, about the concern about an indemnity claim, there really

17   is no other way.

18       Your Honor is correct.  The language is clear.  The

19   language effects a release of the implied covenant claims, the

20   alter ego claims, anything relating to that $172 million of

21   transfers.  I just don't think there's any way around it.

22       So, he also made a point of saying, well, how come this

23   release, the impact of the release, was never raised in state

24   court?  Remember, the release only released a portion of the

25   claims, relating to $172 million in transfers.  So there still

1    is other fraudulent transfer/implied covenant claims as to the

2    remaining $61 million of transfers.  So I'm not sure in what

3    context the Debtor would have raised this in state court,

4    since it wasn't really the dismissal of an entirety of the

5    claims against Highland, the Debtor, but rather simply a

6    substantial reduction in its exposure because of a settlement

7    of a portion of the operative transfers.

8        We didn't -- I mean, again, we're not litigation counsel,

9    but I do litigate in New York state court.  There really

10   hadn't been a real opportunity to have the bank -- the state

11   court rule that the claims were reduced.  We moved for

12   dismissal of -- you know, in their entirety or not, you know.

13   And now here, obviously, we're in a different context in a

14   bankruptcy, where, as you know, we said, Your Honor, that it

15   would be important and helpful to get rulings on certain

16   issues, to take the billion-dollar claim down to $60 million

17   or even 18.  That's why it's relevant in bankruptcy.  But you

18   can't infer from the absence of litigation over that

19   particular issue in the state court that somehow we don't

20   believe in this argument or that the Debtor never had this

21   argument.  It just doesn't fly.

22       All right.  Let's see.  So let me just talk again about

23   res judicata and the February 9th date.  We don't disagree

24   with Mr. Clubok when he says he's allowed to -- evidence that

25   predates February 2009 for some court claims on account of

1    events that occurred post-2009.  And that word "events" is in

2    the Court's decision and it has to mean something.  If you

3    take Mr. Clubok's argument on its face, that decision is

4    irrelevant.  There is no distinction between pre or post

5    because he says he's allowed to use evidence pre or post, no

6    matter what.  That's not what the Appellate Division said.

7    What they said is you can only assert claims based on events.

8    And I think the legal term is sort of operative facts, events

9    that took place after that date, and they're allowed to use

10    evidence of things that happened before that date in order to

11    support claims that are founded on post-February 2009 events.

12        I'm not sure what to make of his argument, Your Honor,

13    other than to say that it seems to obliterate that distinction

14    and try to sink in activities and the like that predated

15    February 2009.

16        And let's not forget, when UBS went to court in February

17    2009, they argued an indemnity obligation.  They didn't argue

18    that Highland was the alter ego of anybody, that, you know,

19    Highland breached an implied covenant.  This is what res

20    judicata is about.  You have a single action where you put up

21    or shut up.  So they didn't believe in those claims enough to

22    put them in their pleading in February of 2009, and now

23    they're trying to back and fill, but they can't override the

24    distinction that the Appellate Division drew.  So I think

25    that's enough said on that point, Your Honor.

1      Let's see.  Let's talk about the points that were made of

2   assets of HFP.  So, remember that HFP is not a signatory to

3   these contracts, either, and there is an asserted alter ego

4   claim that hasn't been adjudicated.  There's no judgment

5   against HFP.  So the fact that these funds weren't turned over

6   to UBS on demand really tells you nothing.  Who would -- who

7   would do -- who would simply hand over $44 million to somebody

8   without having them establish liability?

9      Again, I'm sorry to bounce around, Your Honor, but I'm

10  just being reactive.  So, coming back to the fraudulent

11  transfer claims, as Your Honor noted, the only transfer out of

12  $233 million that went to the Debtor is $18 million.  And we

13  can talk down the road about, you know, whether that's a good

14  claim or bad claim, but the important thing is the other $205

15  million from -- $215 million, rather -- of transfers were made

16  to other parties.  There is no predicate for holding the

17  Debtor liable for those transfers.  Except now, again, in the

18  continuing evolution of the theory of the case, now that Mr.

19  Clubok said, well, implicit in the fraudulent transfer claims

20  are aiding and abetting claims.  Well, implicit doesn't work

21  in court.  Implicit doesn't work when you file a proof of

22  claim.  And by and by, in a lot of states, there is no such

23  thing as aiding and abetting a fraudulent transfer.

24     Again, the case constantly evolves, but we have to work

25  with what's in the four corners of the proof of claim, and

1    that's not in there.  So this goes, again, to both the weight

2    of these claims for voting purposes and also, in terms of

3    summary judgment, that these -- there's no there there.

4        And then I want to talk to -- again, I won't reiterate

5    again, Your Honor.  I've made that point.  I'm sorry.

6        So, Mr. Clubok's papers say that he's not looking to

7    establish -- to get a double recovery.  That, you know, the

8    fraudulent -- that if -- that there were fraudulent transfers,

9    that's implied covenant and vice versa, and he's not looking

10   for a double recovery.  Well, he's admitted now today that the

11   fraudulent claims, the rest of the claims are pretty weak.

12   That on a good day, they're $18 million, right?

13       So to establish a claim of a half a billion, which is what

14   their temporary allowance seeks, they have to do a whole lot

15   more than rely on fraudulent transfer.  And I incorporate

16   everything I've said, Your Honor, before today about why alter

17   ego doesn't work -- he's admitted he hasn't pled it -- and why

18   implied covenant doesn't work.  And that's -- and I encourage

19   Your Honor as well to read the *Citibank* decision, because it's

20   very clear that what Mr. Clubok is trying to construct using

21   implied covenant is to essentially make Highland a guarantor

22   for an obligation that it is not contractually liable for,

23   that the New York state court determined it wasn't liable for

24   on a contractual basis.

25       And again, you can't -- that decision stands for the

1   proposition that you can't use an implied covenant theory to

2   engraft onto a contract an obligation that doesn't exist.  In

3   fact, it contradicts the contract, right, because the contract

4   says only the Fund Counterparties were liable for the loss,

5   not the Debtor.  So, in the face of that, you can't craft some

6   implied covenant theory that in effect contradicts the

7   contract, right?

8        And if you go back and look again, we both go to the same

9   passage in their opposition, if you -- put to the test, what

10  have you got besides fraudulent transfer, all they can come up

11  with is you should have done things that would have allowed

12  the Fund Counterparties to pay us, in effect turning the

13  Debtor into a guarantor, and that is just simply not how this

14  works.

15       If I could just have a moment, Your Honor, to check my

16  notes, I think I'm done, but -- and I know we've been at this

17  for quite some time.

18            THE COURT:  Okay.

19            MR. FEINSTEIN:  Yeah.  The rest of it was about

20  Multi-Strat, Your Honor.  Today, the ownership of Multi-Strat

21  is the Debtor and Mr. Dondero.  I apologize for not having

22  better facts at my fingertips before.  But there were plenty

23  of outside investors and who were there at the time of the

24  transfers, investors who I think were -- out of the Fund.  So

25  it's not a Highland entity.  There are -- there are -- there

1   were third parties affected, third parties who were just as

2   independent of the Debtor as Citibank was.

3       I'm going to stop there, Your Honor.  I think I hit my

4   points, and I know it's late in the day.

5           THE COURT:  Okay.  One last question from me.  Are

6   you asking the Court to determine as a matter of law today

7   that -- or grant summary judgment that UBS can assert no claim

8   against Highland except claims relating to the $61 million of

9   transfer?  And I mean, I know that you have arguments why it

10  ought not to be 61.  But --

11          MR. FEINSTEIN:  Yes.

12          THE COURT:  -- are you asking for that?  Because,

13  obviously, you know, we've talked about the -- how many

14  million, the $45 million, plus maybe $10 million that's been

15  dangled out there.  Has -- is it your position that Mr. Clubok

16  has not created a material fact issue with regard to that

17  extra $45 million that, again, as I understood it, HFP

18  allegedly had about $45 million at I forget what point in

19  2009.  I don't know if it was March or later.  Then he says,

20  you know, evidence has shown CDO may have $10 million even

21  now.  Are you saying that he -- that's not sufficient summary

22  judgment evidence to perhaps sustain a larger damages claim

23  than $61 million plus?

24          MR. FEINSTEIN:  So let me answer it this way, Your

25  Honor.  The partial summary judgment relief that we're seeking

1   is that there is no alter ego claim and that the universe of

2   implied covenant and fraudulent transfer claims should be

3   reduced down to $61 million because all the other claims have

4   been released.

5       So, just purely on a -- what remains after -- if Your

6   Honor were to grant all the relief that we sought would be $61

7   million of transfers challengeable under an implied covenant

8   or fraudulent transfer theory.

9       Now, in terms of those two other pockets of funds, one,

10  that came in, I think it's money that's sitting in the bank

11  account of a judgment debtor, non-debtor in this case --

12          THE COURT:  Right.

13          MR. FEINSTEIN:  -- but a judgment debtor in the New

14  York State Supreme Court, that Mr. Clubok is seeking turnover

15  of.  That $10 million is not subject to any pleadings in this

16  case, so I really can't address it, other than he's trying to

17  --

18          THE COURT:  Well, I think he's arguing that that

19  would be more damages in connection with his breach of implied

20  duty of covenant of fair duty and good faith, that the

21  argument is Highland breached its implied duty by interfering

22  with CDO paying out that $10 million by now.

23          MR. FEINSTEIN:  So, I think that what -- I think that

24  what Your Honor is discussing probably relates more to the $44

25  million than the $10 million.  And that is that, through

1    discovery, which we provided, --

2                 THE COURT:  Right.

3                 MR. FEINSTEIN:  Again, Mr. Clubok's timeline about

4    the discovery doesn't show all the times that we provided

5    documents, and lots and lots of them, or all the time we spent

6    doing that.  But he -- I think what he's arguing is that, back

7    in 2009 or '10 or whatever, one of those entities had $40

8    million, and where did it go?  And I think what he's I guess

9    implying is that, in addition to the $233 million of

10   transfers, that that $40 million was somehow transferred,

11   right?

12                THE COURT:  Right.

13                MR. FEINSTEIN:  So let's remember that the -- these

14   entities were the subject of eight years of litigation and

15   pulled out a ton of (inaudible) fees.  They had other

16   obligations beside an obligation to UBS.  So, again, this is a

17   fact-specific point, but this is -- this isn't pleaded in

18   their proof of claim.  It's an argument that's now come up in

19   light of the discovery that we provided.  But if we get into

20   it, we're happy to, you know, discuss whether -- these other

21   obligations that the Debtor had and where that money was

22   spent.  But it's -- it's not part of our summary judgment case

23   today.

24                THE COURT:  Okay.  That --

25                MR. FEINSTEIN:  I guess that's what I've been saying.

1           THE COURT:  That's what I'm getting at.  When you

2   argue that I should issue summary judgment that UBS cannot

3   assert any claim against the Debtor except with regard to the

4   $61 million worth of transfers -- in other words, I have to X

5   out the $172 million -- that we're just talking about a

6   summary judgment with regard to the $233 million of transfers?

7   There still may be some theoretical argument -- I say

8   theoretical; I don't know if it's good or bad -- but there

9   still may be an argument that can go to trial on whether Mr.

10  Clubok can assert $45 million worth of damages, separate and

11  apart from those transfers under his breach of good faith and

12  fair dealing argument.

13          MR. FEINSTEIN:  The breach of good faith is probably

14  the only way that this would come in, because, to be clear,

15  there's no fraudulent conveyance claim alleged with respect to

16  that $40 million.

17          THE COURT:  Right.

18          MR. FEINSTEIN:  And as I said before, Your Honor,

19  while we produced documents recently, UBS has known about this

20  for eight years, because this $40 million is referenced in the

21  -- in the expert report that was brought out today.  And as I

22  said, to the extent that the money was spent on legal fees by

23  an entity that was in eight years of litigation with UBS, that

24  should shock no one.

25      But, you know, to the extent that it's relevant at all, it

1    could only be to an implied covenant claim, and in that

2    regard, I just, you know, it hasn't been pled so it's kind of

3    hard to react to something that's that ephemeral.

4            THE COURT:  Okay.  All right.  Ms. Mascherin, any

5    last words from you?

6            MS. MASCHERIN:  Yes.  And Your Honor, I'll confine --

7    I'll confine my remarks now to the issue of the release.

8        With all of the argument that we heard from Mr. Clubok, I

9    didn't hear him address the definition of the word -- of the

10   broad term claims, which is the cornerstone of the releases

11   given to Highland.  And as I walked through the language with

12   Your Honor earlier this morning, claims is defined very

13   broadly, and it expressly includes contractual claims arising

14   from the Knox Agreement and/or raised in the UBS litigation.

15   And as I believe I've shown, Your Honor, that what was

16   explicitly brought within the scope of the release of

17   Highland, the implied duty claim, to the extent that UBS was

18   seeking damages for that claim (inaudible) or other relief

19   arising from the transfer of assets to Crusader or to Credit

20   Strategies.

21       Now, Mr. Clubok argued at some length about the fact that

22   the Crusader Fund and the Credit Strategies Fund got broader

23   releases than Highland got in these settlement agreements.  We

24   don't dispute that.  But we do believe the language is clear

25   that UBS released all claims for damages against Highland that

1  relate to those or arise from those transfers.

2       Highland is free to pursue the other damages relating to

3  the other alleged fraudulent transfers.  And if Highland can

4  prove other damages on its implied duty claim that have

5  nothing to do with Crusader and Credit Strategies, that's

6  fine.  But the $172 million that went to Crusader and Credit

7  Strategies, that was released.

8       Now, Mr. Clubok argues, well, it doesn't make any sense,

9  it's not commercially reasonable to reach that result because

10  the obligation of Highland, as manager of the Crusader and

11  Credit Strategies Fund, how could that possibly apply to --

12  how could the indemnity obligation possibly apply to this

13  contract claim?  Well, Your Honor, Mr. Clubok himself showed

14  you the language of that indemnity agreement, and it provides

15  Highland for indemnification for any actions taken in

16  management of the Crusader and Credit Strategies Fund.  And we

17  heard --

18            MR. CLUBOK:  Your Honor?

19            MS. MASCHERIN:  We heard --

20            MR. CLUBOK:  Your Honor, objection.  Sorry.  I just,

21  I think parol evidence excluded on one side should be excluded

22  on all sides.  I would respond to that parol evidence that was

23  brought up, and that's why I talked about it, because -- so I

24  just would object that if there's going to be parol evidence,

25  that's fine.  If there's not going to be parol evidence for

1    either party, then none of this should be admissible.

2             THE COURT:  Okay.  There's not going to be parol

3    evidence.  So, were you going there, --

4             MS. MASCHERIN:  Oh.

5             THE COURT:  -- Ms. Mascherin?

6             MS. MASCHERIN:  No.  I am going to move on, Your

7    Honor.

8             THE COURT:  Okay.

9             MS. MASCHERIN:  We heard significant lengthy argument

10   and we saw -- and we were regaled with video clips today, the

11   point of which I think was that UBS is attempting to show

12   that, as part of its implied duty claim, because those were

13   shown as part of the 3018 motion, right, which deals with the

14   implied duty claim, to a large extent, that UBS is arguing

15   that that testimony that we all heard today proves up a claim

16   for breach of the implied covenant of good faith and fair

17   dealing.

18        And what was the proof that we saw?  The proof that we saw

19   was Mr. Dondero purported to -- purporting to act on behalf of

20   the Crusader Fund, Mr. Dondero purporting to act on behalf of

21   the Credit Strategies Fund.  Mr. Colvin taking issue with, you

22   know, who was acting on behalf of those Funds.  So it's all

23   centers, Your Honor, upon actions purportedly taken by

24   Highland in the management of the Crusader Funds and the

25   Credit Strategies Funds and the other entities that are --

1  that are -- that received transfers here.  And that conduct is

2  the subject of the release.  It's the reason why the release

3  is commercially reasonable.

4      The Crusader Fund, the Credit Strategies Fund, paid a

5  combined $70.5 million to get complete release of the claims

6  for the damages that totaled $172.4 million.  That was the

7  concept of the agreement.  The language makes it clear that

8  capital C claims, which included the contractual claims, were

9  released to the extent they were for losses arising from those

10 transfers.  That's the $172.4 million.  And that was released.

11 So the implied covenant claim, Your Honor, we submit was

12 released to that extent.

13     Finally, Your Honor, we heard some argument, the point of

14 which I think was perhaps that the Debtor somehow waived the

15 right to argue the effect of the releases in the settlement

16 agreements or didn't raise them in a timely way.  Well, Your

17 Honor, all I can say to that is that the Redeemer Committee

18 and the Crusader Fund did raise this issue in a summary

19 judgment motion which was properly brought before this Court.

20 Section 5.6 of each of the settlement agreements specifically

21 reserves to the Crusader Fund on the one hand and the Credit

22 Strategies Fund on the other hand, quote, the right to

23 petition the appropriate courts to enforce the terms of this

24 agreement, end quote.  And that's what we would ask you to do

25 today.

1       Thank you, Your Honor, for indulging us with such a

2    lengthy argument.

3            THE COURT:  Thank you.

4       All right, Mr. Clubok.  I said I'd give you a short

5    rebuttal because you're the movant under the 3018 motion.  Do

6    you have any rebuttal with regard to 3018 issues?

7            MR. CLUBOK:  I'm going to try super hard to limit it

8    just to that, Your Honor.  If I stray, I'm sure folks will

9    tell me.

10      Your Honor, I tried mightily -- it is the hardest thing,

11   Your Honor, to not jump up when Mr. Feinstein accused me of

12   misrepresented things to you.  That was false.  I try hard not

13   to accuse folks of that, but Mr. Feinstein made three factual

14   misstatements in his argument.  I just pointed those out, so I

15   assume it's because he's -- wasn't on the record, it's not his

16   fault.  I don't appreciate being accused of

17   misrepresentations.

18      I'm just going to say the history of the injunctive

19   proceedings in New York is as follows.  We showed on a factual

20   basis that there was a substantial likelihood of success and

21   we obtained an injunction against -- on the assets that were

22   the subject of the transfers by showing equity infusion and

23   alter ego and other -- other (inaudible) showing.  We went to

24   the trial court and we showed that and we got an injunction.

25   It was extraordinarily rare, the first time ever under the DCL

1    that a debtor (inaudible) New York under a statute that has

2    been used for a pre-judgment injunction in that way.  And the

3    court, after first giving us an injunction, then on

4    reconsideration said, you know what, this *Credit Agricole* as a

5    matter of law may prohibit me from doing this.  So I -- she

6    gave us a TRO.  Then she said, I can't decide the preliminary

7    injunction (inaudible) *Credit Agricole*.  But I'll tell you

8    what, I'm going to delay this opinion so you have enough time

9    to go to the appellate court.  And she basically said, I sure

10   hope the law lets you.  You know, effectively, she said, Let's

11   see if the law allows this to happen; I just don't think I'm

12   allowed to.

13       We went to the appellate court and we got that injunction.

14   And for the first time in a hundred years under the DCL,

15   because the evidence was so bad against Highland, we got a

16   pre-judgment injunction in a DCL under these circumstances.

17   It was the only time.  It was unclear if it could happen,

18   could happen that way.  That's -- Ms. Mascherin knows this

19   well, because we froze the assets that had been the subject of

20   the fraudulent transfers in Crusader and Credit Strat.  And we

21   got an injunction.

22       So that case that he showed you is (inaudible) distorted.

23   I'm not accusing Mr. Feinstein of intentionally

24   misrepresenting to you.  He wouldn't know all this because he

25   wasn't the lawyer then.  But just so you know, that's where we

1   ended.  We ended with the Appellate Division issuing an

2   injunction for the first time as far as we knew, there was no

3   precedent, couldn't cite a case where it had ever been done

4   before in those circumstances, and it was because the facts

5   were so egregious.

6       So that's the case that we are finally going to try one

7   day -- now, it seems, in front of you -- and that's the claim

8   that in their papers in the 3018 they say, well, if you're

9   going to give a hundred percent relief to Ms. Mascherin and

10  you're going to say that this language does preclude our, you

11  know, implied duty claims against Highland because they relate

12  to the (inaudible), what Mr. Feinstein said in his papers is,

13  well, you still have roughly, you know, $119 million left that

14  we agree are not even the subject of the summary judgment

15  motion.  And so for purposes of 3018, they start at the $119

16  million.

17      Now, they don't into account the other $45 million that is

18  subject to our implied duty claim that is still live.  It has

19  not been -- there's no -- been no summary judgment against it.

20  They don't take into account the extra I think it's $20

21  million or so.  I can get you the exact document.  So there's

22  another -- there's more to our implied duty claim.  Ms.

23  McLaughlin is hustling to put it up on the screen, and she may

24  get it there.  And so we have documents in the record.  This

25  is for 3018, not for summary judgment, but for 3018.  You can

1    see she's put up Exhibit 25.  That's the nearly $45 million I

2    believe -- yeah, that's -- that's money that was available as

3    of March 16th, 2009.  It's in the minutes of the board of

4    directors, March 16, 2009.  So that was available then, okay?

5    And we know that there was -- if you go to the next slide, I

6    believe another $20 million or so, roughly.

7        Oh, well, so let me -- let me just stop here.  This is

8    fine.  There's another slide that shows there was something

9    like $20 million in the CDO Fund, of which we understand

10   there's now roughly $10 million left.  That does go to our

11   implied duty claim.  We never said it was a fraud -- there's

12   not a fraudulent transfer claim related to that.  It's a

13   breach of the implied duty.  And here is why.  This is what

14   I'm going to end with.  This is our 3018 motion.  This

15   summarizes it in a nutshell.

16       Mr. Travers was the CEO of HFP.  We asked him in his

17   deposition, we've got it up on the screen, 4 3 12, Lines 8

18   through 15.  Fair to say that as of the end of the year 2008

19   Highland Financial Partners and CDO Fund collectively owed UBS

20   hundreds of millions of dollars in connection with the Knox

21   Warehouse Agreement?  Answer, I think that's the case.  The

22   fact that they owed us hundreds of millions and the fact that

23   they still had hundreds of millions in February of 2009 before

24   they engaged in that actual -- well, we've certainly turned up

25   evidence at the summary judgment stage, so the inferences can

1   be drawn, there was actual fraud in March of 2009.  That is

2   the -- and they had another $45 million in HFP and maybe they

3   had another $20 million in CDO, although we haven't still

4   gotten the documents so we don't know if it was even more,

5   that all is a breach of implied duty of good faith and fair

6   dealing that is very much alive, has survived summary

7   judgment, trips to the appellate court in New York.  And in

8   addition to the $119 million, this is even if you subtract the

9   amounts that Crusader tells you were erased in the

10  settlements, but you add for the $119 million plus $45 million

11  plus $20 million, you know, and those then are doubled for

12  pre-judgment interest.  So you're left with a claim that's

13  still roughly, doing the math, $250 million.  Okay?  And, you

14  know, you -- to say to -- what they would have you say is,

15  well, forget the $45 million, forget the $20 million, zero

16  value for that in 3018.  Now we're in 3018.  You've got the

17  $120 million.  And even though you, yes, indeed, got an

18  injunction under incredibly different legal circumstances and

19  unprecedented relief from the Appellate Division in New York,

20  you know, that your claim is so weak that you also have a 30

21  percent chance of success, so we just want to arbitrarily

22  deduct, you know, a hundred percent.  That's obviously not the

23  way you handled Mr. Daugherty's claim.  You lopped off certain

24  things and you said, really, you know, the claims are for the

25  rest of it, that total amount of money was colorable.  That's

1 the standard under 3018.  Our claim is more than colorable.

2      Long ago, Mr. Travers acknowledged that we owed hundreds

3 of millions of dollars -- from CDO and SOHC, not through HCM

4 -- but the person who controlled HCM caused them not to pay

5 us, in breach of implied covenant.

6      I understand that Mr. Feinstein doesn't like that we get

7 to pursue that claim, but the New York Courts of Appeals have

8 said we do, and we should be able to go to trial and seek that

9 roughly $250 million, even if our claims for implied duty are

10 found to be released from that release, notwithstanding

11 (inaudible).

12      I appreciate Your Honor's indulgence in allowing me to

13 finish that.

14           THE COURT:  One last question.  You were mentioning

15 --

16           MR. CLUBOK:  Yes.

17           THE COURT:  -- $45 million and $20 million.  Did you

18 mean $10 million?  What is the $20 million?

19           MR. CLUBOK:  I'm sorry, Your Honor.  Maybe Ms.

20 McLaughlin can put it up here.  It was -- she's got it here.

21 It was $23 million as of December 31st, 2009 in CDO Fund.  So

22 we -- we don't know how much they had.  This is where -- this

23 is where they kept the documents from us.  We don't know how

24 much was there in February of 2009, but we certainly know

25 that, as of December of 2009, they had $23 million.  And we've

1  been begging them to pay it back forever.  We know they owe us

2  $500 million.  You just saw Tom Travers -- they admitted

3  internally.  You saw a document earlier that said, Let's --

4  we know we owe it to them, but let's delay it.  Let's drag it

5  out.  Let's, you know, make them pay for it.

6      That $23 million has now dwindled apparently to such that

7  it's only about $10 million, I'm told.  There's an asset

8  that's still remaining today that's roughly $10 million.  And

9  even today, they won't cause CDO Fund, who they control

10 completely, to just turn that over to us.  They want to hold

11 that up.

12     This is all a breach of implied duty of good faith and

13 fair dealing against HCM, and that's part of what's remained

14 in our claim.

15         THE COURT:  All right.  Thank you.  All right.

16         MR. FEINSTEIN:  Your Honor, I'm going to press my

17 luck and ask you if I just can make one very, very brief

18 statement.

19         MR. CLUBOK:  I object to that --

20         THE COURT:  Yes.  I --

21         MR. CLUBOK:  -- because I did not respond in any way

22 --

23         THE COURT:  I'm really -- I'm done.

24         MR. FEINSTEIN:  Okay.

25         THE COURT:  I'm going to come back at 3:30 and give

1  you some rulings.  So, that's -- it's 3:04 Central Time.

2  Anyway, I hope I'm not interfering with anyone's family or

3  religious plans.  If I get out to you in the next 30 minutes,

4  hopefully you'll be good.  All right.  So I'll be back at

5  3:30.  That's 4:30 Eastern.

6          THE CLERK:  All rise.

7      (A recess ensued from 3:04 p.m. to 3:44 p.m.)

8          THE COURT:  All right.  Please be seated.  This is

9  Judge Jernigan.  I made you wait a little longer than I

10  predicted, but these are obviously not easy issues.

11      All right.  I am first going to give you my ruling on the

12  two motions for partial summary judgment on UBS Proofs of

13  Claim 190 and 191.

14      First, I'm going to dispense, given the late hour, with

15  the legal announcing of the Rule 56 summary judgment

16  standards.  We all know them very well.  They were briefed

17  very well.  I certainly reserve the right to supplement this

18  bench ruling with a more fulsome written order and judgment

19  that includes such things as the Rule 56 standards.

20      Anyway, getting to the heart of my ruling, I am going to

21  grant both the Debtor's and the Redeemer Committee's, or I

22  should say Crusader Fund's, motions for partial summary

23  judgment as follows.  This is obviously a multi-part ruling.

24      First, number one, and I think UBS has very clearly

25  conceded this, but I grant summary judgment that UBS is barred

1  by res judicata and the rulings of the New York courts from

2  asserting any claim against Highland that arose before March

3  -- excuse me, February 24th, 2009, okay, the date that UBS

4  filed its first lawsuit in New York regarding this whole

5  matter.

6      There's no ambiguity at all in the New York court's

7  rulings in this regard, and the rulings of the New York court

8  are binding here.

9      So, summary judgment granted that UBS is barred by res

10  judicata from asserting any claim against Highland that arose

11  before February 24th, 2009.

12      Second, I grant summary judgment that UBS is barred by the

13  2015 settlement agreement and the releases given therein to

14  Highland and the Crusader Funds and Credit Strategies from

15  asserting any claims against Highland that pertain in any way

16  to the March 2009 transfers that were made to the two Crusader

17  Funds and to Highland Credit Strategies Master Fund in the

18  aggregate amount of approximately -- not approximately -- it

19  was exactly $172,411,785.

20      The release language as to Highland -- and obviously I'm

21  focusing on Section 5.2 and 5.3 of those 2015 settlement

22  agreements -- the release language as to Highland and the

23  Crusader Funds and Credit Strategies was unambiguous in this

24  Court's view, and it would be absurd, in this Court's view, to

25  interpret the release given to Highland as releasing

1   fraudulent transfer claims as to this $172 million of

2   transfers to Crusader and Credit Strategies but not releasing

3   other theories of liability relating to those $172 million of

4   transfers, such as under a theory that the transfers amounted

5   to Highland breaching an implied covenant of good faith and

6   fair dealing or some other theory.

7        It would be absurd because UBS would not even have a

8   theory to call these transfers fraudulent transfers as to

9   Highland per se, since Highland was not a transferee, directly

10  or indirectly, on them.  So UBS had to be releasing other

11  claims and theories based on these transfers -- namely, the

12  only potential viable theory that UBS had asserted against

13  Highland at that time relating to these transfers, *i.e.*, the

14  breach of fair dealing and good faith claim.

15       It would further be absurd, in this Court's view, to think

16  that the Crusader Funds and Credit Strategies paid $70.5

17  million to UBS to settle these claims, with a risk that

18  Highland could later be sued on the very same transfers and

19  potentially come back and seek indemnity against the Crusader

20  Funds and Credit Strategies.

21       But most importantly, I emphasize, I think the clear

22  language used in the 2015 settlement agreements supports

23  summary judgment here without even going down the logic trails

24  or absurdity trails.

25       Next, I rule that UBS is barred from asserting alter ego

1    theories of liability against Highland, *i.e.*, that Highland

2    should have liability to UBS based on alter ego theories for

3    the liabilities of CDO Fund, SOHC, and HFP, because the theory

4    was not asserted in its proof of claim, its two proofs of

5    claim.  And I do not believe the mere broad reservation of

6    rights within those proofs of claim allowing UBS to assert any

7    number of things past the bar date, any number of things,

8    including alter ego, would preserve an alter ego theory of

9    liability past the bar date.

10        In this Court's determination, the alter ego theory of

11   liability against Highland in this context would clearly be a

12   claim as broadly defined in Section 101 of the Bankruptcy

13   Code, regardless of any New York state law jurisprudence that

14   talks of it being not a claim but instead a remedy or some

15   other kind of theory of liability.  It makes all the

16   difference when you get into the world of bankruptcy because

17   of the broad, broad, broad definition of claim in Section 101

18   of the Bankruptcy Code.

19        So these are my only rulings on the motions for partial

20   summary judgment.

21        I do not interpret the Debtor's motion -- or either

22   motion, for that matter -- to be asking the Court to rule as a

23   matter of law that UBS is precluded from asserting any damages

24   beyond the $61 million of transfers made in March 2009 to

25   Highland, Multi-Strat, and Citibank, and Highland, for

1   example, precluding damages relating to the $45 million that

2   HFP had in March 2009 or the $20-plus million that the CDO

3   Fund had in December 2009.

4        So I think that's the answer I got from Mr. Feinstein at

5   the end of oral argument.  But even if the Debtor was making

6   the request that the Court rule that, as a matter of law, UBS

7   cannot assert any claim against the Debtor except the claims

8   relating to the $61 million of transfers, I think that UBS has

9   shown, has put summary judgment evidence in the record that

10  there may be a fact issue here with regard to these funds.

11  They may be able to prove, have a potential theory here that

12  Highland breached the covenant of good faith and fair dealing

13  by somehow exercising control over the CDO Fund and HFP and

14  causing them to dissipate those assets and not pay them to

15  UBS.  There might be a theory there.

16       So I hope that is clear, that I'm not granting summary

17  judgment declaring that UBS is barred from asserting something

18  more than the $61 million of March 2009 transfers.

19       So that is my ruling on the motions for partial summary

20  judgment.  I'll turn now to the UBS Rule 3018(a) estimation

21  motion.  Once again, given the late hour, I'm going to

22  dispense with the flowery legal standards that apply to this

23  motion.  I reserve the right in my order to supplement with

24  more fulsome statements.

25       But I have decided that I should estimate UBS's claim for

1    voting purposes at the following number:  $94,761,076.  Okay.

2    So here is my math for how I get there.  Let's start with the

3    three transfers in March 2009 that have been alleged to be

4    fraudulent transfers or, you know, Highland caused to be made

5    in breach of its duty of good faith and fair dealing.  And I'm

6    talking about, obviously, the Multi-Strat entities, you know,

7    the $25,782,988 that HFP transferred in March 2009, then there

8    was $17,778,566 transferred to the Debtor, and then Citibank

9    received $17,481,808.

10        So, as we've talked about, we've talked about $61,043,362.

11   Okay.  So, obviously, I've ruled summary judgment that

12   Crusader -- transfers to Crusader and the transfer to Credit

13   Strategies are gone.  They're off the table.  So, but focusing

14   in on that $61 million, I start with the $25-plus million to

15   Multi-Strat.  I am estimating a high chance of UBS winning on

16   that, a 90-percent chance.  So, 90 percent of $25,783,300 --

17   what is the number?  $25 million.  I may have done my math

18   wrong.  I've computed it equals $23,205,008, but I think I --

19   no, no, no, no.  No, no, no.  Let me back up.  Just a minute.

20   Hang on.  (Pause.)  All right.  I think what I meant to do is

21   calculate 90 percent of $25,782,988, and my math may be wrong.

22   I've got that equals $23,205,008, but I feel like I did

23   something wrong there.  Someone can double-check my math

24   there.  Can someone -- I've left my calculator back in

25   chambers.  What's 90 percent of $25,783,343?  Hello.  You've

 1 | got a calculator over there?

 2 |            THE CLERK:  Yeah.  What was the number?

 3 |            THE COURT:  Okay.

 4 |            THE CLERK:  You said $25,783,4 --

 5 |            THE COURT:  No, no, no.  I'm sorry.  That's where I

 6 | went wrong, I think.  The number is should have -- not --

 7 | that's where I went wrong.  I should have been using

 8 | $25,782,988.  And I have no idea where I got that $25,783,000

 9 | number.  So, 90 percent of $25,782,988.

10 |            MR. FEINSTEIN:  My calculator says that $23.2

11 | million, Your Honor.

12 |            THE COURT:  Okay.  Well, I guess I was right.  Okay.

13 |            MR. FEINSTEIN:  You were right.

14 |            THE COURT:  Okay.  So I'm putting a 90 percent chance

15 | of winning on that, so $23.2 million.

16 |      And then on the transfer to the Debtor, I'm using the

17 | expert report, if you will, of I think his name is Mr. Dudney,

18 | UBS's own expert, where he used $8 million.  He said you

19 | should adjust that number to $8 million, if I was

20 | understanding correctly, because of HFP, the transferor,

21 | having some percentage ownership in that.  So if I use $8

22 | million, that gets us up to $31.2 million.

23 |      Then, with regard to Citibank, the transfer to Citibank of

24 | $17,481,808, I'm giving a 20 percent chance of success on that

25 | one.  I just, again, feel in my gut, you know, in my

1    discretion, looking at the summary judgment evidence, I just

2    feel in my gut there's going to be defenses to that.  So, 20

3    percent of that would be $3,555,713.

4         So that gets us up to roughly 31 -- excuse me, $34.76

5    million.  So, if you assume interest, pre-judgment interest, I

6    used $30 million there.  Again, that's imprecise.  But that

7    gets us up to $64.76 million.

8         Then what I did beyond that is, with regard to the summary

9    judgment evidence thrown out that maybe there was 40 -- $45

10   million on hand at HFP in March of 2009 -- I think we're

11   talking about UBS Exhibit 25 -- and then another $23 million

12   may have been on hand at the CDO Fund, at least in December

13   2009, that's about $68 million.  And I am just assuming that

14   there might be a credible argument made as to $10 million of

15   that.  And then I'll add $10 million of interest for all of

16   these years, of pre-judgment interest.

17        And then I've plugged in another $10 million for

18   attorneys' fees, because I believe there is the ability to get

19   attorneys' fees for actual fraudulent transfers.  And I'm

20   assuming that some of these, the ones to Highland and Multi-

21   Strat, there might be credible arguments of actual fraudulent

22   transfers.  And then I have been told, I think, by Mr. Clubok

23   that you might even get attorneys' fees for breach of covenant

24   of good faith and fair dealing.

25        So, $64.761 million plus $10 million plus another $10

1    million plus $10 million is $94.761 million.

2        Any questions?  I know that was probably hard to follow,

3    but any questions about that estimation?

4            MR. CLUBOK:  Your Honor, the only question, and maybe

5    it's too late and that's fine, I understand your analysis, but

6    the calculation of the amount that was transferred to

7    Highland, I think even Highland had agreed in their -- that

8    the number is higher.  I think that's out of context, and if

9    that's -- if there's no chance for us to clear that up, I

10   understand.  You've made your decision.  But I do want to say

11   that I think even Highland would agree that they received more

12   than $8 million.  The footnote from (inaudible) is a little

13   bit out of context, and, you know, there was -- if you look at

14   Highland's papers in terms of their response on 3018, I think

15   they have accepted our 17, roughly $17 million number.  I

16   think that is a -- it's complicated.  But anyway, I just raise

17   that, and maybe because you've done all this math, that won't

18   affect your view, Your Honor.  Totally understand that.  But I

19   do want to say that I think that Highland even acknowledges

20   that the amount received was $17 million.  That was

21   (inaudible) by Redeemer.  I think it's misunderstood.  You

22   know, our -- a footnote from our expert report that takes the

23   full expert report out of context.

24           THE COURT:  Well, that's going to be my ruling.  And,

25   again, you know, estimation --

1          MR. CLUBOK:  Understood.

2          THE COURT:  -- is just that.  It's imprecise.  And I

3    may have cut you some slack in other areas where I'm sure

4    Highland and the Crusader Fund would vehemently contest what I

5    did.  You know, the 90-percent chance of winning I gave you on

6    Multi-Strat, you know, they said it should be a much lower

7    number, 30 percent or whatever.

8        So that is going to be the ruling.

9        Okay.  Here is what I would like to do.  I'm going to push

10   off work, is what I'm going to do.  I know that on the motions

11   for partial summary judgment Highland submitted a proposed

12   form of order that was pretty short and to the point.  I can't

13   remember seeing one for Redeemer.

14       Bankruptcy Rule 7056, Rule 56, they don't require,

15   obviously, findings of facts and conclusions of law.  They

16   just require some reasoning to support the Court's ruling.  So

17   I feel like I need something more fulsome than what was

18   uploaded by the Debtor, but it doesn't have to be extremely

19   beyond what the Court ruled.  I would, though, ask -- you

20   know, I don't know if a combined order granting both motions

21   with -- you all talk offline, Mr. Feinstein and Ms. Mascherin,

22   whether you want separate orders and judgments or you feel

23   like a combined one suffices.

24          MS. MASCHERIN:  Your Honor, I can say with respect to

25   the motions for summary judgment I think they could be dealt

1   with in a combined order, if that's your question.

2            THE COURT:  Okay.  I mean, I feel fine with that, but

3   I wanted you all to certainly talk, and if you had any

4   different feelings, I wouldn't mind the mechanic of two

5   different ones.

6        But I would like you all to put a little bit of the law

7   in, you know, the Rule 56 standards, and maybe some of the res

8   judicata law and a few of the cases that you argued that I --

9   I'm not going to give you a list of them, but I'm giving you

10  some discretion to add some of the law from your briefing, and

11  then I'll be the ultimate editor whether I think you said

12  either too much or not enough.

13       So I would ask, you've got plenty -- I'm not going to ask

14  you to get it done over the weekend.  I will say maybe by the

15  Monday after Thanksgiving or the week after Thanksgiving, if

16  you could send the form of order and judgment to my courtroom

17  deputy, Traci, in a Word document so that I can edit it if

18  there's anything I feel needs to be edited.  So, any questions

19  about that?

20           MR. FEINSTEIN:  Your Honor, I agree with Ms.

21  Mascherin that a single order that dispenses with both summary

22  judgment motions make sense, and we're happy to take a first

23  crack at drafting that.

24           THE COURT:  Okay.  All right.  Again, well, I'm just

25  going to say the week after Thanksgiving.  And certainly if

1  you run into some sort of problem, just contact my courtroom

2  deputy and say it's going to be a few days behind.  I'm not

3  terribly worried about getting it done by X date.

4      On the other hand, on the 3018 order, Mr. Clubok, I'm

5  going to ask you to be the scrivener on that.  Do you have any

6  questions for me on that?

7          MR. CLUBOK:  No, Your Honor.  I will -- I believe

8  we'll be able to -- I think we took careful notes, so we will

9  work on that.

10          THE COURT:  All right.  That one, I would say you can

11  just upload when it's done.  I don't -- I doubt I'm going to

12  want to edit that.  I would think that could be pretty short.

13  All right.  Well, is there any --

14          MR. CLUBOK:  And when would you like that by, Your

15  Honor?

16          THE COURT:  Well, I think certainly the same time

17  frame, the week after Thanksgiving, would be fine.

18          MR. CLUBOK:  Of course.

19          THE COURT:  You know you're not going to -- the

20  Debtor's not going to be tabulating votes any earlier than

21  that, so I think that's fine.

22          MR. CLUBOK:  Okay.  That sounds good.

23          THE COURT:  Anything else?  It has been a very long

24  day, and --

25          MR. POMERANTZ:  Your Honor, it's Jeff Pomerantz.  I

1    just thought I'd give you a little further heads up on the

2    disclosure statement hearing so you can, I guess, maybe be

3    happy and plan your weekend accordingly.  So we will be filing

4    another amended plan and disclosure statement that will

5    include changes from our discussions with UBS, our discussions

6    with HarbourVest, our discussions with the Committee, and a

7    couple of suggestions from Patrick Daugherty's counsel.  We

8    think that the only real objection that will be outstanding is

9    an objection filed by Mr. Daugherty that raises no more than a

10   handful of issues, I think several of which were dealt with

11   before.

12       So we intend to have the documents uploaded within the

13   next couple of hours, so I imagine Your Honor is going to turn

14   to it at some point, but I just wanted to give Your Honor both

15   a heads up and also just maybe a feeling of relief that it

16   shouldn't be that long a weekend.

17            THE COURT:  Okay.  Well, my Longhorns aren't playing

18   because the other team had players with COVID, so that frees

19   up three hours, unfortunately.

20            MR. POMERANTZ:  There's always a silver lining.

21            THE COURT:  All right.  Well, thank you.  I will see

22   you all on Monday.

23            MR. FEINSTEIN:  Thank you, Your Honor.

24            MR. CLUBOK:  Thank you, Your Honor.

25            THE CLERK:  All rise.

1      (Proceedings concluded at 4:12 p.m.)

2                          --oOo--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                        CERTIFICATE

19      I certify that the foregoing is a correct transcript to
the best of my ability from the electronic sound recording of
20  the proceedings in the above-entitled matter.

21   **/s/ Kathy Rehling**                          **11/25/2020**

22  _____      _____

    Kathy Rehling, CETD-444                              Date
23  Certified Electronic Court Transcriber

24

25

223

INDEX

1

2   PROCEEDINGS                                                                3

3   WITNESSES

4   -none-

5   EXHIBITS

6   -none-

7   RULINGS

8   Debtor's Motion for Partial Summary Judgment on Proof of    209
    Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG,
9   London Branch (1214)

10  Redeemer Committee of the Highland Crusader Fund and the    209
    Crusader Funds' Motion for Partial Summary Judgment and
11  Joinder in Debtor's Motion for Partial Summary Judgment
    on Proof of Claim(s) 190 and 191 of UBS AG, London Branch
12  and UBS Securities LLC (1215, 1216)

13  UBS's Motion for Temporary Allowance of Claims for Voting   213
    Purposes Pursuant to Rule 3018 (1338)
14
    END OF PROCEEDINGS                                          222
15
    INDEX                                                       223
16

17

18

19

20

21

22

23

24

25